Mark R. Somerstein
Gregg L. Weiner
**ROPES & GRAY LLP**
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
Email: mark.somerstein@ropesgray.com
       gregg.weiner@ropesgray.com

*Counsel to PPF OFF Two Park Avenue Owner, LLC*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| ARTISANAL FROMAGERIE & BISTRO LLC, | ) | Case No. 16-12337 (JLG) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

**DECLARATION OF GREGG L. WEINER IN SUPPORT OF PPF OFF TWO PARK
AVENUE OWNER, LLC TO DISMISS THE CHAPTER 11 CASE OR,
ALTERNATIVELY, FOR RELIEF FROM THE AUTOMATIC STAY TO THE
EXTENT APPLICABLE TO PERMIT LESSOR TO OBTAIN POSSESSION OF
PREMISES SUBJECT TO EXPIRED AND TERMINATED
<u>NONRESIDENTIAL REAL PROPERTY LEASE</u>**

Pursuant to 28 U.S.C. § 1746, Gregg L. Weiner declares as follows:

1.    I am a partner at the law firm Ropes & Gray LLP, counsel to PPF OFF

Two Park Avenue Owner, LLC ("<u>Two Park</u>"), a creditor in the above-captioned chapter 11 case.

2.    I submit this declaration in support of Two Park's Motion to Dismiss the

Chapter 11 Case or, Alternatively, for Relief from the Automatic Stay to the Extent Applicable

to Permit Lessor to Obtain Possession of Premises Subject to Expired and Terminated

Nonresidential Real Property Lease, dated August 23, 2016.

3. My firm represents Two Park in connection with the summary holdover proceeding captioned *PPF Off Two Park Avenue Owner, LLC v. Artisanal Fromagerie & Bistro*, L&T Index No. 50707/2016 (the "Holdover Proceeding"), currently pending in the Civil Court of the City of New York, County of New York: Non-Housing Part 52 (the "Civil Court").

4. I was personally involved in: (i) responding to the motion to dismiss the Holdover Proceeding filed by Artisanal Fromagerie & Bistro, LLC (the "Debtor") on February 19, 2016 (the "Motion to Dismiss"); and (ii) Two Park's Cross-Motion for Entry of an Order of Summary Judgment Awarding Two Park Possession and Use and Occupancy Pursuant to CPLR § 409(b) and RPAPL § 745, and Issuance of a Warrant of Eviction Pursuant to RPAPL § 749 (the "Summary Judgment Motion").

5. Attached as Exhibit A is a true and correct copy of the lease dated September 8, 2000 between Two Park's predecessor-in-interest and the Debtor, along with its two amendments (together, the "Lease"), as attached as Exhibit A to the Affidavit of Maria Blake in Opposition to the Motion to Dismiss and in Support of the Summary Judgment Motion, dated April 4, 2016, which was filed in the Civil Court on April 5, 2016 (the "Blake Aff.").

6. Attached as Exhibit B is a true and correct copy of the Reply Affidavit of Maria Blake in Further Support of the Summary Judgment Motion, dated May 2, 2016, including exhibits thereto, which was filed in the Civil Court on May 3, 2016.

7. Attached as Exhibit C is a true and correct copy of a written notice from Two Park to the Debtor, dated February 11, 2015, as attached as Exhibit C to the Blake Aff.

8. Attached as Exhibit D is a true and correct copy of the Affirmation of Jonathan A. Grippo in Opposition to the Motion to Dismiss and in Support of the Summary Judgment Motion, dated April 4, 2016, which was filed in the Civil Court on April 5, 2016.

9.    Attached as Exhibit E is a true and correct copy of Two Park's Memorandum of Law in Opposition to the Motion to Dismiss and in Support of the Summary Judgment Motion, dated April 4, 2016, which was filed in the Civil Court on April 5, 2016.

10.    Attached as Exhibit F is a true and correct copy of the Civil Court's Decision & Order, dated August 10, 2016.

11.    Attached as Exhibit G is a true and correct copy of a letter from Jeffrey L. Goldman to John Z. Wang, dated August 15, 2016.

12.    Attached as Exhibit H is a true and correct copy of a letter from me to John Z. Wang, dated August 16, 2016.

13.    Attached as Exhibit I is a true and correct copy of a letter from Jeffrey L. Goldman to John Z. Wang, dated August 16, 2016.

14.    Attached as Exhibit J is a true and correct copy of a letter from me to John Wang, dated August 17, 2016.

Dated: August 23, 2016
    New York, New York

Gregg L. Weiner

# <u>Exhibit A</u>

September 11, 2000

**VIA HAND DELIVERY**

Mr. Larry Forgione
An American Place, LLC

Mr. Terrance Brennan
Artisinal, Fromagerie & Bistro, LLC

RE:    **ARTISINAL, FROMAGERIE & BISTRO, LLC**
          **AN AMERICAN PLACE, LLC**
          **TWO PARK AVENUE – PT. BASEMENT, MEZZANINE & GRND FLR**
          <u>**LEASE AGREEMENT/SURRENDER AGREEMENT**</u>

Dear Gentlemen:

      Enclosed please find one (1) fully executed counterpart of the above referenced agreement.

      Please acknowledge receipt by signing and returning this letter to my office. A self-addressed stamped envelope is enclosed for your convenience.

                            Very truly yours,

**ACKNOWLEDGED AND RECEIVED:**

      *Agreements were taken at closing.*
**BY:**_____

cc:   Bob Burns
      Lynn Rose
      David Perl
      Kammie M. Gormezano, Esq.

DEG:ja
Encls.

# AGREEMENT OF LEASE

between

## TWO PARK COMPANY

Landlord

and

## ARTISANAL, FROMAGERIE & BISTRO, LLC

Tenant

Portions of the basement, mezzanine and ground floors
Two Park Avenue
New York, New York

Proskauer Rose LLP
1585 Broadway
New York, New York 10036

# TABLE OF CONTENTS

DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARTICLE 1    DEMISE, PREMISES, TERM, RENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE 2    USE AND OCCUPANCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARTICLE 3    ALTERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARTICLE 4    REPAIRS-FLOOR LOAD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARTICLE 5    WINDOW CLEANING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARTICLE 6    REQUIREMENTS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARTICLE 7    SUBORDINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

ARTICLE 8    RULES AND REGULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

ARTICLE 9    INSURANCE, PROPERTY LOSS OR DAMAGE; REIMBURSEMENT . . . . 24

ARTICLE 10   DESTRUCTION-FIRE OR OTHER CAUSE . . . . . . . . . . . . . . . . . . . . . . . . 27

ARTICLE 11   EMINENT DOMAIN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ARTICLE 12   ASSIGNMENT, SUBLETTING, MORTGAGE, ETC. . . . . . . . . . . . . . . . . . 31

ARTICLE 13   ELECTRICITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

ARTICLE 14   ACCESS TO PREMISES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

ARTICLE 15   CERTIFICATE OF OCCUPANCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

ARTICLE 16   DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

ARTICLE 17   REMEDIES AND DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

ARTICLE 18   LANDLORD FEES AND EXPENSES . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

ARTICLE 19   NO REPRESENTATIONS BY LANDLORD . . . . . . . . . . . . . . . . . . . . . . . 53

ARTICLE 20   END OF TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

ARTICLE 21   QUIET ENJOYMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

ARTICLE 22 FAILURE TO GIVE POSSESSION ................................... 54

ARTICLE 23 NO WAIVER ..................................................... 55

ARTICLE 24 WAIVER OF TRIAL BY JURY ..................................... 56

ARTICLE 25 INABILITY TO PERFORM ........................................ 56

ARTICLE 26 BILLS AND NOTICES ............................................ 56

ARTICLE 27 ESCALATION ................................................... 57

ARTICLE 28 SERVICES ..................................................... 64

ARTICLE 29 PARTNERSHIP TENANT .......................................... 65

ARTICLE 30 VAULT SPACE .................................................. 66

ARTICLE 31 SECURITY ..................................................... 66

ARTICLE 32 CAPTIONS ..................................................... 68

ARTICLE 33 PARTIES BOUND ................................................ 68

ARTICLE 34 BROKER ....................................................... 68

ARTICLE 35 INDEMNITY .................................................... 69

ARTICLE 36 ADJACENT EXCAVATION-SHORING ............................... 69

ARTICLE 37 MISCELLANEOUS ............................................... 70

ARTICLE 38 RENT CONTROL ................................................ 72

ARTICLE 39 TENANT'S SIGNS ............................................... 73

ARTICLE 40 CONTINUOUS OPERATION ...................................... 73

ARTICLE 41 OPERATING COVENANTS ....................................... 75

| Schedule A | - Rules and Regulations |
|---|---|
| EXHIBIT "A" - | - Floor Plan of the Premises |
| EXHIBIT "B" | - List of Contractors Approved in Connection with the Initial Alterations |
| EXHIBIT "C" | - Tenant's Projected Start-Up and Capital Expenditures |

AGREEMENT OF LEASE, made as of the $\mathcal{B}^{\underline{th}}$ day of September, 2000, between Landlord and Tenant.

## WITNESSETH:

The parties hereto, for themselves, their legal representatives, successors and assigns, hereby covenant as follows.

## DEFINITIONS

"Affiliate" shall mean a Person which shall (1) Control, (2) be under the Control of, or (3) be under common Control with the Person in question.

"Alteration Fee" shall have the meaning set forth in Section 3.2 hereof.

"Alterations" shall mean alterations, installations, improvements, additions or other physical changes (other than decorations) in or about the Premises.

"American" shall have the meaning set forth in Section 12.9(A) hereof.

"American Fixture Costs" shall have the meaning set forth in Section 12.9(A) hereof.

"Annual Statement" shall have the meaning set forth in Section 27.6 hereof.

"Applicable Rate" shall mean the lesser of (x) two (2) percentage points above the then current Base Rate, and (y) the maximum rate permitted by applicable law.

"Assessed Valuation" shall have the meaning set forth in Section 27.1 hereof.

"Assignment Criteria" shall have the meaning set forth in Section 12.8(A) hereof.

"Assignment Proceeds" shall have the meaning set forth in Section 12.9(B) hereof.

"Assignment Statement" shall have the meaning set forth in Section 12.8(C) hereof.

"Assignment Rent" shall have the meaning set forth in Section 12.8(E) hereof.

"Assignment Termination" shall have the meaning set forth in Section 12.8(C) hereof.

"Bankruptcy Code" shall mean 11 U.S.C. Section 101 et seq., or any statute of similar nature and purpose.

"Base Rate" shall mean the rate of interest publicly announced from time to time by The Chase Manhattan Bank, N.A., or its successor, as its "prime lending rate" (or such other term as may be used by The Chase Manhattan Bank, N.A., from time to time, for the rate presently referred to as its "prime lending rate"), which rate was 9.00% on May 16, 2000.

"Base Taxes" shall have the meaning set forth in Section 27.1 hereof.

"Brennan" shall have the meaning set forth in Section 42.3 hereof.

"Broker" shall have the meaning set forth in Article 34 hereof.

"Building" shall mean all the buildings, equipment and other improvements and appurtenances of every kind and description now located or hereafter erected, constructed or placed upon the land and any and all alterations, and replacements thereof, additions thereto and substitutions therefor, known by the address of Two Park Avenue, New York, New York.

"Building Systems" shall mean the curtain wall or the mechanical, gas, electrical, sanitary, heating, air conditioning, ventilating, elevator, plumbing, life-safety and other service systems of the Building.

"Business Days" shall mean all days, excluding Saturdays, Sundays and all days observed by either the State of New York or the Federal Government and by the labor unions servicing the Building as legal holidays.

"Commencement Date" shall have the meaning set forth in Section 1.1 hereof.

"Control" or "control" shall mean the direct or indirect ownership of more than fifty percent (50%) of the outstanding voting stock of a corporation or other majority equity and control interest if not a corporation and the possession of power, directly or indirectly, to direct or cause the direction of the management and policy of such corporation or other entity, whether through the ownership of voting securities, by statute or according to the provisions of a contract.

"Deficiency" shall have the meaning set forth in Section 17.2 hereof.

"Electricity Additional Rent" shall have the meaning set forth in Section 13.2 hereof.

"Electricity Fee" shall have the meaning set forth in Section 13.3 hereof.

"Electricity Inclusion Charge" shall have the meaning set forth in Section 13.3 hereof.

"Escalation Rent" shall mean, individually or collectively, the Tax Payment and the Percentage Rent.

"Escrow Agent" shall have the meaning set forth in Section 12.8(A) hereof.

"Escrow Agreement" shall have the meaning set forth in Section 12.8(A) hereof.

"Existing Tenant" shall have the meaning set forth in Section 22.2 hereof.

"Event of Default" shall have the meaning set forth in Section 16.1 hereof.

"Expiration Date" shall mean the Fixed Expiration Date or such earlier date on which the Term shall sooner end pursuant to any of the terms, conditions or covenants of this Lease or pursuant to law.

"1st Rental Period" shall have the meaning set forth in Section 1.1 hereof.

"1st Security Period" shall mean the period commencing on the Commencement Date and ending on the day immediately preceding the fifth (5th) anniversary of the Commencement Date.

"Fixed Expiration Date" shall have the meaning set forth in Section 1.1 hereof.

"Fixed Rent" shall have the meaning set forth in Section 1.1 hereof.

"Governmental Authority (Authorities)" shall mean the United States of America, the State of New York, the City of New York, any political subdivision thereof and any agency, department, commission, board, bureau or instrumentality of any of the foregoing, or any quasi-governmental authority, now existing or hereafter created, having jurisdiction over the Real Property or any portion thereof.

"Gross Sales" shall have the meaning set forth in Section 27.1 hereof.

"HVAC" shall mean heat, ventilation and air conditioning.

"HVAC Systems" shall mean the Building Systems providing HVAC.

"Indemnitees" shall mean Landlord, the members and partners comprising Landlord and its and their members, partners, shareholders, officers, directors, employees, agents and contractors, Lessors and Mortgagees.

"Initial Alterations" shall mean the Alterations to be made by Tenant to initially prepare the Premises for Tenant's occupancy.

"Landlord", on the date as of which this Lease is made, shall mean Two Park Company, a New York limited partnership having an office c/o MRC Management LLC, 330 Madison Avenue, New York, New York 10017, but thereafter, "Landlord" shall mean only the fee owner of the Real Property or if there shall exist a Superior Lease, the tenant thereunder.

"Landlord's Assignment Payment" shall have the meaning set forth in Section 12.9(A) hereof.

"Lessor(s)" shall mean a lessor under a Superior Lease.

"Letter of Credit" shall have the meaning set forth in Article 31 hereof.

"Long Lead Work" shall mean any item which is not a stock item and must be specially manufactured, fabricated or installed or is of such an unusual, delicate or fragile nature that there is a substantial risk that

        (i)  there will be a delay in its manufacture, fabrication, delivery or installation, or

        (ii)  after delivery, such item will need to be reshipped or redelivered or repaired

so that in Landlord's reasonable judgment the item in question cannot be completed when the standard items are completed even though the item of Long Lead Work in question is (1) ordered together with the other items required and (2) installed or performed (after the manufacture or fabrication thereof) in the order and sequence that such Long Lead Work and other items are normally installed or performed in accordance with good construction practice. In addition, "Long Lead Work" shall include any standard item which in accordance with good construction practice should be completed after the completion of any item of work in the nature of the items described in the immediately preceding sentence.

"Merchandise" shall have the meaning set forth in Section 27.1 hereof.

"Mortgage(s)" shall mean any trust indenture or mortgage which may now or hereafter affect the Real Property, the Building or any Superior Lease and the leasehold interest created thereby, and all renewals, extensions, supplements, amendments, modifications, consolidations and replacements thereof or thereto, substitutions therefor, and advances made thereunder.

"Mortgagee(s)" shall mean any trustee, mortgagee or holder of a Mortgage.

"Net Assignment Proceeds" shall have the meaning set forth in Section 12.9(A) hereof.

"Non-Compliance Date" shall have the meaning set forth in Section 12.8(A) hereof.

"Operation of the Property" shall mean the maintenance, repair and management of the Real Property and the curbs, sidewalks and areas adjacent thereto.

"Operator" shall have the meaning set forth in Section 42.3 hereof.

"Operator Services" shall have the meaning set forth in Section 42.3 hereof.

"Overtime Periods" shall have the meaning set forth in Section 28.3 hereof.

"Parties" shall have the meaning set forth in Section 37.2 hereof.

"Partner" or "partner" shall mean any partner of Tenant, any employee of a professional corporation which is a partner comprising Tenant, and any shareholder of Tenant if Tenant shall become a professional corporation.

"Partnership Tenant" shall have the meaning set forth in Article 29 hereof.

"Percentage Rent" shall have the meaning set forth in Section 27.5 hereof.

"Percentage Rent Threshold Amount" shall have the meaning set forth in Section 27.5 hereof.

"Person(s) or person(s)" shall mean any natural person or persons, a partnership, a corporation and any other form of business or legal association or entity.

"Premises" shall mean, subject to the provisions of Section 14.4 hereof, the portions of the basement, mezzanine and ground floors of the Building as set forth on the floor plans attached hereto and made a part hereof as Exhibit "A".

"Projected Budget" shall have the meaning set forth in Section 12.9(A) hereof.

"Qualified Purchaser" shall have the meaning set forth in Section 12.8(A) hereof.

"Real Property" shall mean the Building, together with the plot of land upon which it stands.

"Recapture Space" shall have the meaning set forth in Section 12.6 hereof.

"Recapture Sublease" shall have the meaning set forth in Section 12.6 hereof.

"Rent Notice" shall have the meaning set forth in Section 39.3 hereof.

"Rental" shall mean and be deemed to include Fixed Rent, Escalation Rent, all additional rent and any other sums payable by Tenant hereunder.

"Rental Period" shall mean the 1st Rental Period, the 2nd Rental Period, or the 3rd Rental Period, as the case may be.

"Requirements" shall mean all present and future laws, rules, orders, ordinances, regulations, statutes, requirements, codes and executive orders, extraordinary as well as ordinary, of all Governmental Authorities now existing or hereafter created, and of any and all of their departments and bureaus, and of any applicable fire rating bureau, or other body exercising similar functions, affecting the Real Property or any portion thereof, or any street, avenue or sidewalk comprising a part of or in front thereof or any vault in or under the same, or requiring removal of any encroachment, or affecting the maintenance, use or occupation of the Real Property or any portion thereof.

"Routine Assignment" shall have the meaning set forth in Section 12.8(B) hereof.

"Rules and Regulations" shall mean the rules and regulations annexed hereto and made a part hereof as Schedule A, and such other and further rules and regulations as Landlord or Landlord's agents may from time to time adopt on such notice to be given as Landlord may elect, subject to Tenant's right to dispute the reasonableness thereof as provided in Article 8 hereof.

"Sale of Business Assignment" shall have the meaning set forth in Section 12.8(A) hereof.

"Sale of Business Escrow" shall have the meaning set forth in Section 12.8(A) hereof.

"Sales Year" shall have the meaning set forth in Section 27.5 hereof.

"Security Agreement" shall have the meaning set forth in Section 3.1 hereof.

"2nd Rental Period" shall have the meaning set forth in Section 1.1 hereof.

"2nd Security Period" shall mean the period commencing on the fifth (5th) anniversary of the Commencement Date and ending on the day immediately preceding the tenth (10th) anniversary of the Commencement Date.

"Security Amount" shall mean:

(i)     One Hundred Thousand Dollars ($100,000) during the 1st Security Period;

(ii)    Seventy-Five Thousand Dollars ($75,000) during the 2nd Security Period;

and

(iii) Fifty Thousand Dollars ($50,000) during the 3rd Security Period.

"Space Factor" shall mean Nine Thousand (9,000) as the same may be increased or decreased pursuant to the terms hereof.

"Specialty Alterations" shall mean Alterations consisting of kitchens, executive bathrooms, raised computer floors, computer installations, raised walkways, storefronts, escalators, vaults, libraries, internal staircases, dumbwaiters, pneumatic tubes, vertical and horizontal transportation systems, and other Alterations of a similar character.

"Sublease Termination Date" shall have the meaning set forth in Section 12.6 hereof.

"Superior Lease(s)" shall mean all ground or underlying leases of the Real Property or the Building and all renewals, extensions, supplements, amendments and modifications thereof.

"System" shall have the meaning set forth in Section 27.7 hereof.

"Taxes" shall have the meaning set forth in Section 27.1 hereof.

"Tax Payment" shall have the meaning set forth in Section 27.2 hereof.

"Tax Statement" shall have the meaning set forth in Section 27.1 hereof.

"Tax Year" shall have the meaning set forth in Section 27.1 hereof.

"Tenant" on the date as of which this Lease is made, shall mean Artisanal, Fromagerie & Bistro, LLC, a New York limited liability company having an office at c/o Picholine, 35 West 64th Street, New York, New York 10023, but thereafter "Tenant" shall mean only the tenant under this Lease at the time in question; provided, however, that the originally named tenant and any assignee of this Lease shall not be released from liability hereunder in the event of any assignment of this Lease.

"Tenant Statement" shall have the meaning set forth in Section 12.6 hereof.

"Tenant's Assignment Payment" shall have the meaning set forth in Section 12.9(A) hereof.

"Tenant's Cost Statement" shall have the meaning set forth in Section 12.9(A) hereof.

"Tenant's Property" shall mean Tenant's movable fixtures and movable partitions, telephone and other equipment, furniture, furnishings, decorations, cash registers and other items of personal property.

"Tenant's Share" shall mean One percent (1.00%) as the same may be increased or decreased pursuant to the terms hereof.

"Term" shall mean a term which shall commence on the Commencement Date and shall expire on the Expiration Date.

"3rd Rental Period" shall have the meaning set forth in Section 1.1 hereof.

"3rd Security Period" shall mean the period commencing on the tenth (10th) anniversary of the Commencement Date and ending on the Fixed Expiration Date.

"Three Month Average" shall have the meaning set forth in Section 13.3 hereof.

"Unamortized Improvement Payment" shall have the meaning set forth in Section 12.9(A) hereof.

"Unavoidable Delays" shall have the meaning set forth in Article 25 hereof.

## ARTICLE 1
## DEMISE, PREMISES, TERM, RENT

Section 1.1. Landlord hereby leases to Tenant and Tenant hereby hires from Landlord the Premises for the Term to commence on the date (the "Commencement Date") on which Landlord shall deliver possession of the Premises to Tenant and to end on the date (the "Fixed Expiration Date") which is the last day of the month in which the fifteenth (15th) anniversary of the Commencement Date shall occur, at an annual rent (the "Fixed Rent") of:

(1)     Three Hundred Thousand Dollars ($300,000) per annum during the period (the "1st Rental Period") commencing on the Commencement Date and ending on the day immediately preceding the fifth (5th) anniversary of the Commencement Date, or if the Commencement Date shall occur other than on the first day of the month, ending on the last day of the month in which the fifth (5th) anniversary of the Commencement Date occurs ($25,000 per month),

(2)     Three Hundred Seventy-Two Thousand Dollars ($372,000) per annum during the period (the "2nd Rental Period") commencing on the day next succeeding the end of the 1st Rental Period and ending on the day immediately preceding the tenth (10th) anniversary of the Commencement Date, or if the Commencement Date shall occur other than on the first day of the month, ending on the last day of the month in which the tenth (10th) anniversary of the Commencement Date occurs ($31,000 per month), and

(3)     Four Hundred Thirty-Two Thousand Dollars ($432,000) per annum during the period (the "3rd Rental Period") commencing on the day next succeeding the end of the 2nd Rental Period and ending on the Fixed Expiration Date ($36,000 per month),

which Tenant agrees to pay in lawful money of the United States which shall be legal tender in payment of all debts and dues, public and private, at the time of payment, in equal monthly installments in advance, on the first (1st) day of each calendar month during the Term commencing on the Commencement Date, at the office of Landlord or such other place as Landlord may designate, without any set-off, offset, abatement or deduction whatsoever, except that Tenant shall pay the first full monthly installment on the execution hereof. At the request of Landlord, Fixed Rent shall be payable when due by wire transfer of funds to an account designated from time to time by Landlord.

Section 1.2. (A) If the Commencement Date shall occur other than on the first (1st) day of any calendar month, then, on the Commencement Date, Tenant shall pay to Landlord an amount equal to Eight Hundred Thirty-Three and 33/100 Dollars ($833.33), multiplied by the number of calendar days in the period from the Commencement Date to the last day of the month in which the Commencement Date occurs, both dates inclusive.

(B) Tenant shall be entitled to a credit against Fixed Rent in an amount equal to Nine Thousand Six Hundred Ninety-Seven and 04/100 Dollars ($9,697.04) per month during the period commencing on the Commencement Date and ending on the date which is six (6) calendar months after the Commencement Date, provided that (x) no Event of Default shall have occurred and be continuing on the date(s) upon which the foregoing credit is to be applied, and (y) Artisanal, Fromagerie & Bistro, LLC is then occupying the entire Premises.

(C) If the Commencement Date shall occur on a date other than the first (1ˢᵗ) day of any calendar month, then the credit against Fixed Rent for the first (1ˢᵗ) monthly installment of Fixed Rent accruing hereunder shall be an amount equal to Three Hundred Twenty-Three and 23/100 Dollars ($323.23), multiplied by the number of calendar days in the period from the Commencement Date to the last day of the month in which the Commencement Date shall occur, both dates inclusive.

Section 1.3. In addition to the payment required pursuant to Section 1.1 hereof, simultaneously with the execution hereof, Tenant shall pay to Landlord, by certified check, an amount equal to Sixteen Thousand One Hundred Seven and 50/100 Dollars ($16,107.50) pursuant to an agreement between Landlord and Tenant.

## ARTICLE 2
## USE AND OCCUPANCY

Section 2.1. (A) Tenant shall use and occupy the Premises solely as a first class restaurant for the table service of first class quality cuisine and, if Tenant shall so elect, as a bar for the sale for on-premises consumption only of fine quality beer, wines and spirits, provided, however, that Tenant shall be permitted to operate a bar in the Premises only as an incidental use to the use hereinbefore specified and in no event as a primary use of the same, and for no other purpose. Tenant shall use and occupy the Premises during the Term as a dignified first-class restaurant establishment in a high grade and reputable manner which shall not detract from the character, appearance or dignity of the Building. Tenant shall not use or permit the use of the Premises or any part thereof (i) in any way which would violate any of the covenants, agreements, terms, provisions and conditions of this Lease, (ii) for any unlawful purposes or in any unlawful manner, or (iii) in violation of the certificate of occupancy for the Premises or the Building.

(B) If any governmental license or permit shall be required for the proper and lawful conduct of Tenant's business in the Premises or any part thereof (including, without limitation, a food service permit and/or a liquor license), Tenant, at its expense, shall duly procure, and thereafter maintain, such license or permit and submit the same for inspection by Landlord. Upon request by Tenant, Landlord, at Tenant's cost and expense, shall join in any application for such food service permit and/or liquor license required to be obtained by Tenant

(provided that the provisions of the applicable Requirement shall require that Landlord join in such application) and shall otherwise cooperate with Tenant in connection therewith, provided that Landlord shall not be obligated to incur any cost or expense, including, without limitation, attorneys' fees and disbursements, or suffer any liability in connection therewith.

(C) Tenant shall operate its business during the Term under the name "Artisanal", or any other name, provided that (i) such other name is used in connection with a first class restaurant establishment in accordance with this Lease, and (ii) Tenant gives Landlord at least ninety (90) days prior notice of such name change. Tenant covenants to open for business on or before March 1, 2000, and to be open for business to the general public at least five (5) days per week for lunch and at least six (6) days per week for dinner, at least during the hours of 11:30 A.M. and 11:30 P.M. on such days, except that on the day on which Tenant does not serve lunch, Tenant shall be open at least during the hours of 5:30 P.M and 11:30 P.M.

Section 2.2. (A) Tenant shall not use the Premises or any part thereof, or permit the Premises or any part thereof to be used, (1) to conduct or permit any fire, auction, going-out-of-business or bankruptcy sale, (2) to engage in any unethical method of business operation, (3) as a so-called "discount house" or for a "cut rate" or "discount" type of business, (4) to sell or display for sale any pornographic or obscene material, (5) to sell tickets for lotteries, games of chance or otherwise permit the Premises to be used for gambling, (6) to distribute or permit to be distributed handbills or other matter to persons or customers outside the Premises, or (7) by the United States government, the City or State of New York, any foreign government, the United Nations or any agency or department of any of the foregoing. Tenant shall not use or permit to be used the sidewalks or other space outside the Premises for any display, sale or similar undertaking, or storage or use or permit to be used any loudspeaker, phonograph or other sound system or advertising device which may be heard outside the Premises. Nothing contained in this Section 2.2. shall prevent Tenant from providing outdoor seating for Tenant's restaurant, provided that Tenant (i) obtains Landlord's prior consent for such outdoor seating, and (ii) obtains all applicable permits and licenses and complies with all applicable Requirements in connection therewith. Nothing contained herein shall prevent Tenant from catering food outside of the Premises, provided that all monies received in connection with such outside catering are included in Gross Sales for the purpose of calculating Percentage Rent pursuant to Article 27 hereof.

(B) Tenant acknowledges that Landlord may suffer irreparable harm by reason of a breach or threatened breach of the provisions of this Article 2 and, accordingly, Landlord, in addition to any other remedy that Landlord shall have under this Lease or permitted by law, shall be entitled to seek the relief of a court of competent jurisdiction to enjoin the action, activity or inaction that gives rise to, or may give rise to, such breach or threatened breach by Tenant.

## ARTICLE 3
## ALTERATIONS

Section 3.1. (A) Tenant shall not make any Alterations without Landlord's prior consent. Landlord shall not unreasonably withhold or delay its consent to any proposed nonstructural Alterations, provided that such Alterations (i) do not affect any part of the Building other than the Premises or require any alterations, installations, improvements, additions or other physical changes to be performed in or made to any portion of the Building or the Real Property other than the Premises, (ii) do not affect any service required to be furnished by Landlord to Tenant or to any other tenant or occupant of the Building, (iii) do not affect the proper functioning of any Building System, (iv) do not reduce the value or utility of the Building, and (v) do not violate the certificate of occupancy for the Building or the Premises, provided that Tenant, at Tenant's sole cost and expense and with Landlord's consent (which consent shall not be unreasonably withheld in accordance with this Section 3.1), may apply for an amendment to the existing certificate of occupancy which would permit any such Alterations, provided further that any such change to the certificate of occupancy shall not affect any portion of the Building outside of the Premises. Landlord shall not be deemed to be unreasonable with respect to withholding its consent to any proposed nonstructural Alteration which meets the criteria set forth in this Section 3.1(A) if the Lessor or Mortgagee, as the case may be, shall withhold its consent.

(B) (1) Prior to making any Alterations, including, without limitation, the Initial Alterations, Tenant shall (i) submit to Landlord detailed plans and specifications (including layout, architectural, mechanical and structural drawings) for each proposed Alteration and shall not commence any such Alteration without first obtaining Landlord's approval of such plans and specifications which, in the case of nonstructural Alterations which meet the criteria set forth in Section 3.1(A) above, shall not be unreasonably withheld or delayed, (ii) at Tenant's expense, obtain all permits, approvals and certificates required by any Governmental Authorities, it being agreed that all filings with Governmental Authorities to obtain such permits, approvals and certificates shall be made, at Tenant's expense, by a Person designated by Landlord, provided the rates of such Person shall be commercially competitive (it being agreed that the Person so designated as of the date hereof is Charles Rizzo of Charles Rizzo Co., Inc., 11 Penn Plaza, New York, New York), and (iii) furnish to Landlord duplicate original policies or certificates thereof of worker's compensation (covering all persons to be employed by Tenant, and Tenant's contractors and subcontractors in connection with such Alteration) and comprehensive public liability (including property damage coverage) insurance in such form, with such companies, for such periods and in such amounts as Landlord may reasonably approve, naming Landlord and its agents, any Lessor and any Mortgagee, as additional insureds. Upon completion of such Alteration, Tenant, at Tenant's expense, shall obtain certificates of final approval of such Altera-tion required by any Governmental Authority and shall furnish Landlord with copies thereof, together with the "as-built" plans and specifications for such Alterations, it being agreed that all filings with Governmental Authorities to obtain such permits, approvals and certificates shall be made, at Tenant's expense, by a Person designated by Landlord, provided the rates of such Person shall be commercially competitive (it being agreed that the Person so designated as of the date

hereof is Charles Rizzo of Charles Rizzo Co., Inc., 11 Penn Plaza, New York, New York). All Alterations shall be made and performed substantially in accordance with the plans and specifications therefor as approved by Landlord, all Requirements, the Rules and Regulations, and all reasonable rules and regulations relating to Alterations promulgated by Landlord in its reasonable judgment. All materials and equipment to be incorporated in the Premises as a result of any Alterations or a part thereof shall be first quality and no such materials or equipment (other than Tenant's Property, kitchen equipment and other moveable trade fixtures) shall be subject to any lien, encumbrance, chattel mortgage or title retention or security agreement. In addition, no Alteration (except with respect to (x) non-structural alterations in accordance with Section 3.1 hereof and (y) structural alterations at a cost for labor and materials, as reasonably estimated by Landlord's architect, engineer or contractor, of not more than Three Hundred Fifty Thousand Dollars ($350,000) in the aggregate) shall be undertaken prior to Tenant's delivering to Landlord either (i) a performance bond and labor and materials payment bond (issued by a surety company and in form reasonably satisfactory to Landlord), each in an amount equal to one hundred ten percent (110%) of the cost of such Alteration (as reasonably estimated by Landlord's architect, engineer, or contractor), or (ii) such other security as shall be reasonably satisfactory to Landlord or required by any Mortgagee or Lessor. If, as a result of any Alterations performed by Tenant, including, without limitation, the Initial Alterations, any alterations, installations, improvements, additions or other physical changes are required to be performed or made to any portion of the Building or the Real Property other than the Premises in order to comply with any Requirement(s), which alterations, installations, improvements, additions or other physical changes would not otherwise have had to be performed or made pursuant to applicable Requirement(s) at such time, Landlord, at Tenant's sole cost and expense, may perform or make such alterations, installations, improvements, additions or other physical changes and take such actions as are reasonably necessary and Tenant, within five (5) days after demand therefor by Landlord, shall provide Landlord with such security as Landlord shall reasonably require, in an amount equal to one hundred ten percent (110%) of the cost of such alterations, installations, improvements, additions or other physical changes, as reasonably estimated by Landlord's architect, engineer or contractor. All Alteration(s) shall be performed only under the supervision of an independent licensed architect approved by Landlord, which approval shall not be unreasonably withheld.

(2)     Landlord reserves the right to disapprove any plans and specifications in part, to reserve approval of items shown thereon pending its review and approval of other plans and specifications, and to condition its approval upon Tenant making revisions to the plans and specifications or supplying additional information, which approval by Landlord shall not be unreasonably withheld in accordance with the provisions of Section 3.1 hereof. Any review or approval by Landlord of any plans and/or specifications or any preparation or design of any plans by Landlord's architect or engineer (or any architect or engineer designated by Landlord) with respect to any Alteration is solely for Landlord's benefit, and without any representation or warranty whatsoever to Tenant or any other Person with respect to the compliance thereof with any Requirements, the adequacy, correctness or efficiency thereof or otherwise.

(3) Tenant covenants and agrees that, except with respect to Tenant's Property, no security agreement, whether by way of conditional sales agreement, chattel mortgage or other title retention or instrument of similar import (a "Security Agreement") shall be placed upon any improvement made by Tenant which is affixed to the Premises. In the event that any of the machinery, fixtures, furniture and equipment installed by Tenant in the Premises are purchased or acquired by Tenant subject to a Security Agreement, Tenant undertakes and agrees (i) that no Security Agreement or Uniform Commercial Code filing statement shall be permitted to be filed as a lien against the Premises, the Building or the Real Property, and (ii) to cause to be inserted in any Security Agreement the following provisions: "Notwithstanding anything to the contrary contained herein, this chattel mortgage, conditional sales agreement, title retention agreement or security agreement shall not create or be filed as a lien against the land, building and improvements comprising the real property in which the goods, machinery, equipment, appliances or other personal property covered hereby are to be located or installed." If any such lien, based on a Security Agreement or Uniform Commercial Code filing statement, is filed against the Premises, the Building or the Real Property, Tenant shall, within ten (10) days following notice thereof from Landlord, cause such lien or notice to be removed or discharged at Tenant's cost and expense, and Tenant's failure to do so shall constitute a breach of a material provision of this Lease.

(C) Tenant shall be permitted to perform Alterations during the hours of 8:00 A.M. to 6:00 P.M. on Business Days and at all other times, provided that (i) such work shall not interfere with or interrupt the operation and maintenance of the Building or unreasonably interfere with or interrupt the use and occupancy of the Building by other tenants in the Building, and (ii) in the case of work done outside of the hours of 8:00 A.M. to 6:00 P.M. on Business Days, Tenant shall reimburse Landlord for any overtime costs incurred in connection with such work within twenty (20) days after demand therefor. Otherwise, Alterations shall be performed at such times and in such manner as Landlord may from time to time reasonably designate. All Tenant's Property installed by Tenant and all Alterations in and to the Premises which may be made by Tenant at its own cost and expense prior to and during the Term, shall remain the property of Tenant. Upon the Expiration Date, Tenant shall remove all of Tenant's Property from the Premises and, at Tenant's option, Tenant also may remove, at Tenant's cost and expense, any Alterations made by Tenant to the Premises, provided, however, in any case, that Tenant shall repair and restore in a good and workerlike manner to good condition any damage to the Premises or the Building caused by such removal. Notwithstanding the foregoing, however, Landlord, upon notice given at least thirty (30) days prior to the Fixed Expiration Date or upon such shorter notice as is reasonable under the circumstances upon the earlier expiration of the Term, may require Tenant to remove any Alterations, and to repair and restore in a good and workerlike manner to good condition any damage to the Premises or the Building caused by such removal.

(D) (1) All Alterations shall be performed, at Tenant's sole cost and expense, by contractors, subcontractors or mechanics approved by Landlord, which approval shall not be unreasonably withheld with respect to contractors; subcontractors or mechanics performing

Alterations that do not affect any Building System. Prior to making an Alteration, at Tenant's request, Landlord shall furnish Tenant with a list of contractors who may perform Alterations to the Premises on behalf of Tenant (it being agreed that the list of contractors and subcontractors approved by Landlord with respect to the performance of the Initial Alterations is attached hereto and made a part hereof as Exhibit "B"). If Tenant engages any contractor set forth on the list, Tenant shall not be required to obtain Landlord's consent for such contractor unless, prior to the earlier of (a) entering into a contract with such contractor, and (b) the commencement of work by such contractor, Landlord shall notify Tenant that such contractor has been removed from the list.

(2) Notwithstanding the foregoing, with respect to any Alteration affecting any Building System, (i) Tenant shall select a contractor from a list of approved contractors furnished by Landlord to Tenant (containing at least three (3) contractors) and (ii) the Alteration shall, at Tenant's cost and expense, be designed by Landlord's engineer for the relevant Building System.

(E) Any mechanic's lien filed against the Premises or the Real Property for work claimed to have been done for, or materials claimed to have been furnished to, Tenant shall be discharged by Tenant within thirty (30) days after Tenant shall have received notice thereof (or such shorter period if required by the terms of any Superior Lease or Mortgage), at Tenant's expense, by payment or filing the bond required by law. Tenant shall not, at any time prior to or during the Term, directly or indirectly employ, or permit the employment of, any contractor, mechanic or laborer in the Premises, whether in connection with any Alteration or otherwise, if such employment would interfere or cause any conflict with other contractors, mechanics or laborers engaged in the construction, maintenance or operation of the Building by Landlord, Tenant or others, or of any adjacent property owned by Landlord. In the event of any such interference or conflict, Tenant, upon demand of Landlord, shall cause all contractors, mechanics or laborers causing such interference or conflict to leave the Building immediately.

(F) Tenant shall commence performance of the Initial Alterations by not later than thirty (30) days after the Commencement Date, shall thereafter diligently continuously prosecute the same to completion and shall substantially complete the Initial Alterations by not later than the date on which Tenant opens for business pursuant to Section 2.1(C) hereof.

Section 3.2. Tenant shall pay to Landlord or, at Landlord's option, to Landlord's agent, as additional rent, all actual out-of-pocket costs and expenses reasonably incurred by Landlord or Landlord's agent in connection with any Alterations, including, without limitation, the Initial Alterations (the "Alteration Fee"). The Alteration Fee shall be paid by Tenant within ten (10) days after demand therefor. Tenant also shall pay any fee charged by any Lessor or Mortgagee in reviewing the plans and specifications for such Alterations or inspecting the progress of completion of the same.

Section 3.3. Upon the request of Tenant, Landlord, at Tenant's cost and expense, shall join in any applications for any permits, approvals or certificates required to be obtained by

Tenant in connection with any permitted Alteration (provided that the provisions of the applicable Requirement shall require that Landlord join in such application) and shall otherwise cooperate with Tenant in connection therewith, provided that Landlord shall not be obligated to incur any cost or expense, including, without limitation, attorneys' fees and disbursements, or suffer any liability in connection therewith.

## ARTICLE 4
### REPAIRS-FLOOR LOAD

Section 4.1. Landlord shall operate, maintain and make all necessary repairs (both structural and nonstructural) to the part of Building Systems which provide service to the Premises (but not to the distribution portions of such Building Systems located within the Premises) and the public portions of the Building, both exterior and interior, in conformance with standards applicable to non-institutional first class office and retail buildings in Manhattan. Tenant, at Tenant's sole cost and expense, shall take good care of the Premises and the fixtures, equipment and appurtenances therein and the distribution systems and shall make all non-structural repairs thereto (including, without limitation, the exterior and interior of all windows, plate glass, showcase windows, doors, door frames and bucks) as and when needed to preserve them in good working order and condition, except for reasonable wear and tear, obsolescence and damage for which Tenant is not responsible pursuant to the provisions of Article 10 hereof. Tenant, at Tenant's sole cost and expense, shall replace Tenant's Property when desirable or necessary in accordance with prudent commercial practices consistent with the first class operation of the Premises for the uses as set forth in Section 2.1 hereof. Notwithstanding the foregoing, all damage or injury to the Premises or to any other part of the Building and Building Systems, or to its fixtures, equipment and appurtenances, whether requiring structural or nonstructural repairs, caused by or resulting from carelessness, omission, neglect or improper conduct of, or Alterations made by, Tenant, Tenant's agents, employees, invitees or licensees, shall be repaired at Tenant's sole cost and expense, by Tenant to the reasonable satisfaction of Landlord (if the required repairs are nonstructural in nature and do not affect any Building System), or by Landlord (if the required repairs are structural in nature or affect any Building System). All of the aforesaid repairs shall be of first quality and of a class consistent with non-institutional first class office and retail building work or construction and shall be made in accordance with the provisions of Article 3 hereof. If Tenant fails after ten (10) days' notice (or such shorter period as Landlord may be permitted pursuant to any Superior Lease or Mortgage or such shorter period as may be required due to an emergency) to proceed with due diligence to make repairs required to be made by Tenant, the same may be made by Landlord at the expense of Tenant, and the expenses thereof incurred by Landlord, with interest thereon at the Applicable Rate, shall be forthwith paid to Landlord as additional rent after rendition of a bill or statement therefor. Tenant shall give Landlord prompt notice of any defective condition in the Building or in any Building System, located in, servicing or passing through the Premises of which Tenant becomes aware.

16

Section 4.2. Tenant shall not place a load upon any floor of the Premises exceeding the pounds per square foot "live load" permitted by the Certificate of Occupancy for the Premises. Tenant shall not move any safe, heavy machinery, heavy equipment, business machines, freight, bulky matter or fixtures into or out of the Building without Landlord's prior consent, which consent shall not be unreasonably withheld, and shall make payment to Landlord of Landlord's costs in connection therewith. If such safe, machinery, equipment, freight, bulky matter or fixtures requires special handling, Tenant shall employ only persons holding a Master Rigger's license to do said work. All work in connection therewith shall comply with all Requirements and the Rules and Regulations, and shall be done during such hours as Landlord may reasonably designate. Business machines and mechanical equipment shall be placed and maintained by Tenant at Tenant's expense in settings sufficient to absorb and prevent vibration, noise and annoyance. Except as expressly provided in this Lease, there shall be no allowance to Tenant for a diminution of rental value and no liability on the part of Landlord by reason of inconvenience, annoyance or injury to business arising from Landlord, Tenant or others making, or failing to make, any repairs, alterations, additions or improvements in or to any portion of the Building or the Premises, or in or to fixtures, appurtenances or equipment thereof.

Section 4.3. Landlord shall use its reasonable efforts to minimize interference with Tenant's use and occupancy of the Premises in making any repairs, alterations, additions or improvements; provided, however, that Landlord shall have no obligation to employ contractors or labor at so-called overtime or other premium pay rates or to incur any other overtime costs or expenses whatsoever, except that Landlord, at its expense, shall employ contractors or labor at so-called overtime or other premium pay rates if necessary to make any repair required to be made by it hereunder to remedy any condition that either (i) results in a denial of access to the Premises, (ii) threatens the health or safety of any occupant of the Premises, or (iii) except in the case of a fire or other casualty, materially interferes with Tenant's ability to conduct its business in the Premises. In all other cases, at Tenant's request, Landlord shall employ contractors or labor at so-called overtime or other premium pay rates and incur any other overtime costs or expenses in making any repairs, alterations, additions or improvements, and Tenant shall pay to Landlord, as additional rent, within ten (10) Business Days after demand, an amount equal to the difference between the overtime or other premium pay rates and the regular pay rates for such labor and any other overtime costs or expenses so incurred.

Section 4.4. Tenant acknowledges that the nature of the business to be conducted in the Premises could, in the absence of adequate preventive measures, create objectionable fumes, vapors or odors, vermin, damage and injury, unreasonable noise and other conditions which would cause annoyance and interference to the Building and its occupants. As an express inducement to Landlord to enter into this Lease, Tenant agrees that it shall conduct its operation in the Premises so as to minimize such annoyance or interference and Tenant specifically agrees that in furtherance of this covenant it shall, at its own cost and expense:

(1)     install (to the extent not already installed), maintain, service and repair a ventilating and exhaust system servicing the Premises only and make all replacements

thereto during the Term, including installation of charcoal filters, rotoclone or other similar devices at all points of cooking (if required in Landlord's reasonable judgment), and the establishment of control procedures to eliminate odors, and in furtherance and not in limitation of the foregoing, maintain such ventilating exhaust system, and any ducts connecting thereto, in such manner so as not to interfere with the Building's ventilating system;

(2) provide, to Landlord's reasonable satisfaction, chemical treatment for the exhaust system for the elimination of all odors and fumes;

(3) keep the drain, waste and sewer pipes and connections with water mains, to the extent the same service the Premises exclusively, free from obstruction, and maintain grease traps in the main soil lines of the Premises;

(4) keep the Premises free of noxious chemicals or inflammable materials other than those customarily employed in connection with restaurant use;

(5) provide such other exhaust, cleaning or similar systems which shall be necessary to prevent any smoke, fumes, vapors, odors or other offensive substances from emanating from the Premises to the annoyance of other occupants of the Building;

(6) fireproof all draperies and curtains in the Premises and submit to Landlord, upon Landlord's request, current certificates evidencing such fireproofing;

(7) install and maintain in all cooking areas, at its sole cost and expense, chemical fire extinguishing devices (such as ansul) approved by the Fire Insurance Rating Organization having jurisdiction over the Premises and, if gas is used in the Premises for cooking or other purposes, suitable gas cut-off devices (manual and automatic), in accordance with all Requirements;

(8) take all reasonable steps, at its sole cost and expense, to prevent fat, grease, or any other greasy substance from entering the waste lines of the Building;

(9) perform, at its sole cost and expense, any and all maintenance reasonably necessary or desirable in order to keep the floors in the Premises in a waterproof condition; and

(10) employ the most improved methods for the prevention and extermination of vermin, rats or mice in the Premises.

In the event that at any time during the Term there shall be any violation of the foregoing covenants of this Section 4.4, or notwithstanding the performance by Tenant of such covenants, additional services, equipment or facilities shall be necessary in Landlord's reasonable judgment to accomplish the purposes of this Section 4.4, Landlord shall have the right upon ten (10) days'

prior written notice to Tenant (except in the case of an emergency), to perform any of such obligations or provide any such additional services or equipment to accomplish such purposes and Tenant shall reimburse Landlord, as additional rent, for any expenditures made by Landlord in connection therewith within ten (10) Business Days after receipt by Tenant of statement from Landlord thereof. All work required to be done by Tenant pursuant to the provisions of this Section 4.4 shall be done in strict compliance with the provisions and conditions of this Lease. Nothing contained in this Section 4.4 shall limit, modify or otherwise alter the provisions of Section 2.2 hereof.

## ARTICLE 5
### WINDOW CLEANING

Tenant shall not clean, nor require, permit, suffer or allow any window in the Premises to be cleaned from the outside in violation of Section 202 of the Labor Law, or any other Requirement, or of the rules of the Board of Standards and Appeals, or of any other board or body having or asserting jurisdiction.

## ARTICLE 6
### REQUIREMENTS OF LAW

Section 6.1. Tenant, at its sole cost and expense shall comply with all Requirements applicable to the Premises, including, without limitation, those applicable to the making of any Alterations therein or the result of the making thereof and those applicable by reason of the nature or type of business operated by Tenant in the Premises. Tenant shall not do or permit to be done any act or thing upon the Premises which will invalidate or be in conflict with a standard "all-risk" insurance policy; and shall not do, or permit anything to be done in or upon the Premises, or bring or keep anything therein, except as now or hereafter permitted by the New York City Fire Department, New York Board of Fire Underwriters, the Insurance Services Office or other authority having jurisdiction and then only in such quantity and manner of storage as not to increase the rate for fire insurance applicable to the Building, or use the Premises in a manner which shall increase the rate of fire insurance on the Building or on property located therein, over that in similar type buildings or in effect on the Commencement Date. If by reason of Tenant's failure to comply with the provisions of this Article, the fire insurance rate shall be higher than it would be if the provisions were complied with, then Tenant shall desist from doing or permitting to be done any such act or thing and shall reimburse Landlord, as additional rent hereunder, for that part of all fire insurance premiums thereafter paid by Landlord which shall have been charged because of such failure by Tenant, and shall make such reimbursement upon demand by Landlord. In any action or proceeding wherein Landlord and Tenant are parties, a schedule or "make up" of rates for the Building or the Premises issued by the Insurance Services Office, or other body fixing such fire insurance rates, shall be conclusive evidence of the facts therein stated and of the several items and charges in the fire insurance rates then applicable to the Building.

Section 6.2. Tenant, at its sole cost and expense and after notice to Landlord, may contest by appropriate proceedings prosecuted diligently and in good faith, the legality or applicability of any Requirement affecting the Premises, provided that (a) Landlord (or any Indemnitee) shall not be subject to imprisonment or to prosecution for a crime, nor shall the Real Property or any part thereof be subject to being condemned or vacated, nor shall the certificate of occupancy for the Premises or the Building be suspended or threatened to be suspended by reason of non-compliance or by reason of such contest; (b) before the commencement of such contest, if Landlord or any Indemnitee may be subject to any civil fines or penalties or other criminal penalties or if Landlord may be liable to any independent third party as a result of such noncompliance, Tenant shall furnish to Landlord either (i) a bond of a surety company satisfactory to Landlord, in form and substance reasonably satisfactory to Landlord, and in an amount equal to one hundred twenty percent (120%) of the sum of (A) the cost of such compliance, (B) the criminal or civil penalties or fines that may accrue by reason of such non-compliance, and (C) the amount of such liability to independent third parties (as reasonably estimated by Landlord), and shall indemnify Landlord (and any Indemnitee) against the cost of such compliance and liability resulting from or incurred in connection with such contest or non-compliance (except that Tenant shall not be required to furnish such bond to Landlord if it has otherwise furnished any similar bond required by law to the appropriate Governmental Authority and has named Landlord as a beneficiary thereunder) or (ii) other security reasonably satisfactory in all respects to Landlord; (c) such non-compliance or contest shall not constitute or result in a violation (either with the giving of notice or the passage of time or both) of the terms of any Mortgage or Superior Lease, or if such Superior Lease or Mortgage shall condition such non-compliance or contest upon the taking of action or furnishing of security by Landlord, such action shall be taken or such security shall be furnished at the expense of Tenant; and (d) Tenant shall keep Landlord regularly advised as to the status of such proceedings. Without limiting the applicability of the foregoing, Landlord (or any Indemnitee) shall be deemed subject to prosecution for a crime if Landlord (or any Indemnitee), a Lessor, a Mortgagee or any of their officers, directors, partners, shareholders, agents or employees is charged with a crime of any kind whatsoever, unless such charges are withdrawn ten (10) days before Landlord (or any Indemnitee), such Lessor or such Mortgagee or such officer, director, partner, shareholder, agent or employee, as the case may be, is required to plead or answer thereto.

## ARTICLE 7
## SUBORDINATION

Section 7.1. This Lease shall be subject and subordinate to each and every Superior Lease and to each and every Mortgage. This clause shall be self-operative and no further instrument of subordination shall be required from Tenant to make the interest of any Lessor or Mortgagee superior to the interest of Tenant hereunder; however, Tenant shall execute and deliver promptly any instrument, in recordable form, that Landlord, any Mortgagee or Lessor may request to evidence and confirm such subordination. If the date of expiration of any Superior Lease shall be the same day as the Expiration Date, the Term shall end and expire twelve (12)

hours prior to the expiration of the Superior Lease. Tenant shall not do anything that would constitute a default under any Superior Lease or Mortgage, or omit to do anything that Tenant is obligated to do under the terms of this Lease so as to cause Landlord to be in default thereunder. If, in connection with the financing of the Real Property, the Building or the interest of the lessee under any Superior Lease, or if in connection with the entering into of a Superior Lease, any lending institution or Lessor shall request reasonable modifications of this Lease that do not increase Tenant's monetary obligations under this Lease, or materially adversely affect or diminish the rights, or materially increase the other obligations of Tenant under this Lease, Tenant shall make such modifications.

Section 7.2. If at any time prior to the expiration of the Term, any Superior Lease shall terminate or be terminated for any reason or any Mortgagee comes into possession of the Real Property or the Building or the estate created by any Superior Lease by receiver or otherwise, Tenant agrees, at the election and upon demand of any owner of the Real Property or the Building, or of the Lessor, or of any Mortgagee in possession of the Real Property or the Building, to attorn, from time to time, to any such owner, Lessor or Mortgagee or any person acquiring the interest of Landlord as a result of any such termination, or as a result of a foreclosure of the Mortgage or the granting of a deed in lieu of foreclosure, upon the then executory terms and conditions of this Lease, subject to the provisions of Section 7.1 hereof and this Section 7.2, for the remainder of the Term, provided that such owner, Lessor or Mortgagee, or receiver caused to be appointed by any of the foregoing, as the case may be, shall then be entitled to possession of the Premises and provided further that such owner, Lessor or Mortgagee, as the case may be, or anyone claiming by, through or under such owner, Lessor or Mortgagee, as the case may be, including a purchaser at a foreclosure sale, shall not be:

        (1)    liable for any act or omission of any prior landlord (including, without limitation, the then defaulting landlord), or

        (2)    subject to any defense or offsets which Tenant may have against any prior landlord (including, without limitation, the then defaulting landlord), or

        (3)    bound by any payment of Rental which Tenant may have made to any prior landlord (including, without limitation, the then defaulting landlord) more than thirty (30) days in advance of the date upon which such payment was due, or

        (4)    bound by any obligation to make any payment to or on behalf of Tenant, or

        (5)    bound by any obligation to perform any work or to make improvements to the Premises, except for (i) repairs and maintenance pursuant to the provisions of Article 4, the need for which repairs and maintenance first arises after the date upon which such owner, Lessor, or Mortgagee shall be entitled to possession of the Premises, (ii) repairs to the Premises or any part thereof as a result of damage by fire or other casualty pursuant to Article

10 hereof, but only to the extent that such repairs can be reasonably made from the net proceeds of any insurance actually made available to such owner, Lessor or Mortgagee, and (iii) repairs to the Premises as a result of a partial condemnation pursuant to Article 11 hereof, but only to the extent that such repairs can be reasonably made from the net proceeds of any award made available to such owner, Lessor or Mortgagee, or

(6)     bound by any amendment or modification of this Lease made without its consent, or

(7)     bound to return Tenant's security deposit, if any, until such deposit has come into its actual possession and Tenant would be entitled to such security deposit pursuant to the terms of this Lease.

The provisions of this Section 7.2 shall enure to the benefit of any such owner, Lessor or Mortgagee, shall apply notwithstanding that, as a matter of law, this Lease may terminate upon the termination of any Superior Lease, shall be self-operative upon any such demand, and no further instrument shall be required to give effect to said provisions. Tenant, however, upon demand of any such owner, Lessor or Mortgagee, shall execute, at Tenant's expense, from time to time, instruments, in recordable form, in confirmation of the foregoing provisions of this Section 7.2, satisfactory to any such owner, Lessor or Mortgagee, acknowledging such attornment and setting forth the terms and conditions of its tenancy. Nothing contained in this Section 7.2 shall be construed to impair any right otherwise exercisable by any such owner, Lessor or Mortgagee. Notwithstanding the provisions of this Section 7.2, this Lease shall not terminate by reason of the termination of any Superior Lease without the prior written consent of the Mortgagee of the Mortgage which is a first mortgage on Landlord's interest in the Real Property or the leasehold estate created by such Superior Lease.

Section 7.3. From time to time, within seven (7) days next following request by Landlord, any Mortgagee or any Lessor, Tenant shall deliver to Landlord, such Mortgagee or such Lessor a written statement executed by Tenant, in form reasonably satisfactory to Landlord, such Mortgagee or such Lessor, (1) stating that this Lease is then in full force and effect and has not been modified (or if modified, setting forth all modifications), (2) setting forth the date to which the Fixed Rent, Escalation Rent and other items of Rental have been paid, (3) stating whether or not, to the best knowledge of Tenant, Landlord is in default under this Lease, and, if Landlord is in default, setting forth the specific nature of all such defaults, and (4) as to any other matters reasonably requested by Landlord, such Mortgagee or such Lessor. Tenant acknowledges that any statement delivered pursuant to this Section 7.3 may be relied upon by any purchaser or owner of the Real Property or the Building, or Landlord's interest in the Real Property or the Building or any Superior Lease, or by any Mortgagee, or by an assignee of any Mortgagee, or by any Lessor.

Section 7.4. From time to time, within seven (7) days next following request by Tenant but not more frequently than twice in any twelve (12) month period, Landlord shall deliver to

Tenant a written statement executed by Landlord (i) stating that this Lease is then in full force and effect and has not been modified (or if modified, setting forth all modifications), (ii) setting forth the date to which the Fixed Rent, Escalation Rent and any other items of Rental have been paid, (iii) stating whether or not, to the best knowledge of Landlord (but without having made any investigation), Tenant is in default under this Lease, and, if Tenant is in default, setting forth the specific nature of all such defaults, and (iv) as to any other matters reasonably requested by Tenant and related to this Lease.

Section 7.5. As long as any Superior Lease or Mortgage shall exist (of which Tenant shall have been given notice), Tenant shall not seek to terminate this Lease by reason of any act or omission of Landlord until Tenant shall have given written notice of such act or omission to all Lessors and Mortgagees at such addresses as shall have been furnished to Tenant by such Lessors and Mortgagees and, if any such Lessor or Mortgagee, as the case may be, shall have notified Tenant within ten (10) Business Days following receipt of such notice of its intention to remedy such act or omission, until a reasonable period of time shall have elapsed following the giving of such notice, during which period such Lessors and Mortgagees shall have the right, but not the obligation, to remedy such act or omission.

Section 7.6. Tenant hereby irrevocably waives any and all right(s) it may have in connection with any zoning lot merger or transfer of development rights with respect to the Real Property including, without limitation, any rights it may have to be a party to, to contest, or to execute, any Declaration of Restrictions (as such term is used in Section 12-10 of the Zoning Resolution of The City of New York effective December 15, 1961, as amended) with respect to the Real Property, which would cause the Premises to be merged with or unmerged from any other zoning lot pursuant to such Zoning Resolution or to any document of a similar nature and purpose, and Tenant agrees that this Lease shall be subject and subordinate to any Declaration of Restrictions or any other document of similar nature and purpose now or hereafter affecting the Real Property. In confirmation of such subordination and waiver, Tenant shall execute and deliver promptly any certificate or instrument that Landlord reasonably may request.

Section 7.7. On the date on which this Lease is unconditionally executed and delivered by Landlord and Tenant, Bayerische Landesbank Cayman Islands Branch, as Administrative Agent, is the Mortgagee under the existing Mortgage and there is no existing Superior Lease.

## ARTICLE 8
## RULES AND REGULATIONS

Tenant and Tenant's contractors, employees, agents, visitors, invitees and licensees shall comply with the Rules and Regulations. Tenant shall have the right to dispute the reasonableness of any additional Rule or Regulation hereafter adopted by Landlord. If Tenant disputes the reasonableness of any additional Rule or Regulation hereafter adopted by Landlord, the dispute shall be determined by arbitration in the City of New York in accordance with the rules and

regulations then obtaining of the American Arbitration Association or its successor. Any such determination shall be final and conclusive upon the parties hereto. The right to dispute the reasonableness of any additional Rule or Regulation upon Tenant's part shall be deemed waived unless the same shall be asserted by service of a notice upon Landlord within thirty (30) days after receipt by Tenant of notice of the adoption of any such additional Rule or Regulation. Nothing in this Lease contained shall be construed to impose upon Landlord any duty or obligation to enforce the Rules and Regulations or terms, covenants or conditions in any other lease against any other tenant, and Landlord shall not be liable to Tenant for violation of the same by any other tenant, its employees, agents, visitors or licensees. In the event of any conflict between the provisions of this Lease and the Rules and Regulations, the provisions of this Lease shall control.

## ARTICLE 9
## INSURANCE, PROPERTY LOSS OR DAMAGE; REIMBURSEMENT

Section 9.1. (A) Any Building employee to whom any property shall be entrusted by or on behalf of Tenant shall be deemed to be acting as Tenant's agent with respect to such property and neither Landlord nor its agents shall be liable for any damage to property of Tenant or of others entrusted to employees of the Building, nor for the loss of or damage to any property of Tenant by theft or otherwise. Neither Landlord nor its agents shall be liable for any injury (or death) to persons or damage to property, or interruption of Tenant's business, resulting from fire or other casualty; nor shall Landlord or its agents be liable for any such injury (or death) to persons or damage caused by other tenants or persons in the Building or caused by construction of any private, public or quasi-public work; nor shall Landlord be liable for any injury (or death) to persons or damage to property or improvements, or interruption of Tenant's business, resulting from any latent defect in the Premises or in the Building (provided that the foregoing shall not relieve Landlord from its obligations, if any, to repair such latent defect pursuant to the provisions of Article 4 hereof). Anything in this Article 9 to the contrary notwithstanding, except as expressly set forth herein, Landlord shall not be relieved from responsibility to Tenant for any loss or damage caused to Tenant wholly or in part by the negligent acts or omissions of Landlord. Nothing in the foregoing sentence shall affect any right of Landlord to the indemnity from Tenant to which Landlord may be entitled under Article 35 hereof in order to recoup for payments made to compensate for losses of third parties.

(B) If at any time any windows of the Premises are temporarily closed, darkened or bricked-up due to any Requirement or by reason of repairs, maintenance, alterations, or improvements to the Building, or the storefront or any signboard is temporarily removed, obstructed or altered, or any scaffolding or "sidewalk bridge" is erected in front of the Building due to any Requirement or by reason of any repairs, maintenance, alterations to the Building or any property adjacent to the Building, Landlord shall not be liable for any damage Tenant may sustain thereby and Tenant shall not be entitled to any compensation therefor, nor abatement or diminution of Fixed Rent or any other item of Rental, nor shall the same release Tenant from its

obligations hereunder, nor constitute an actual or constructive eviction, in whole or in part, by reason of inconvenience or annoyance to Tenant, or injury to or interruption of Tenant's business, or otherwise, nor impose any liability upon Landlord or its agents. If at any time the windows of the Premises are temporarily closed, darkened or bricked-up, as aforesaid or any scaffolding or sidewalk bridge is erected in from of the Premises, then, unless Tenant is required pursuant to the Lease to perform the repairs, maintenance, alterations, or improvements, or to comply with the Requirements, which resulted in such windows being closed, darkened or bricked-up or such scaffolding or sidewalk bridge being erected in front of the Premises, Landlord shall perform such repairs, maintenance, alterations or improvements and comply with the applicable Requirements with reasonable diligence and otherwise take such action as may be reasonably necessary to minimize the period during which such windows are temporarily closed, darkened, or bricked-up or such scaffolding or sidewalk bridge remains in front of the Premises. Landlord shall place on any sidewalk bridge which is erected in front of the Premises a sign identifying Tenant which is visible from the street. Landlord shall permanently brick up windows to the Premises only to the extent required by Requirements. If any windows are darkened or bricked-up due to Landlord's voluntary acts (and not due to Requirements), Landlord shall use reasonable efforts to minimize the time period during which any such windows are affected.

           (C) Tenant shall immediately notify Landlord of any fire or accident in the Premises.

Section 9.2. Tenant shall obtain and keep in full force and effect (i) an "all risk" insurance policy (including, without limitation, fire extended coverage, vandalism, water and sprinkler damage) for Tenant's improvements, betterments (including, without limitation, all Alterations), personalty and Tenant's Property at the Premises in an amount equal to one hundred percent (100%) of the replacement value thereof, (ii) a policy of commercial general liability and property damage insurance on an occurrence basis, with a broad form contractual liability endorsement, (iii) plate glass insurance on a replacement cost basis, (iv) business interruption insurance insuring interruption or stoppage of Tenant's business at the Premises for a period of not less than one (1) year and (v) Liquor Liability (dram shop) insurance in an amount of not less than Five Million Dollars ($5,000,000) on an occurrence basis, covering bodily injury and death to one or more persons and One Million Dollars ($1,000,000) in connection with property damage. Such policies shall provide that Tenant is named as the insured. Landlord, Landlord's managing agent, Landlord's agents and any Lessors and any Mortgagees (whose names shall have been furnished to Tenant) shall be added as additional insureds, as their respective interests may appear, with respect to the insurance required to be carried. Such policy with respect to clause (ii) above shall include a provision under which the insurer agrees to indemnify, defend and hold Landlord, Landlord's managing agent, Landlord's agents and such Lessors and Mortgagees harmless from and against, subject to the limits of liability set forth in this Section 9.2, all cost, expense and liability arising out of, or based upon, any and all claims, accidents, injuries and damages mentioned in Article 35. In addition, the policy required to be carried pursuant to clause (ii) above shall contain a provision that (a) no act or omission of Tenant shall affect or limit the obligation of the insurer to pay the amount of any loss sustained and (b) the policy shall

be non-cancelable with respect to Landlord, Landlord's managing agent, Landlord's agents and such Lessors and Mortgagees (whose names and addresses shall have been furnished to Tenant) unless thirty (30) days' prior written notice shall have been given to Landlord by certified mail, return receipt requested, which notice shall contain the policy number and the names of the insured and additional insureds. In addition, upon receipt by Tenant of any notice of cancellation or any other notice from the insurance carrier which may adversely affect the coverage of the insureds under such policy of insurance, Tenant shall immediately deliver to Landlord and any other additional insured hereunder a copy of such notice. The minimum amounts of liability under the policy of insurance required to be carried pursuant to clause (ii) above shall be a combined single limit with respect to each occurrence in an amount of Five Million Dollars ($5,000,000) for injury (or death) to persons and damage to property, which amount shall be increased from time to time to that amount of insurance which in Landlord's reasonable judgment is then being customarily required by prudent landlords of non-institutional first class buildings in New York City with respect to tenants leasing space similar in size, nature and location to the Premises. All insurance required to be carried by Tenant pursuant to the terms of this Lease shall be effected under valid and enforceable policies issued by reputable and independent insurers permitted to do business in the State of New York, and rated in Best's Insurance Guide, or any successor thereto (or if there be none, an organization having a national reputation) as having a general policyholder rating of "A" and a financial rating of at least "XIII".

Section 9.3. On or prior to the Commencement Date, Tenant shall deliver to Landlord appropriate certificates of insurance, including evidence of waivers of subrogation required pursuant to Section 10.5 hereof, required to be carried by Tenant pursuant to this Article 9. Evidence of each renewal or replacement of a policy shall be delivered by Tenant to Landlord at least twenty (20) days prior to the expiration of such policy.

Section 9.4. Tenant acknowledges that Landlord shall not carry insurance on, and shall not be responsible for damage to, Tenant's Property or any Alterations, betterments or improvements to the Premises (unless and to the extent caused by Landlord's negligence or willful misconduct) and that Landlord shall not carry insurance against, or be responsible for any loss suffered by Tenant due to, interruption of Tenant's business.

Section 9.5. If, notwithstanding the recovery of insurance proceeds by Tenant for loss, damage or destruction of its property (or rental value or business interruptions) Landlord is liable to Tenant with respect thereto or is obligated under this Lease to make replacement, repair or restoration, then, at Landlord's option, either (i) the amount of the net proceeds of Tenant's insurance against such loss, damage or destruction shall be offset against Landlord's liability to Tenant therefor, or (ii) shall be made available to Landlord to pay for replacement, repair or restoration.

## ARTICLE 10
## DESTRUCTION-FIRE OR OTHER CAUSE

Section 10.1. (A) If the Premises shall be damaged by fire or other casualty, Landlord, at its sole cost and expense, shall diligently repair the floor and ceiling slabs and the demising walls of the Premises and the Building Systems (but not the distribution portions of such Building Systems) to the point at which such Building Systems enter into the Premises, all to the condition which existed on the date of such fire or casualty. Tenant shall give prompt notice of any such damage to Landlord. Landlord shall have no obligation to repair any damage to, or to replace, any Alterations, betterments, improvements or Tenant's Property or any wall finishings, wall coverings or other items not specifically set forth in the immediately preceding sentence, whether installed in the Premises before, on or after the Commencement Date. Landlord shall use its reasonable efforts to minimize interference with Tenant's use and occupancy in making any repairs pursuant to this Section. Tenant's obligations to pay all Fixed Rent and all other items of Rental shall continue in full force and effect and shall not abate during the period the Premises is affected by any such fire or other casualty, or during the period of the repair of the Premises after any such fire or other casualty.

(B)     Prior to the substantial completion of Landlord's repair obligations set forth in Section 10.1 (A) hereof, Landlord shall provide Tenant and Tenant's contractor, subcontractors and materialmen access to the Premises to perform Alterations on the following terms and conditions (but not to occupy the same for the conduct of business):

(1)     Tenant shall not commence work in any portion of the Premises until the date specified in a notice from Landlord to Tenant stating that the repairs required to be made by Landlord have been or will be completed to the extent reasonably necessary, in Landlord's reasonable discretion, to permit the commencement of the Alterations then prudent to be performed in accordance with good construction practice in the portion of the Premises in question without interference with, and consistent with the performance of, the repairs remaining to be performed.

(2)     Such access by Tenant shall be deemed to be subject to all of the applicable provisions of this Lease.

(3)     It is expressly understood that if Landlord shall be delayed from substantially completing the repairs due to any acts of Tenant, its agents, servants, employees or contractors, including, without limitation, by reason of the performance of any Alteration, by reason of Tenant's failure or refusal to comply or to cause its architects, engineers, designers and contractors to comply with any of Tenant's obligations described or referred to in this Lease, or if such repairs are not completed because under good construction scheduling practice such repairs should be performed after completion of any Alteration, then such repairs shall be deemed substantially complete on the date when the repairs would have been substantially complete but

for such delay. Any additional costs to Landlord to complete any repairs occasioned by such delay shall be paid by Tenant to Landlord within ten (10) days after demand, as additional rent.

Section 10.2. Anything contained in Section 10.1 hereof to the contrary notwithstanding, if the Building shall be so damaged by fire or other casualty that, in Landlord's reasonable opinion, substantial alteration, demolition, or reconstruction of the Building shall be required (whether or not the Premises shall have been damaged or rendered untenantable), then Landlord, at Landlord's option, may, not later than ninety (90) days following the damage, give Tenant a notice in writing terminating this Lease. If Landlord elects to terminate this Lease, the Term shall expire upon a date set by Landlord, but not sooner than the tenth (10th) day after such notice is given, and Tenant shall vacate the Premises and surrender the same to Landlord in accordance with the provisions of Article 20 hereof. Upon the termination of this Lease under the conditions provided for in this Section 10.2, the Fixed Rent and Escalation Rent shall be apportioned and any prepaid portion of Fixed Rent and Escalation Rent for any period after such date shall be refunded by Landlord to Tenant.

Section 10.3. (A) Within forty-five (45) days after notice to Landlord of any damage described in Section 10.1 hereof, Landlord shall deliver to Tenant a statement prepared by a reputable contractor setting forth such contractor's estimate as to the time required to repair such damage as required by Section 10.1 hereof, exclusive of time required to repair any Alterations, betterments or improvements to the Premises (which are Tenant's obligation to repair). If the estimated time period exceeds eighteen (18) months from the date of such statement, Tenant may elect to terminate this Lease by notice to Landlord not later than thirty (30) days following receipt of such statement. If Tenant makes such election, the Term shall expire upon the thirtieth (30th) day after notice of such election is given by Tenant, and Tenant shall vacate the Premises and surrender the same to Landlord in accordance with the provisions of Article 20 hereof. If Tenant shall not have elected to terminate this Lease pursuant to this Article 10 (or is not entitled to terminate this Lease pursuant to this Article 10), the damages shall be diligently repaired by and at the expense of Landlord as set forth in Section 10.1 hereof.

(B)    Except as expressly set forth in this Section 10.3, Tenant shall have no other options to cancel this Lease under this Article 10.

Section 10.4. This Article 10 constitutes an express agreement governing any case of damage or destruction of the Premises or the Building by fire or other casualty, and Section 227 of the Real Property Law of the State of New York, which provides for such contingency in the absence of an express agreement, and any other law of like nature and purpose now or hereafter in force shall have no application in any such case.

Section 10.5. The parties hereto shall procure an appropriate clause in, or endorsement on, any fire or extended coverage insurance covering the Premises, the Building and personal property, fixtures and equipment located thereon or therein, pursuant to which the insurance companies waive subrogation or consent to a waiver of right of recovery and having obtained

such clauses or endorsements of waiver of subrogation or consent to a waiver of right of recovery, will not make any claim against or seek to recover from the other for any loss or damage to its property or the property of others resulting from fire or other hazards covered by such fire and extended coverage insurance, provided, however, that the release, discharge, exoneration and covenant not to sue herein contained shall be limited by and be coextensive with the terms and provisions of the waiver of subrogation clause or endorsements or clauses or endorsements consenting to a waiver of right of recovery. If the payment of an additional premium is required for the inclusion of such waiver of subrogation provision, each party shall advise the other of the amount of any such additional premiums and the other party at its own election may, but shall not be obligated to, pay the same. If such other party shall not elect to pay such additional premium, the first party shall not be required to obtain such waiver of subrogation provision. If either party shall be unable to obtain the inclusion of such clause even with the payment of an additional premium, then such party shall attempt to name the other party as an additional insured (but not a loss payee) under the policy. If the payment of an additional premium is required for naming the other party as an additional insured (but not a loss payee), each party shall advise the other of the amount of any such additional premium and the other party at its own election may, but shall not be obligated to, pay the same. If such other party shall not elect to pay such additional premium or if it shall not be possible to have the other party named as an additional insured (but not loss payee), even with the payment of an additional premium, then (in either event) such party shall so notify the first party and the first party shall not have the obligation to name the other party as an additional insured. Tenant acknowledges that Landlord shall not carry insurance on and shall not be responsible for damage to, Tenant's Property or Alterations, betterments or improvements to the Premises and that Landlord shall not carry insurance against, or be responsible for any loss suffered by Tenant due to, interruption of Tenant's business.

## ARTICLE 11
## EMINENT DOMAIN

Section 11.1. If the whole of the Real Property, the Building or the Premises shall be acquired or condemned for any public or quasi-public use or purpose, this Lease and the Term shall end as of the date of the vesting of title with the same effect as if said date were the Expiration Date. If only a part of the Real Property and not the entire Premises shall be so acquired or condemned then, (1) except as hereinafter provided in this Section 11.1, this Lease and the Term shall continue in force and effect, but, if a part of the Premises is included in the part of the Real Property so acquired or condemned, from and after the date of the vesting of title, the Fixed Rent and the Space Factor shall be reduced in the proportion which the area of the part of the Premises so acquired or condemned bears to the total area of the Premises immediately prior to such acquisition or condemnation and Tenant's Share shall be redetermined based upon the proportion in which the ratio between the rentable area of the Premises remaining after such acquisition or condemnation bears to the rentable area of the Building remaining after such acquisition or condemnation; (2) whether or not the Premises shall be affected thereby, Landlord, at Landlord's

option, may give to Tenant, within sixty (60) days next following the date upon which Landlord shall have received notice of vesting of title, a thirty (30) days' notice of termination of this Lease if Landlord shall elect to terminate leases (including this Lease), affecting at least fifty percent (50%) of the rentable area of the Building or the rentable area of any retail areas thereof (excluding any rentable area leased by Landlord or its Affiliates); and (3) if the part of the Real Property so acquired or condemned shall contain more than twenty-five percent (25%) of the total area of the Premises immediately prior to such acquisition or condemnation, or if, by reason of such acquisition or condemnation, Tenant no longer has reasonable means of access to the Premises, Tenant, at Tenant's option, may give to Landlord, within sixty (60) days next following the date upon which Tenant shall have received notice of vesting of title, a thirty (30) days' notice of termination of this Lease. If any such thirty (30) days' notice of termination is given by Landlord or Tenant, this Lease and the Term shall come to an end and expire upon the expiration of said thirty (30) days with the same effect as if the date of expiration of said thirty (30) days were the Expiration Date. If a part of the Premises shall be so acquired or condemned and this Lease and the Term shall not be terminated pursuant to the foregoing provisions of this Section 11.1, Landlord, at Landlord's expense, shall restore that part of the Premises not so acquired or condemned by erecting demising walls and restoring the Building Systems servicing the Premises, but not the distribution portions of such Systems located within the Premises, at the point at which such Building Systems enter the Premises to a self-contained rental unit exclusive of Tenant's Alterations, betterments and improvements at the Premises. Upon the termination of this Lease and the Term pursuant to the provisions of this Section 11.1, the Fixed Rent and all other items of Rental shall be apportioned and any prepaid portion of Rental for any period after such date shall be refunded by Landlord to Tenant.

Section 11.2. In the event of any such acquisition or condemnation of all or any part of the Real Property, Landlord shall be entitled to receive the entire award for any such acquisition or condemnation, Tenant shall have no claim against Landlord or the condemning authority for the value of any unexpired portion of the Term and Tenant hereby expressly assigns to Landlord all of its right in and to any such award. Nothing contained in this Section 11.2 shall be deemed to prevent Tenant from making a separate claim in any condemnation proceedings for the then value of any Tenant's Property included in such taking, and for any moving expenses.

Section 11.3. If the whole or any part of the Premises shall be acquired or condemned temporarily during the Term for any public or quasi-public use or purpose, Tenant shall give prompt notice thereof to Landlord and the Term shall not be reduced or affected in any way and Tenant shall continue to pay in full all items of Rental payable by Tenant hereunder without reduction or abatement, and Tenant shall be entitled to receive for itself any award or payments for such use, provided, however, that:

> (i) if the acquisition or condemnation is for a period not extending beyond the Term and if such award or payment is made less frequently than in monthly installments, the same shall be paid to and held by Landlord as a fund which Landlord shall apply from time to time to the Rental payable by Tenant hereunder,

except that, if by reason of such acquisition or condemnation changes or alterations are required to be made to the Premises which would necessitate an expenditure to restore the Premises, then a portion of such award or payment considered by Landlord as appropriate to cover the expenses of the restoration shall be retained by Landlord, without application as aforesaid, and applied toward the restoration of the Premises as provided in Section 11.1 hereof; or

(ii)    if the acquisition or condemnation is for a period extending beyond the Term, such award or payment shall be apportioned between Landlord and Tenant as of the Expiration Date; Tenant's share thereof, if paid less frequently than in monthly installments, shall be paid to Landlord and applied in accordance with the provisions of clause (i) above, provided, however, that the amount of any award or payment allowed or retained for restoration of the Premises shall remain the property of Landlord if this Lease shall expire prior to the restoration of the Premises.

## ARTICLE 12
## ASSIGNMENT, SUBLETTING, MORTGAGE, ETC.

Section 12.1.  (A) Except as expressly permitted herein, Tenant, without the prior consent of Landlord in each instance, shall not (a) assign its rights or delegate its duties under this Lease (whether by operation of law, transfers of interests in Tenant or otherwise), mortgage or encumber its interest in this Lease, in whole or in part, (b) sublet, or permit the subletting of, the Premises or any part thereof, or (c) permit the Premises or any part thereof to be occupied or used for desk space, mailing privileges or otherwise, by any Person other than Tenant.

(B)  If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, any and all monies or other consideration payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the estate of Tenant within the meaning of the Bankruptcy Code.  Any and all monies or other consideration constituting Landlord's property under the preceding sentence not paid or delivered to Landlord shall be held in trust for the benefit of Landlord and shall be promptly paid to or turned over to Landlord.

Section 12.2.  (A) If Tenant's interest in this Lease is assigned in violation of the provisions of this Article 12, such assignment shall be void and of no force and effect against Landlord; provided, however, that Landlord may collect an amount equal to the then Fixed Rent plus any other item of Rental from the assignee as a fee for its use and occupancy, and shall apply the net amount collected to the Fixed Rent and other items of Rental reserved in this Lease.  If the Premises or any part thereof are sublet to, or occupied by, or used by, any Person other than Tenant, whether or not in violation of this Article 12, Landlord, after default by Tenant under this

Lease, including, without limitation, a subletting or occupancy in violation of this Article 12, may collect any item of Rental or other sums paid by the subtenant, user or occupant as a fee for its use and occupancy, and shall apply the net amount collected to the Fixed Rent and other items of Rental reserved in this Lease. No such assignment, subletting, occupancy or use, whether with or without Landlord's prior consent, nor any such collection or application of Rental or fee for use and occupancy, shall be deemed a waiver by Landlord of any term, covenant or condition of this Lease or the acceptance by Landlord of such assignee, subtenant, occupant or user as tenant hereunder. The consent by Landlord to any assignment, subletting, occupancy or use shall not relieve Tenant from its obligation to obtain the express prior consent of Landlord to any further assignment, subletting, occupancy or use.

(B) Tenant shall reimburse Landlord on demand for any costs that may be incurred by Landlord in connection with any proposed assignment of Tenant's interest in this Lease or any proposed subletting of the Premises or any part thereof, including, without limitation, any reasonable processing fee, reasonable attorneys' fees and disbursements and the reasonable costs of making investigations as to the acceptability of the proposed subtenant or the proposed assignee.

(C) Neither any assignment of Tenant's interest in this Lease nor any subletting, occupancy or use of the Premises or any part thereof by any Person other than Tenant, nor any collection of Rental by Landlord from any Person other than Tenant as provided in this Section 12.2, nor any application of any such Rental as provided in this Section 12.2 shall, in any circumstances, relieve Tenant of its obligations under this Lease on Tenant's part to be observed and performed.

(D) Any Person to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such assignee shall execute and deliver to Landlord upon demand an instrument confirming such assumption. No assignment of this Lease shall relieve Tenant of its obligations hereunder and, subsequent to any assignment, Tenant's liability hereunder shall continue notwithstanding any subsequent modification or amendment hereof or the release of any subsequent tenant hereunder from any liability, to all of which Tenant hereby consents in advance.

Section 12.3. (A) If Tenant assumes this Lease and proposes to assign the same pursuant to the provisions of the Bankruptcy Code to any Person who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to Tenant, then notice of such proposed assignment shall be given to Landlord by Tenant no later than twenty (20) days after receipt by Tenant, but in any event no later than ten (10) days prior to the date that Tenant shall make application to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption. Such notice shall set forth (a) the name and address of such Person, (b) all of the terms and conditions of such offer, and (c) adequate assurance of future performance by such Person under the Lease as set forth in Paragraph (B) below,

including, without limitation, the assurance referred to in Section 365(b)(3) of the Bankruptcy Code. Landlord shall have the prior right and option, to be exercised by notice to Tenant given at any time prior to the effective date of such proposed assignment, to accept an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such Person, less any brokerage commissions which would otherwise be payable by Tenant out of the consideration to be paid by such Person in connection with the assignment of this Lease.

(B) The term "adequate assurance of future performance" as used in this Lease shall mean that any proposed assignee shall, among other things, (a) deposit with Landlord on the assumption of this Lease an amount equal to nine (9) months of the then Fixed Rent as security for the faithful performance and observance by such assignee of the terms and obligations of this Lease, which sum shall be held by Landlord, in accordance with the provisions of Article 31 hereof, (b) furnish Landlord with financial statements of such assignee for the prior three (3) fiscal years, as finally determined after an audit and certified as correct by a certified public accountant, which financial statements shall show a net worth of at least six (6) times the then Fixed Rent for each of such three (3) years, (c) grant to Landlord a security interest in such property of the proposed assignee as Landlord shall deem necessary to secure such assignee's future performance under this Lease, and (d) provide such other information or take such action as Landlord, in its reasonable judgment shall determine is necessary to provide adequate assurance of the performance by such assignee of its obligations under the Lease.

Section 12.4. Either a transfer (including the issuance of treasury stock or the creation and issuance of new stock or a new class of stock) of a controlling interest in the shares of Tenant or of any entity which holds an interest in Tenant through one or more intermediaries (if Tenant or such entity is a corporation or trust) or a transfer of a majority of the total interest in Tenant or of any entity which holds an interest in Tenant through one or more intermediaries (if Tenant or such entity is a partnership or other entity) at any one time or over a period of time through a series of transfers, shall be deemed an assignment of this Lease and shall be subject to all of the provisions of this Article 12, including, without limitation, the requirement that Tenant obtain Landlord's prior consent thereto. The transfer of shares of Tenant or of any entity which holds an interest in Tenant through one or more intermediaries (if Tenant or such entity is a corporation or trust) for purposes of this Section 12.4 shall not include the sale of shares by persons other than those deemed "insiders" within the meaning of the Securities Exchange Act of 1934, as amended, which sale is effected through the "over-the-counter market" or through any recognized stock exchange.

Section 12.5. If, at any time after the originally named Tenant herein may have assigned Tenant's interest in this Lease, this Lease shall be disaffirmed or rejected in any proceeding of the types described in paragraph (E) of Section 16.1 hereof, or in any similar proceeding, or in the event of termination of this Lease by reason of any such proceeding or by reason of lapse of time following notice of termination given pursuant to said Article 16 based upon any of the Events of Default set forth in such paragraph, any prior Tenant, including, without limitation, the originally

named Tenant, upon request of Landlord given within thirty (30) days next following any such disaffirmance, rejection or termination (and actual notice thereof to Landlord in the event of a disaffirmance or rejection or in the event of termination other than by act of Landlord), shall (1) pay to Landlord all Fixed Rent, Escalation Rent and other items of Rental due and owing by the assignee to Landlord under this Lease to and including the date of such disaffirmance, rejection or termination, and (2) as "tenant", enter into a new lease with Landlord of the Premises for a term commencing on the effective date of such disaffirmance, rejection or termination and ending on the Expiration Date, unless sooner terminated as in such lease provided, at the same Fixed Rent and upon the then executory terms, covenants and conditions as are contained in this Lease, except that (a) Tenant's rights under the new lease shall be subject to the possessory rights of the assignee under this Lease and the possessory rights of any person claiming through or under such assignee or by virtue of any statute or of any order of any court, (b) such new lease shall require all defaults existing under this Lease to be cured by Tenant with due diligence, and (c) such new lease shall require Tenant to pay all Escalation Rent reserved in this Lease which, had this Lease not been so disaffirmed, rejected or terminated, would have accrued under the provisions of Article 27 hereof after the date of such disaffirmance, rejection or termination with respect to any period prior thereto. If any such prior Tenant shall default in its obligation to enter into said new lease for a period of ten (10) days next following Landlord's request therefor, then, in addition to all other rights and remedies by reason of such default, either at law or in equity, Landlord shall have the same rights and remedies against such Tenant as if such Tenant had entered into such new lease and such new lease had thereafter been terminated as of the commencement date thereof by reason of such Tenant's default thereunder.

Section 12.6. (A) At least fifteen (15) Business Days prior to any proposed subletting of the Premises, Tenant shall submit a statement to Landlord (a "Tenant Statement") containing or accompanied by the following information: (a) the name and address of the proposed subtenant, (b) the terms and conditions of the proposed subletting, including, without limitation, the rent payable and the cost (including overhead and supervision) of any improvements (including any demolition to be performed) to the Premises for occupancy by such subtenant, (c) the nature and character of the business of the proposed subtenant, (d) the financial statements of the proposed subtenant and a description of the experience of the proposed subtenant and the principals thereof in the operation of restaurants in Manhattan, and (e) any other information that Landlord may reasonably request, together with a statement specifically directing Landlord's attention to the provisions of this Section 12.6(A) requiring Landlord to respond to Tenant's request within fifteen (15) Business Days after Landlord's receipt of the Tenant Statement. Landlord shall have the right, exercisable by notice to Tenant within fifteen (15) Business Days after Landlord's receipt of the Tenant Statement, to either (i) terminate this Lease on a date to be specified in Landlord's notice to Tenant (the "Sublease Termination Date"), which date shall not be earlier than one (1) day before the effective date of the proposed subletting nor later than sixty-one (61) days after said effective date, or (ii) to sublet (in its own name or that of its designee) the Premises (the "Recapture Space") from Tenant on the terms and conditions set forth in the Tenant Statement (as modified by the provisions of paragraph (C) of this Section 12.6) for a term expiring on the day immediately preceding the Expiration Date. If Landlord shall fail to notify

Tenant within said fifteen (15) Business Day period of Landlord's intention to exercise its rights pursuant to this Section 12.6(A) hereof or of Landlord's consent to or disapproval of the proposed subletting pursuant to the Tenant Statement, or if Landlord shall have consented to such subletting, Tenant shall have the right to sublease the Premises to such proposed subtenant on the same terms and conditions set forth in the Tenant Statement, subject to the terms and conditions of this Lease. If Tenant shall not enter into such sublease within sixty (60) days after the delivery of the Tenant Statement to Landlord, then the provisions of Section 12.1 and this Section 12.6 shall again be applicable to any other proposed subletting. If Tenant shall enter into such sublease within sixty (60) days as aforesaid, Tenant shall deliver a true, complete and fully executed counterpart of such sublease to Landlord within five (5) days after execution thereof.

(B) If Landlord exercises its option to terminate this Lease as aforesaid, Tenant shall vacate and surrender the Premises on or before the Sublease Termination Date in accordance with Article 20 hereof and the Term shall end on the Sublease Termination Date as if it were the Expiration Date.

(C) If Landlord exercises its option to sublet the Recapture Space, such sublease to Landlord or its designee as subtenant (each, a "Recapture Sublease") shall:

(i) be at a rental equal to the lesser of (x) the sum of the Fixed Rent, Escalation Rent and Electricity Additional Rent then payable hereunder and (y) the sublease rent set forth in the Tenant Statement (including electricity) and otherwise be upon the same terms and conditions as those contained in this Lease (as modified by the Tenant Statement, except such as are irrelevant or inapplicable and except as otherwise expressly set forth to the contrary in this paragraph (C));

(ii) give the subtenant the unqualified and unrestricted right, without Tenant's permission, to assign such sublease and to further sublet the Recapture Space or any part thereof and to make any and all changes, alterations, and improvements in the Recapture Space;

(iii) provide in substance that any such changes, alterations, and improvements made in the Recapture Space may be removed, in whole or in part, prior to or upon the expiration or other termination of the Recapture Sublease provided that any material damage and injury caused thereby shall be repaired;

(iv) provide that (i) the parties to such Sublease expressly negate any intention that any estate created under such Sublease be merged with any other estate held by either of said parties, (ii) prior to the commencement of the term of the Recapture Sublease, Tenant, at its sole cost and expense (unless the Tenant Statement provides otherwise), shall make such alterations as may be required or reasonably deemed necessary by the subtenant, and (iii) at the expiration of the term of such Sublease, Tenant shall accept the Recapture Space in its then existing condition, broom clean;

        (v)     provide that the subtenant or occupant may use and occupy the Recapture Space for any lawful purpose (without regard to any limitation set forth in the Tenant Statement); and

        (vi)    not require the subtenant thereunder to post a security deposit.

        (D)    Performance by Landlord, or its designee, under a Recapture Sublease shall be deemed performance by Tenant of any similar obligation under this Lease and Tenant shall not be liable for any default under this Lease or deemed to be in default hereunder if such default is occasioned by or arises from any act or omission of the subtenant under the Recapture Sublease or is occasioned by or arises from any act or omission of any occupant under the Recapture Sublease.

        (E)    If Landlord is unable to give Tenant possession of the Recapture Space at the expiration of the term of the Recapture Sublease by reason of the holding over or retention of possession of any tenant or other occupant, then (w) Landlord shall continue to pay all charges previously payable, and comply with all other obligations, under the Recapture Sublease until the date upon which Landlord shall give Tenant possession of the Recapture Space free of occupancies, (x) neither the Expiration Date nor the validity of this Lease shall be affected, (y) Tenant waives any rights under Section 223-a of the Real Property Law of New York, or any successor statute of similar import, to rescind this Lease and further waives the right to recover any damages from Landlord which may result from the failure of Landlord to deliver possession of the Recapture Space at the end of the term of the Recapture Sublease, and (z) Landlord, at Landlord's expense, shall use its reasonable efforts to deliver possession of the Recapture Space to Tenant and in connection therewith, if necessary, shall institute and diligently and in good faith prosecute holdover and any other appropriate proceedings against the occupant of such Space; if Landlord fails to prosecute such proceedings in such manner and such failure continues after reasonable notice thereof by Tenant, Tenant may prosecute such proceedings in Landlord's name and at Landlord's expense.

        (F)    The failure by Landlord to exercise its option under Section 12.6(A) with respect to any subletting shall not be deemed a waiver of such option with respect to any extension of such subletting or any subsequent subletting of the Premises affected thereby.

        Section 12.7.  (A)  In connection with any subletting of the Premises, Tenant shall pay to Landlord an amount equal to sixty percent (60%) of any Sublease Profit derived therefrom. Anything contained herein to the contrary notwithstanding, Tenant shall not be entitled to any proceeds derived from or relating to (directly or indirectly) any subletting of the Recapture Space by Landlord or its designee to a subtenant. All sums payable hereunder by Tenant shall be calculated on an annualized basis, but shall be paid to Landlord, as additional rent, within ten (10) days after receipt thereof by Tenant.

        (B)    For purposes of this Lease:

(1) "Sublease Profit" shall mean the excess of (i) the Sublease Rent over (ii) the then Fixed Rent, Escalation Rent and Electricity Additional Rent.

(2) "Sublease Rent" shall mean any rent or other consideration paid to Tenant directly or indirectly by any subtenant or any other amount received by Tenant from or in connection with any subletting (including, but not limited to, sums paid for the sale or rental, or consideration received on account of any contribution, of Tenant's Property or sums paid in connection with the supply of electricity or HVAC), less the Sublease Expenses.

(3) "Sublease Expenses" shall mean: (i) in the event of a sale to or leasing by such subtenant of Tenant's Property, the then unamortized or undepreciated cost thereof, determined on the basis of Tenant's federal income tax returns, (ii) the reasonable out-of-pocket costs and expenses of Tenant in making such sublease, such as brokers' fees, attorneys' fees, and advertising fees paid to unrelated third parties, (iii) any sums paid to Landlord pursuant to Section 12.2(B) hereof, and (iv) the cost of improvements or alterations made by Tenant expressly and solely for the purpose of preparing the Premises for such subtenancy if not used by Tenant subsequent to the expiration of the term of the sublease. In determining Sublease Rent, the costs set forth in clauses (i) (with respect only to a leasing by such subtenant of Tenant's Property), (ii), (iii) and (iv) shall be amortized on a straight-line basis over the term of such sublease.

(4) Sublease Profit shall be recalculated from time to time to reflect any corrections in the prior calculation thereof due to (i) subsequent payments received or made by Tenant, (ii) the final adjustment of payments to be made by or to Tenant, and (iii) mistake. Promptly after receipt or final adjustment of any such payments or discovery of any such mistake, Tenant shall submit to Landlord a recalculation of the Sublease Profit, and an adjustment shall be made between Landlord and Tenant, on account of prior payments made or credits received pursuant to this Section 12.7.

Section 12.8. (A) (1) For purposes of this Lease, a "Sale of Business Assignment" shall mean a proposed assignment of this Lease in conjunction with the sale or transfer of all or substantially all of the assets and business of Tenant where (I) the resulting restaurant operated at the Premises by such assignee or transferee (a) is operated, for a period of at least two (2) years, under the same name under which Tenant's restaurant at the Premises was operated prior to such sale or transfer, (b) retains, for a period of at least two (2) years, the same decor (with no material alterations thereto) as in Tenant's restaurant prior to such sale or transfer, (c) contracts in writing, for a period of at least two (2) years after such sale or transfer, to employ Brennan as the operator of such restaurant and Brennan operates such restaurant during such period, and (d) operates as a first-class restaurant comparable with Tenant's restaurant prior to such sale or transfer (the criteria set forth in clauses (a) through (d) above being referred to herein as the "Assignment Criteria"), and (II) the principal of such proposed assignee responsible for the operation of the restaurant at the Premises (or, in the case of clause (z) below, the proposed assignee) (x) is a first-class restauranteur with at least ten (10) years of experience in the restaurant business

comparable with Brennan's experience as of the date hereof, (y) has at least one (1) other restaurant in the New York City area of similar quality to Tenant's restaurant prior to such sale or transfer, and (z) has a net worth and annual income and cash flow, determined in accordance with generally accepted accounting principles, consistently applied, after giving effect to such assignment, equal to the greater of Tenant's net worth and annual income and cash flow, as so determined, on (i) the date immediately preceding the date of such assignment, and (ii) the Commencement Date (any assignee meeting the conditions set forth in clauses (x) through (z) above being referred to herein as a "Qualified Purchaser").

          (2)     If a Sale of Business Assignment is consummated and the Qualified Purchaser fails to comply, at any time during the two (2) year period after the effective date of such Sale of Business Assignment, with the Assignment Criteria (except with respect to clause (c) of Section 12.8(A)(1) above, if such failure is due to the disability or death of Brennan), then, from and after such date of non-compliance (the "Non-Compliance Date") (i) the Sale of Business Assignment shall be deemed a Routine Assignment for purposes of this Lease and, at any time thereafter, Landlord may exercise all of its rights hereunder that it would be permitted to exercise if such Sale of Business Assignment were a Routine Assignment, including, without limitation, the right to terminate this Lease as set forth in Section 12.8(C)(2) hereof, but without any obligation by Landlord to make any payment pursuant to Section 12.9(A)(2) hereof, (ii) such failure to comply with the Assignment Criteria shall constitute an Event of Default under this Lease and Landlord shall have all rights and remedies to which it is entitled hereunder with respect to an Event of Default, and (iii) Landlord may direct Escrow Agent to deliver the Sale of Business Escrow to Landlord in accordance with Section 12.8(C)(3) below.

          (3)     If Landlord consents to a Sale of Business Assignment proposed by Tenant, then Landlord and Tenant, promptly after receipt of Landlord's consent to such Assignment, shall enter into an escrow agreement (the "Escrow Agreement") with Landlord's attorney, as so designated by Landlord ("Escrow Agent"), pursuant to which Tenant shall deposit into escrow (the "Sale of Business Escrow"), on or prior to the effective date of such Sale of Business Assignment, an amount equal to Landlord's Assignment Payment (as defined in Section 12.9 hereof) that would be payable to Landlord if the Sale of Business Assignment were a Routine Assignment, which Sale of Business Escrow shall be held by Escrow Agent on the terms set forth herein. The Escrow Agreement shall provide that (i) if the Qualified Purchaser complies with the Assignment Criteria set forth in Section 12.8(A)(1) hereof during the entire two (2) year period, then Landlord and Tenant shall direct Escrow Agent to deliver the Sale of Business Escrow to Tenant promptly after the end of such period, and (ii) if the Qualified Purchaser fails to comply, at any time during the two (2) year period, with the Assignment Criteria, then Landlord may direct Escrow Agent to deliver the Sale of Business Escrow to Landlord. It shall be a condition of Tenant's right to enter into a Sale of Business Assignment that Landlord, Tenant and the Escrow Agent each execute and deliver the Escrow Agreement.

(B)     For purposes of this Lease, a "Routine Assignment" shall mean any proposed assignment of this Lease which does not constitute a Sale of Business Assignment.

(C)     (1)     At least fifteen (15) Business Days prior to any proposed Sale of Business Assignment or Routine Assignment, Tenant shall submit a statement to Landlord (the "Assignment Statement") containing the following information: (i) a statement whether the assignment is a Sale of Business Assignment or a Routine Assignment, (ii) the name and address of the proposed assignee, (iii) the material terms and conditions of the proposed assignment, including, without limitation, the consideration payable for such assignment and the cost (including overhead and supervision) of any improvements (including any demolition to be performed) to the Premises proposed to be made by Tenant to prepare the Premises for occupancy by such assignee, and the cost of any other inducements to be provided by Tenant to such proposed assignee in connection with such assignment, by way of contribution or otherwise, (iv) the nature and character of the business of the proposed assignee, (v) the financial statement and a description of the experience in the operation of restaurants in Manhattan of the proposed assignee and the principals thereof, (vi) in the case of a Sale of Business Assignment, a certification by Tenant and the proposed assignee that the proposed assignment is a Sale of Business Assignment, together with evidence that the proposed assignment satisfies the Assignment Criteria, and (vii) any other information that Landlord may reasonably request (provided that such other information is requested by Landlord within ten (10) Business Days after Landlord's receipt of the Tenant Statement), together with a statement specifically directing Landlord's attention to the provisions of this Section 12.8(C)(1) requiring Landlord to respond to Tenant's request within fifteen (15) Business Days after Landlord's receipt of the Assignment Statement. The Assignment Statement shall be executed by Tenant and the proposed assignee and shall indicate both parties' intent (but not necessarily binding obligation) to enter into an assignment agreement conforming to the terms and conditions of the Assignment Statement and on such other terms and conditions to which the parties may agree which are not inconsistent with the material terms set forth in the Assignment Statement.

(2)     Landlord shall have the right, exercisable by written notice given by Landlord to Tenant within fifteen (15) Business Days after Landlord's receipt of an Assignment Statement with respect to a Routine Assignment, to terminate this Lease (an "Assignment Termination"), in which event the Term shall expire on a date set by Landlord that is not sooner than ninety (90) days after the date of Landlord's notice, and Tenant shall vacate the Premises and surrender the same to Landlord on such date set by Landlord in accordance with the provisions of Article 20 hereof.

(3)     If Landlord shall fail to notify Tenant within said fifteen (15) Business Day period of Landlord's intention to exercise its rights pursuant to paragraph (C)(2) of this Section 12.8 or of Landlord's consent to or disapproval of the proposed assignment pursuant to the Assignment Statement, or if Landlord shall have consented to such assignment pursuant to the terms of this Article 12, then Tenant shall be free to assign the Premises to such proposed assignee on the same terms and conditions set forth in the Assignment Statement. If Tenant shall

not enter into such assignment within sixty (60) days after the delivery of the Assignment Statement to Landlord, then the provisions of this Section 12.8 shall again be applicable in their entirety to any proposed assignment.

(D)     If Tenant shall assign this Lease, Tenant shall deliver to Landlord, within five (5) days after execution thereof, (x) a duplicate original instrument of assignment in form and substance reasonably satisfactory to Landlord, duly executed by Tenant, (y) an instrument in form and substance reasonably satisfactory to Landlord, duly executed by the assignee, in which such assignee shall assume observance and performance of, and agree to be personally bound by, all of the terms, covenants and conditions of this Lease on Tenant's part to be observed and performed, and (z) in the case of a Sale of Business Assignment, a copy of the executed contract referred to in Section 12.8(A)(1)(c) hereof.

(E)     If Landlord consents to any Sale of Business Assignment or Routine Assignment, then, from and after the effective date of such Assignment, the Fixed Rent payable hereunder for each Rental Period shall be increased by ten percent (10%) of the Fixed Rent payable hereunder for each Rental Period (such increased rent being referred to herein as the "Assignment Rent").

(F)     Promptly after a determination has been made of the Assignment Rent, the parties shall execute and deliver to each other an instrument setting forth the Fixed Rent for the remainder of the term of this Lease as determined in accordance with this Section 12.8, provided that failure of the parties to execute and deliver such instrument shall not affect the payment of the Assignment Rent pursuant to this Section 12.8.

Section 12.9.  (A) (1)  If Tenant submits an Assignment Statement to which Landlord consents or is deemed to have consented pursuant to the provisions of this Article 12, then Tenant shall pay (x) to Landlord, in the case of a Routine Assignment, within ten (10) days after receipt thereof, or (y) to Escrow Agent, in the case of a Sale of Business Assignment, on or prior to the effective date of such Sale of Business Assignment, an amount equal to the product of (I) the Assignment Proceeds, less (i) in the event of a sale (or contribution of Tenant's Property, the then unamortized or undepreciated cost thereof, determined by amortizing such costs on a straight-line basis over the term of this Lease, (ii) the reasonable out-of-pocket costs and expenses of Tenant in making such assignment, such as broker's fees, attorneys' fees and advertising fees paid to unrelated third parties, (iii) any sums paid by Tenant to Landlord pursuant to Section 12.2(B) hereof, and (iv) the cost of improvements or alterations made by Tenant expressly and solely for the purpose of preparing the Premises for such assignment and the cost of any other inducements to be provided by Tenant to the proposed assignee in connection with such assignment by way of contribution or otherwise (the Assignment Proceeds, less the amounts set forth in clauses (i) through (iv) above, being referred to herein as the "Net Assignment Proceeds"), and (v) the then unamortized amount of (1) the "hard" costs of Tenant's Initial Alterations, other than any costs for Initial Alterations which are moveable and decorative in nature (collectively, the "Alteration Costs"), and (2) the amount paid by Tenant to An

American Place, LLC ("American") for the purchase of American's fixtures (the "American Fixture Costs"), determined in each case by amortizing such costs on a straight-line basis over the term of this Lease (the "Unamortized Improvement Payment"), and (II) sixty percent (60%) (such amount payable to Landlord or Escrow Agent being referred to herein as "Landlord's Assignment Payment"). Tenant has advised Landlord, and Landlord has agreed, that subject to verification thereof in Tenant's Cost Statement, the amount of the American Fixture Costs shall be Four Hundred Twenty-Five Thousand Dollars ($425,000) as reflected in Tenant's estimated Projected Start-Up and Capital Expenditures attached hereto as Exhibit "C" and made a part hereof (the "Projected Budget"). Within ninety (90) days after the date on which Tenant opens for business, Tenant shall deliver to Landlord a statement signed by Tenant's independent certified public accountant ("Tenant's Cost Statement"), certifying the amount of the Alteration Costs and the American Fixture Costs, together with reasonable backup documentation of such Costs. The costs included in the determination of the Alteration Costs (i) shall be substantially similar to the categories of costs set forth in the Projected Budget, and (ii) shall not exceed the costs set forth in the Projected Budget by more than thirty percent (30%) of such Projected Budget (exclusive of the American Fixture Costs).

(2) If Tenant submits an Assignment Statement with respect to a Routine Assignment and Landlord exercises its right to terminate this Lease pursuant to Section 12.8(C)(2) hereof, then (A) Landlord shall pay to Tenant an amount equal to (X) the Unamortized Improvement Payment, plus (Y) the product of (I) (i) the Net Assignment Proceeds, less (ii) the Unamortized Improvement Payment, and (II) forty percent (40%) ("Tenant's Assignment Payment"), and (B) Tenant shall pay to Landlord, within ten (10) days after demand therefor, an amount equal to the cost of the items set forth in Paragraph 12.9(A)(1)(iv) above, as such costs are reflected in the Assignment Statement. Tenant's Assignment Payment shall be payable by Landlord over the same period of time that the Assignment Proceeds would have been payable to Tenant pursuant to the Assignment Statement if Landlord had not elected to terminate this Lease; provided, however, that Landlord shall have the right to prepay such installments of Tenant's Assignment Payment in a lump-sum payment discounted at a discount rate equal to the then current yield on the Federal Treasury Bill, Note or Bond with a maturity closest to the Fixed Expiration Date.

(B) For purposes of this Lease, "Assignment Proceeds" shall mean, in the case of a Routine Assignment or Sale of Business Assignment, all consideration payable to Tenant, directly or indirectly, by any assignee, or any other amount received by Tenant from or in connection with any such assignment (including, but not limited to, sums paid for the sale or rental, or consideration received on account of any contribution, of Tenant's Property).

Section 12.10. Notwithstanding any other provision of this Lease, neither Tenant nor any direct or indirect assignee or subtenant of Tenant may enter into any lease, sublease, license, concession or other agreement for use, occupancy or utilization of space in the Premises which provides for a rental or other payment for such use, occupancy or utilization based in whole or in part on the net income or profits derived by any person from the property leased, occupied or

utilized, or which would require the payment of any consideration which would not fall within the definition of "rents from real property", as that term is defined in Section 856(d) of the Internal Revenue Code of 1986, as amended.

## ARTICLE 13
## ELECTRICITY

Section 13.1. Tenant shall at all times comply with the rules, regulations, terms and conditions applicable to service, equipment, wiring and requirements of the public utility supplying electricity to the Building. Tenant shall not use any electrical equipment which would exceed the capacity of existing feeders to the Building or the risers or wiring installations therein or which will overload such installations or interfere with the electrical service to other tenants of the Building. In the event that, in Landlord's reasonable judgment, Tenant's electrical requirements necessitate installation of an additional riser, risers or other proper and necessary equipment, Landlord shall so notify Tenant of same. Within five (5) Business Days after receipt of such notice, Tenant shall either cease such use of such additional electricity or shall request that additional electrical capacity (specifying the amount requested) be made available to Tenant. Landlord, in Landlord's reasonable judgment shall determine whether to make available such additional electrical capacity to Tenant and the amount of such additional electrical capacity to be made available. If Landlord shall agree to make available additional electrical capacity and the same necessitates installation of an additional riser, risers or other proper and necessary equipment, including, without limitation, any switchgear, the same shall be installed by Landlord. Any such installation shall be made at Tenant's sole cost and expense, and shall be chargeable and collectible as additional rent and paid within ten (10) days after the rendition of a bill to Tenant therefor. Landlord shall not be liable in any way to Tenant for any failure or defect in the supply or character of electric service furnished to the Premises by reason of any requirement, act or omission of the utility serving the Building or for any other reason not attributable to the gross negligence of Landlord, whether electricity is provided by public or private utility or by any electricity generation system owned and operated by Landlord.

Section 13.2. (A) Unless Landlord elects to have Tenant obtain electricity from the public utility company furnishing electricity to the Building pursuant to the provisions of Section 13.4 hereof, then subject to the provisions of Section 13.3 hereof, electricity shall be furnished by Landlord to the Premises and Tenant shall pay to Landlord, as additional rent for such service, during the Term, an amount (the "Electricity Additional Rent") equal to (i) the amount Landlord actually pays to the utility company to provide electricity to the Premises, including all applicable surcharges, demand charges, time-of-day charges, energy charges, fuel adjustment charges, rate adjustment charges, taxes and other sums payable in respect thereof and net of any rebates or credits actually received by Landlord in respect of such electricity supplied to the Premises, based on Tenant's demand and/or consumption of electricity (and/or any other method of quantifying Tenant's use of or demand for electricity as set forth in the utility company's tariff) as registered on a meter or submeter for purposes of measuring such demand, consumption and/or

other method of quantifying Tenant's use of or demand for electricity (it being agreed that such meter or submeter shall measure demand and consumption, and off-peak and on-peak use, in either case to the extent such factors are relevant in making the determination of Landlord's cost) plus (ii) four percent (4%) of the amount set forth in clause (i) above as Landlord's administrative charge for overhead supervision. Tenant, from time to time, shall have the right to review Landlord's meter readings, and Landlord's calculation of the Electricity Additional Rent, at reasonable times and on reasonable prior notice, by giving notice thereof to Landlord on or prior to the thirtieth (30th) day after the date when Landlord gives Tenant a bill or statement for the Electricity Additional Rent.

(B) Where more than one meter measures the electricity supplied to Tenant, the electricity rendered through each meter may be computed and billed separately in accordance with the provisions hereinabove set forth. Bills for the Electricity Additional Rent shall be rendered to Tenant at such time as Landlord may elect, and Tenant shall pay the amount shown thereon to Landlord within ten (10) days after receipt of such bill. Tenant expressly acknowledges that in connection with the installation of the meters or submeters, the electricity being supplied to the Premises shall be temporarily interrupted. Landlord shall use reasonable efforts to minimize interference with the conduct of Tenant's business in connection with such installation; provided, however, that Landlord shall have no obligation to employ contractors or labor at so-called overtime or other premium pay rates or to incur any other overtime costs or expenses whatsoever.

Section 13.3. (A) If, prior to Tenant's performance of the Initial Alterations, such meters or submeters become non-operational for any reason, Tenant shall be provided access to the Premises or portion thereof for the purpose of performing Tenant's Initial Alterations and Tenant shall pay to Landlord a fee (the "Electricity Fee") in consideration of Landlord furnishing electricity to the Premises for construction lighting and for power for normal construction tools. The Electricity Fee shall only be payable with respect to the period during which such meters or submeters are non-operational. Upon the meters becoming operational, Tenant shall pay Electricity Additional Rent based upon the demand and consumption shown on such meters or submeters, as more particularly set forth in Section 13.2 hereof. The Electricity Fee shall be an amount equal to the product of (x) Seventy-Three and 97/100 Dollars ($73.97) (provided, however, that if Landlord shall provide Tenant with access to less than the entire Premises, the Electricity Fee shall be proportionately reduced based on the area of the Premises to which Tenant has been given access), and (y) the number of calendar days on which Tenant shall have access to the Premises or portion thereof for the purpose of performing Tenant's Initial Alterations. Landlord shall render a bill to Tenant for such Electricity Fee from time to time, but not more frequently than monthly, and Tenant shall pay such Electricity Fee to Landlord, as additional rent, within ten (10) days after receipt of such bill.

(B) If, at any time during the Term after the performance of the Initial Alterations, the meters or submeters in the Premises become non-operational for any reason and Tenant shall occupy all or any portion of the Premises for the conduct of business, Landlord shall

furnish electric current to the Premises on a "rent inclusion" basis, until said meters or submeters become operational. Upon such meters or submeters becoming operational, Tenant shall pay Electricity Additional Rent pursuant to Section 13.2 hereof. The Fixed Rent set forth in this Lease does not include a charge for such electric service. Accordingly, Tenant shall pay to Landlord on the first day of each month during such inclusion period, in the same manner as Fixed Rent is payable hereunder, an amount equal to Two Thousand Two Hundred Fifty Dollars ($2,250) (the "Electricity Inclusion Charge"). If such inclusion period shall commence on a date other than the first (1st) day of any calendar month, Tenant shall pay to Landlord on the date such inclusion period commences an amount equal to the product of (i) Seventy-Three and 97/100 Dollars, and (ii) the number of calendar days in the period from the beginning of such inclusion period to the last day of the month in which such date shall occur, both dates inclusive. If Landlord is supplying electricity to only a portion of the Premises on a "rent inclusion" basis as aforesaid, the Electricity Inclusion Charge shall be proportionately reduced based on the area of the Premises being supplied with electricity on a "rent inclusion" basis. The parties agree that although the charge for furnishing electrical energy is reflected in the Electricity Inclusion Charge on a so called "rent inclusion" basis, the value to Tenant of such service may not be accurately reflected in such Electricity Inclusion Charge. Accordingly, Landlord and Tenant agree that after the meters and/or submeters are operational and electricity is being furnished to such portion of the Premises pursuant to Section 13.2 hereof for a three (3) month period, the Electricity Inclusion Charge shall be adjusted based on the average of the Electricity Additional Rent ("Three Month Average") payable by Tenant for such three (3) month period with respect to the portion of the Premises which was previously being furnished with electricity on a "rent inclusion" basis. If the Three Month Average shall exceed the Electricity Inclusion Charge, Tenant, within ten (10) Business Days after demand therefor, shall pay such excess to Landlord, and if the Electricity Inclusion Charge shall exceed the Three Month Average, Landlord, at its option, shall either promptly refund to Tenant such excess or shall credit such excess against immediately subsequent monthly installments of Fixed Rent next becoming due and payable hereunder.

Section 13.4. If Landlord shall be required by Requirements or the public utility serving the Premises to discontinue furnishing electricity to Tenant, this Lease shall continue in full force and effect and shall be unaffected thereby, except only that from and after the effective date of such discontinuance, Landlord shall not be obligated to furnish electricity to Tenant and Tenant shall not be obligated to pay the Electricity Additional Rent or the Electricity Inclusion Charge, as the case may be. If Landlord so discontinues furnishing electricity to Tenant, Tenant shall use diligent efforts to obtain electric energy directly from the public utility furnishing electric service to the Building. The costs of such service shall be paid by Tenant directly to such public utility. Such electricity may be furnished to Tenant by means of the existing electrical facilities serving the Premises, at no charge, to the extent the same are available, suitable and safe for such purposes as determined by Landlord. All meters and all additional panel boards, feeders, risers, wiring and other conductors and equipment which may be required to obtain electricity shall be installed by Landlord at Tenant's expense. Provided Tenant shall use and continue to use diligent efforts to obtain electric energy directly from the public utility, Landlord, to the extent permitted

by applicable Requirements, shall not discontinue furnishing electricity to the Premises until such installations have been made and Tenant shall be able to obtain electricity directly from the public utility.

## ARTICLE 14
## ACCESS TO PREMISES

Section 14.1. (A) Tenant shall permit Landlord, Landlord's agents, representatives, contractors and employees and public utilities servicing the Building to erect, use and maintain, concealed ducts, pipes and conduits in and through the Premises as Landlord deems reasonably necessary for Landlord's business operations. Landlord, Landlord's agents, representatives, contractors, and employees and the agents, representatives, contractors, and employees of public utilities servicing the Building shall have the right to enter the Premises at all reasonable times upon reasonable prior notice (except in the case of an emergency in which event Landlord and Landlord's agents, representatives, contractors, and employees may enter without prior notice to Tenant), which notice may be oral, to examine the same, to show them to prospective purchasers, or prospective or existing Mortgagees or Lessors, and to make such repairs, alterations, improvements, additions or restorations (i) as Landlord may deem reasonably necessary or desirable to the Premises or to any other portion of the Building, or (ii) which Landlord may elect to perform following ten (10) days after notice, except in the case of an emergency (in which event Landlord and Landlord's agents, representatives, contractors, and employees may enter without prior notice to Tenant), following Tenant's failure to make repairs or perform any work which Tenant is obligated to make or perform under this Lease, or (iii) for the purpose of complying with any Requirements, a Superior Lease or a Mortgage, and Landlord shall be allowed to take all material into and upon the Premises that may be required therefor without the same constituting an eviction or constructive eviction of Tenant in whole or in part and the Fixed Rent (and any other item of Rental) shall in no wise abate while said repairs, alterations, improvements, additions or restorations are being made, by reason of loss or interruption of business of Tenant, or otherwise.

(B) Any work performed or installations made pursuant to this Article 14 shall be made with reasonable diligence and otherwise pursuant to the provisions of Section 4.3 hereof.

(C) Except as hereinafter provided, any pipes, ducts, or conduits installed in or through the Premises pursuant to this Article 14 shall be concealed behind, beneath or within partitioning, columns, ceilings or floors located or to be located in the Premises. Notwithstanding the foregoing, any such pipes, ducts, or conduits may be furred at points immediately adjacent to partitioning columns or ceilings located or to be located in the Premises, provided that the same are completely furred and that the installation of such pipes, ducts, or conduits, when completed, shall not reduce the usable area of the Premises beyond a de minimis amount.

Section 14.2. During the nine (9) month period prior to the Expiration Date, Landlord may exhibit the Premises to prospective tenants thereof.

Section 14.3. If Tenant shall not be present when for any reason entry into the Premises shall be necessary or permissible, Landlord or Landlord's agents, representatives, contractors or employees may enter the same without rendering Landlord or such agents liable therefor if during such entry Landlord or Landlord's agents shall accord reasonable care under the circumstances to Tenant's Property, and without in any manner affecting this Lease. Nothing herein contained, however, shall be deemed or construed to impose upon Landlord any obligation, responsibility or liability whatsoever, for the care, supervision or repair of the Building or any part thereof, other than as herein provided.

Section 14.4. Landlord also shall have the right at any time, without the same constituting an actual or constructive eviction and without incurring any liability to Tenant therefor, to change the arrangement or location of entrances or passageways, doors and door-ways, and corridors, elevators, stairs, toilets, or other public parts of the Building and to change the name, number or designation by which the Building is commonly known, provided any such change does not (a) unreasonably reduce, interfere with or deprive Tenant of access to the Building or the Premises, (b) reduce the rentable area (except by a de minimis amount) of the Premises, or (c) move the entrance(s) to the Premises (except by a de minimis amount). All parts (except surfaces facing the interior of the Premises) of all walls, windows and doors bounding the Premises (including exterior Building walls, exterior core corridor walls, exterior doors and entrances), all balconies, terraces and roofs adjacent to the Premises, all space in or adjacent to the Premises used for shafts, stacks, stairways, chutes, pipes, conduits, ducts, fan rooms, heating, air cooling, plumbing and other mechanical facilities, service closets and other Building facilities are not part of the Premises, and Landlord shall have the use thereof, as well as access thereto through the Premises for the purposes of operation, maintenance, alteration and repair.

ARTICLE 15
CERTIFICATE OF OCCUPANCY

Tenant shall not at any time use or occupy the Premises in violation of the certificate of occupancy at such time issued for the Premises or for the Building and in the event that any department of the City or State of New York shall hereafter contend or declare by notice, violation, order or in any other manner whatsoever that the Premises are used for a purpose which is a violation of such certificate of occupancy, Tenant, upon written notice from Landlord or any Governmental Authority, shall immediately discontinue such use of the Premises; provided, however, that Tenant, at Tenant's sole cost and expense and with Landlord's consent (which consent shall not be unreasonably withheld), may apply for, and pay all costs in connection with, an amendment to the existing certificate of occupancy which would permit any such use which is permitted in accordance with this Lease, provided further that any such change to the certificate of occupancy shall not affect the use of any portion of the Building outside of

the Premises. On the Commencement Date a temporary or permanent certificate of occupancy covering the Premises will be in force permitting certain portions of the Premises to be used for "retail" or "storage" purposes, as the case may be, provided, however, neither such certificate, nor any provision of this Lease, nor any act or omission of Landlord, shall be deemed to constitute a representation or warranty that any particular part of the Premises may be used for either "retail" or "storage" purposes, or that the Premises, or any part thereof, lawfully may be used or occupied for any particular purpose or in any particular manner, in contradistinction to mere "retail" or "storage" use, as the case may be.

## ARTICLE 16
### DEFAULT

Section 16.1. Each of the following events shall be an "Event of Default" hereunder:

(A) if Tenant shall default in the payment when due of any installment of Fixed Rent and such default shall continue for five (5) days after notice of such default is given to Tenant, or in the payment when due of any other item of Rental and such default shall continue for five (5) days after notice of such default is given to Tenant, except that if Landlord shall have given two (2) such notices in any twelve (12) month period, Tenant shall not be entitled to any further notice of its delinquency in the payment of Rental until such time as twelve (12) consecutive months shall have elapsed without Tenant having defaulted in any such payment; or

(B) Intentionally Omitted; or,

(C) if the Premises shall become vacant, deserted or abandoned or if Tenant shall fail to be open to the public for the conduct of its business as provided in Section 2.1(C) hereof for more than five (5) consecutive days more than four (4) times in any six (6) month period (other than by reason of casualty or similar reasons beyond Tenant's reasonable control); or

(D) if Tenant's interest or any portion thereof in this Lease shall devolve upon or pass to any person, whether by operation of law or otherwise, except as expressly permitted under Article 12 hereof; or

(E) (1) if Tenant shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(2) if Tenant shall commence or institute any case, proceeding or other action (A) seeking relief on its behalf as debtor, or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of

debtors, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property; or

(3) if Tenant shall make a general assignment for the benefit of creditors; or

(4) if any case, proceeding or other action shall be commenced or instituted against Tenant (A) seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (B) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, which in either of such cases (i) results in any such entry of an order for relief, adjudication of bankruptcy or insolvency or such an appointment or the issuance or entry of any other order having a similar effect or (ii) remains undismissed for a period of sixty (60) days; or

(5) if any case, proceeding or other action shall be commenced or instituted against Tenant seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its property which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or

(6) if Tenant shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clauses (2), (3), (4) or (5) above; or

(7) if a trustee, receiver or other custodian is appointed for any substantial part of the assets of Tenant which appointment is not vacated or stayed within seven (7) Business Days; or

(F) if Tenant shall fail more than five (5) times during any twelve (12) month period to pay any installment of Fixed Rent or any item of Rental when due after receipt of the notice and the expiration of the applicable grace period pursuant to the provisions of paragraph (A) above, if such notice and grace period are then required; or

(G) if Tenant shall fail to pay any installments of Fixed Rent or items of Rental when due as required by this Lease, and Landlord shall bring more than two (2) summary dispossess proceedings during any twelve (12) month period; or

(H) if Landlord shall present the Letter of Credit to the bank which issued the same in accordance with the provisions of Article 31 hereof, and the bank shall fail to honor the Letter of Credit and pay the proceeds thereof to Landlord for any reason whatsoever; or

(I) if Tenant shall default in the observance or performance of any other term, covenant or condition of this Lease on Tenant's part to be observed or performed and Tenant shall fail to remedy such default within twenty (20) days after notice by Landlord to Tenant of such default, or if such default is of such a nature that it cannot with due diligence be completely remedied within said period of twenty (20) days and Tenant shall not commence within said period of twenty (20) days, or shall not thereafter diligently prosecute to completion, all steps necessary to remedy such default.

Section 16.2. (A) If an Event of Default (i) described in Section 16.1(E) hereof shall occur, or (ii) described in Sections 16.1(A), (B), (C), (D), (F), (G), (H) or (I) shall occur and Landlord, at any time thereafter, at its option gives written notice to Tenant stating that this Lease and the Term shall expire and terminate five (5) days after the date Landlord shall give Tenant such notice, then this Lease and the Term and all rights of Tenant under this Lease shall expire and terminate as if the date on which the Event of Default described in clause (i) above occurred or five (5) days after the date of such notice, pursuant to clause (ii) above, as the case may be, were the Fixed Expiration Date, and Tenant immediately shall quit and surrender the Premises, but Tenant shall nonetheless be liable for all of its obligations hereunder, as provided for in Articles 17 and 18 hereof. Anything contained herein to the contrary notwithstanding, if such termination shall be stayed by order of any court having jurisdiction over any proceeding described in Section 16.1(E) hereof, or by federal or state statute, then, following the expiration of any such stay, or if the trustee appointed in any such proceeding, Tenant or Tenant as debtor-in-possession shall fail to assume Tenant's obligations under this Lease within the period prescribed therefor by law or within one hundred twenty (120) days after entry of the order for relief or as may be allowed by the court, or if said trustee, Tenant or Tenant as debtor-in-possession shall fail to provide adequate protection of Landlord's right, title and interest in and to the Premises or adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease as provided in Section 12.3(B), Landlord, to the extent permitted by law or by leave of the court having jurisdiction over such proceeding, shall have the right, at its election, to terminate this Lease on five (5) days' notice to Tenant, Tenant as debtor-in-possession or said trustee and upon the expiration of said five (5) day period this Lease shall cease and expire as aforesaid and Tenant, Tenant as debtor-in-possession or said trustee shall immediately quit and surrender the Premises as aforesaid.

(B) If an Event of Default described in Section 16.1(A) hereof shall occur, or this Lease shall be terminated as provided in Section 16.2(A) hereof, Landlord, without notice, may reenter and repossess the Premises using such force for that purpose as may be necessary without being liable to indictment, prosecution or damages therefor and may dispossess Tenant by summary proceedings or otherwise.

Section 16.3. If at any time, (i) Tenant shall be comprised of two (2) or more persons, or (ii) Tenant's obligations under this Lease shall have been guaranteed by any person other than Tenant, or (iii) Tenant's interest in this Lease shall have been assigned, the word "Tenant", as used in Section 16.1(E), shall be deemed to mean any one or more of the persons primarily or

secondarily liable for Tenant's obligations under this Lease. Any monies received by Landlord from or on behalf of Tenant during the pendency of any proceeding of the types referred to in Section 16.1(E) shall be deemed paid as compensation for the use and occupation of the Premises and the acceptance of any such compensation by Landlord shall not be deemed an acceptance of Rental or a waiver on the part of Landlord of any rights under Section 16.2.

## ARTICLE 17
## REMEDIES AND DAMAGES

Section 17.1. (A) If there shall occur any Event of Default, and this Lease and the Term shall expire and come to an end as provided in Article 16 hereof:

(1) Tenant shall quit and peacefully surrender the Premises to Landlord, and Landlord and its agents may immediately, or at any time after such default or after the date upon which this Lease and the Term shall expire and come to an end, re-enter the Premises or any part thereof, without notice, either by summary proceedings, or by any other applicable action or proceeding, or by force or otherwise (without being liable to indictment, prosecution or damages therefor), and may repossess the Premises and dispossess Tenant and any other persons from the Premises and remove any and all of their property and effects from the Premises; and

(2) Landlord, at Landlord's option, may relet the whole or any portion or portions of the Premises from time to time, either in the name of Landlord or otherwise, to such tenant or tenants, for such term or terms ending before, on or after the Expiration Date, at such rental or rentals and upon such other conditions, which may include concessions and free rent periods, as Landlord, in its sole discretion, may determine; provided, however, that Landlord shall have no obligation to relet the Premises or any part thereof and shall in no event be liable for refusal or failure to relet the Premises or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon any such reletting, and no such refusal or failure shall operate to relieve Tenant of any liability under this Lease or otherwise affect any such liability, and Landlord, at Landlord's option, may make such repairs, replacements, alterations, additions, improvements, decorations and other physical changes in and to the Premises as Landlord, in its sole discretion, considers advisable or necessary in connection with any such reletting or proposed reletting, without relieving Tenant of any liability under this Lease or otherwise affecting any such liability.

(B) Tenant hereby waives the service of any notice of intention to re-enter or to institute legal proceedings to that end which may otherwise be required to be given under any present or future law. Tenant, on its own behalf and on behalf of all persons claiming through or under Tenant, including all creditors, does further hereby waive any and all rights which Tenant and all such persons might otherwise have under any present or future law to redeem the Premises, or to re-enter or repossess the Premises, or to restore the operation of this Lease, after (a) Tenant shall have been dispossessed by a judgment or by warrant of any court or judge, or (b)

any re-entry by Landlord, or (c) any expiration or termination of this Lease and the Term, whether such dispossess, re-entry, expiration or termination shall be by operation of law or pursuant to the provisions of this Lease. The words "re-enter," "re-entry" and "re-entered" as used in this Lease shall not be deemed to be restricted to their technical legal meanings. In the event of a breach or threatened breach by Tenant, or any persons claiming through or under Tenant, of any term, covenant or condition of this Lease, Landlord shall have the right to enjoin such breach and the right to invoke any other remedy allowed by law or in equity as if re-entry, summary proceedings and other special remedies were not provided in this Lease for such breach. The right to invoke the remedies hereinbefore set forth are cumulative and shall not preclude Landlord from invoking any other remedy allowed at law or in equity.

Section 17.2. (A) If this Lease and the Term shall expire and come to an end as provided in Article 16 hereof, or by or under any summary proceeding or any other action or proceeding, or if Landlord shall re-enter the Premises as provided in Section 17.1, or by or under any summary proceeding or any other action or proceeding, then, in any of said events:

(1) Tenant shall pay to Landlord all Fixed Rent, Escalation Rent and other items of Rental payable under this Lease by Tenant to Landlord to the date upon which this Lease and the Term shall have expired and come to an end or to the date of re-entry upon the Premises by Landlord, as the case may be;

(2) Tenant also shall be liable for and shall pay to Landlord, as damages, any deficiency (referred to as "Deficiency") between the Rental for the period which otherwise would have constituted the unexpired portion of the Term and the net amount, if any, of rents collected under any reletting effected pursuant to the provisions of clause (2) of Section 17.1 (A) for any part of such period (first deducting from the rents collected under any such reletting all of Landlord's expenses in connection with the termination of this Lease, Landlord's re-entry upon the Premises and with such reletting, including, but not limited to, all repossession costs, brokerage commissions, legal expenses, attorneys' fees and disbursements, alteration costs, contribution to work and other expenses of preparing the Premises for such reletting); any such Deficiency shall be paid in monthly installments by Tenant on the days specified in this Lease for payment of installments of Fixed Rent; Landlord shall be entitled to recover from Tenant each monthly Deficiency as the same shall arise, and no suit to collect the amount of the Deficiency for any month shall prejudice Landlord's right to collect the Deficiency for any subsequent month by a similar proceeding; and

(3) whether or not Landlord shall have collected any monthly Deficiency as aforesaid, Landlord shall be entitled to recover from Tenant, and Tenant shall pay to Landlord, on demand, in lieu of any further Deficiency as and for liquidated and agreed final damages, a sum equal to the amount by which the Rental for the period which otherwise would have constituted the unexpired portion of the Term (commencing on the date immediately succeeding the last date with respect to which a Deficiency, if any, was collected) exceeds the then fair and reasonable rental value of the Premises for the same period, both discounted to present worth at

the Base Rate; if, before presentation of proof of such liquidated damages to any court, commission or tribunal, the Premises, or any part thereof, shall have been relet by Landlord for the period which otherwise would have constituted the unexpired portion of the Term, or any part thereof, the amount of rent reserved upon such reletting shall be deemed, prima facie, to be the fair and reasonable rental value for the part or the whole of the Premises so relet during the term of the reletting.

(B) If the Premises, or any part thereof, shall be relet together with other space in the Building, the rents collected or reserved under any such reletting and the expenses of any such reletting shall be equitably apportioned for the purposes of this Section 17.2. Tenant shall in no event be entitled to any rents collected or payable under any reletting, whether or not such rents shall exceed the Fixed Rent reserved in this Lease. Solely for the purposes of this Article 17, the term "Escalation Rent" as used in Section 17.2(A) shall mean the Escalation Rent in effect immediately prior to the Expiration Date, or the date of re-entry upon the Premises by Landlord, as the case may be, adjusted to reflect any increase pursuant to the provisions of Article 27 hereof for the year immediately preceding such event. Nothing contained in Article 16 hereof or this Article 17 shall be deemed to limit or preclude the recovery by Landlord from Tenant of the maximum amount allowed to be obtained as damages by any statute or rule of law, or of any sums or damages to which Landlord may be entitled in addition to the damages set forth in this Section 17.2.

ARTICLE 18<br>LANDLORD FEES AND EXPENSES

Section 18.1. If Tenant shall be in default under this Lease or if Tenant shall do or permit to be done any act or thing upon the Premises which would cause Landlord to be in default under any Superior Lease or Mortgage, Landlord may (1) as provided in Section 14.1 hereof, perform the same for the account of Tenant, or (2) make any expenditure or incur any obligation for the payment of money, including, without limitation, reasonable attorneys' fees and disbursements in instituting, prosecuting or defending any action or proceeding, and the cost thereof, with interest thereon at the Applicable Rate, shall be deemed to be additional rent hereunder and shall be paid by Tenant to Landlord within ten (10) days of rendition of any bill or statement to Tenant therefor and if the term of this Lease shall have expired at the time of making of such expenditures or incurring of such obligations, such sums shall be recoverable by Landlord as damages.

Section 18.2. If Tenant shall fail to pay any installment of Fixed Rent, Escalation Rent or any other item of Rental when due after applicable notice and grace period (if any), Tenant shall pay to Landlord, in addition to such installment of Fixed Rent, Escalation Rent or other item of Rental, as the case may be, as a late charge and as additional rent, a sum equal to interest at the Applicable Rate on the amount unpaid, computed from the date such payment was due to and including the date of payment.

## ARTICLE 19
## NO REPRESENTATIONS BY LANDLORD

Section 19.1. Landlord and Landlord's agents and representatives have made no representations or promises with respect to the Building, the Real Property or the Premises except as herein expressly set forth, and no rights, easements or licenses are acquired by Tenant by implication or otherwise except as expressly set forth herein. Tenant shall accept possession of the Premises in the condition which shall exist on the Commencement Date "as is" (subject to the provisions of Section 4.1 hereof), and Landlord shall have no obligation to perform any work or make any installations in order to prepare the Premises for Tenant's occupancy.

## ARTICLE 20
## END OF TERM

Upon the expiration or other termination of this Lease, Tenant shall quit and surrender to Landlord the Premises, vacant, broom clean, in good order and condition, ordinary wear and tear and damage for which Tenant is not responsible under the terms of this Lease excepted, and otherwise in compliance with the provisions of Article 3 hereof. If the last day of the Term falls on Saturday or Sunday, this Lease shall expire on the Business Day immediately preceding. Tenant expressly waives, for itself and for any person claiming through or under Tenant, any rights which Tenant or any such person may have under the provisions of Section 2201 of the New York Civil Practice Law and Rules and of any successor law of like import then in force in connection with any holdover summary proceedings which Landlord may institute to enforce the foregoing provisions of this Article 20. Tenant acknowledges that possession of the Premises must be surrendered to Landlord on the Expiration Date. Tenant agrees to indemnify and save Landlord harmless from and against all claims, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and disbursements) resulting from delay by Tenant in so surrendering the Premises, including, without limitation, any claims made by any succeeding tenant founded on such delay. The parties recognize and agree that the damage to Landlord resulting from any failure by Tenant to timely surrender possession of the Premises as aforesaid will be extremely substantial, will exceed the amount of the monthly installments of the Fixed Rent and Rental theretofore payable hereunder, and will be impossible to accurately measure. Tenant therefore agrees that if possession of the Premises is not surrendered to Landlord on the Expiration Date, in addition to any other rights or remedies Landlord may have hereunder or at law, and without in any manner limiting Landlord's right to demonstrate and collect any damages suffered by Landlord and arising from Tenant's failure to surrender the Premises as provided herein, Tenant shall pay to Landlord on account of use and occupancy of the Premises for each month and/or for each portion of any month during which Tenant holds over in the Premises after the Expiration Date, a sum equal to the greater of (i) two (2) times the aggregate of that portion of the Fixed Rent, Escalation Rent and Rental which was payable under this Lease during the last month of the Term, and (ii) two (2) times the then fair market rental

value for the Premises. Nothing herein contained shall be deemed to permit Tenant to retain possession of the Premises after the Expiration Date or to limit in any manner Landlord's right to regain possession of the Premises through summary proceedings, or otherwise, and no acceptance by Landlord of payments from Tenant after the Expiration Date shall be deemed to be other than on account of the amount to be paid by Tenant in accordance with the provisions of this Article 20. The provisions of this Article 20 shall survive the Expiration Date.

ARTICLE 21
QUIET ENJOYMENT

Provided no Event of Default has occurred and is continuing, Tenant may peaceably and quietly enjoy the Premises subject, nevertheless, to the terms and conditions of this Lease.

ARTICLE 22
FAILURE TO GIVE POSSESSION

Section 22.1. Tenant waives any right to rescind this Lease under Section 223-a of the New York Real Property Law or any successor statute of similar nature and purpose then in force and further waives the right to recover any damages which may result from Landlord's failure for any reason to deliver possession of the Premises on the date set forth in Section 1.1 hereof for the commencement of the Term. The provisions of this Article are intended to constitute an "express provision to the contrary" within the meaning of Section 223-a of the New York Real Property Law. No such failure to give possession on the date set forth in Section 1.1 hereof for the commencement of the Term shall in any wise affect the validity of this Lease or the obligations of Tenant hereunder or give rise to any claim for damages by Tenant or claim for rescission of this Lease, nor shall the same be construed in any wise to extend the Term.

Section 22.2. Tenant acknowledges that the Premises are currently occupied by an existing Tenant ("Existing Tenant"). Landlord and Tenant hereby expressly acknowledge and agree that this Lease is conditioned upon the unconditional execution and delivery by Landlord and Existing Tenant of an agreement with respect to the surrender of the Premises on terms and conditions acceptable to Landlord in its sole discretion (the aforesaid event being hereinafter referred to as the "Condition"), and shall be of no force and effect unless and until the Condition is satisfied; it being understood and agreed however, that if for any reason whatsoever, the Condition is not satisfied or waived by Landlord on or before the date which is ninety (90) days after the date hereof, this Lease shall be void ab initio, and be of no force and effect, and Landlord and Tenant shall have no obligations or liability to the other respective party under this Lease.

## ARTICLE 23
## NO WAIVER

Section 23.1. No act or thing done by Landlord or Landlord's agents during the Term shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid unless in writing signed by Landlord. No employee of Landlord or of Landlord's agents shall have any power to accept the keys of the Premises prior to the termination of this Lease. The delivery of keys to any employee of Landlord or of Landlord's agents shall not operate as a termination of this Lease or a surrender of the Premises. In the event Tenant at any time desires to have Landlord sublet the Premises for Tenant's account, Landlord or Landlord's agents are authorized to receive said keys for such purpose without releasing Tenant from any of the obligations under this Lease, and Tenant hereby relieves Landlord of any liability for loss of or damage to any of Tenant's effects in connection with such subletting.

Section 23.2. The failure of Landlord to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Lease, or any of the Rules and Regulations set forth or hereafter adopted by Landlord, shall not prevent a subsequent act, which would have originally constituted a violation of the provisions of this Lease, from having all of the force and effect of an original violation of the provisions of this Lease. The receipt by Landlord of Fixed Rent, Escalation Rent or any other item of Rental with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach. The failure of Landlord to enforce any of the Rules and Regulations set forth, or hereafter adopted, against Tenant or any other tenant in the Building shall not be deemed a waiver of any such Rules and Regulations. No provision of this Lease shall be deemed to have been waived by Landlord, unless such waiver be in writing signed by Landlord. No payment by Tenant or receipt by Landlord of a lesser amount than the monthly Fixed Rent or other item of Rental herein stipulated shall be deemed to be other than on account of the earliest stipulated Fixed Rent or other item of Rental, or as Landlord may elect to apply same, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Fixed Rent or other item of Rental be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Fixed Rent or other item of Rental or to pursue any other remedy provided in this Lease. This Lease contains the entire agreement between the parties and all prior negotiations and agreements are merged herein. Any executory agreement hereafter made shall be ineffective to change, modify, discharge or effect an abandonment of this Lease in whole or in part unless such executory agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought.

## ARTICLE 24
## WAIVER OF TRIAL BY JURY

The respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other (except for personal injury or property damage) on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, or for the enforcement of any remedy under any statute, emergency or otherwise. If Landlord commences any summary proceeding against Tenant, Tenant will not interpose any counterclaim of whatever nature or description in any such proceeding (unless failure to impose such counterclaim would preclude Tenant from asserting in a separate action the claim which is the subject of such counterclaim), and will not seek to consolidate such proceeding with any other action which may have been or will be brought in any other court by Tenant.

## ARTICLE 25
## INABILITY TO PERFORM

This Lease and the obligation of Tenant to pay Rental hereunder and perform all of the other covenants and agreements hereunder on the part of Tenant to be performed shall in no wise be affected, impaired or excused because Landlord is unable to fulfill any of its obligations under this Lease expressly or impliedly to be performed by Landlord or because Landlord is unable to make, or is delayed in making any repairs, additions, alterations, improvements or decorations or is unable to supply or is delayed in supplying any equipment or fixtures, if Landlord is prevented or delayed from so doing by reason of strikes or labor troubles or by accident, or by any cause whatsoever beyond Landlord's control, including, but not limited to, laws, governmental preemption in connection with a national emergency or by reason of any Requirements of any Governmental Authority or by reason of failure of the HVAC, electrical, plumbing, or other Building Systems in the Building, or by reason of the conditions of supply and demand which have been or are affected by war or other emergency ("Unavoidable Delays").

## ARTICLE 26
## BILLS AND NOTICES

Except as otherwise expressly provided in this Lease, any bills, statements, consents, notices, demands, requests or other communications given or required to be given under this Lease shall be in writing and shall be deemed sufficiently given or rendered if delivered by hand (against a signed receipt) or if sent by registered or certified mail (return receipt requested) addressed

> if to Tenant (a) at Tenant's address set forth in this Lease, Attn.:
> Mr. Terrance Brennan, if mailed prior to Tenant's taking pos-

session of the Premises, or (b) at the Building, Attn.: Mr. Terrance Brennan, if mailed subsequent to Tenant's taking possession of the Premises, or (c) at any place where Tenant or any agent or employee of Tenant may be found if mailed subsequent to Tenant's vacating, deserting, abandoning or surrendering the Premises, in each case with a copy to Maloney & Porcelli, 225 Broadway, New York, New York 10007, Attn.: Joseph Porcelli, Esq., or

if to Landlord at Landlord's address set forth in this Lease, Attn.: Mr. David E. Green, and with copies to (x) Vornado Realty Trust, 210 Route 4 East, Paramus, New Jersey 07652, Attn.: Mr. Joseph Macnow, (y) Proskauer Rose LLP, 1585 Broadway, New York, New York 10036, Attn.: Lawrence J. Lipson, Esq., and (z) each Mortgagee and Lessor which shall have requested same, by notice given in accordance with the provisions of this Article 26 at the address designated by such Mortgagee or Lessor, or

to such other address(es) as Landlord, Tenant or any Mortgagee or Lessor may designate as its new address(es) for such purpose by notice given to the other in accordance with the provisions of this Article 26. Any such bill, statement, consent, notice, demand, request or other communication shall be deemed to have been rendered or given on the date when it shall have been hand delivered or three (3) Business Days from when it shall have been mailed as provided in this Article 26. Anything contained herein to the contrary notwithstanding, any Tax Statement or any other bill, statement, consent, notice, demand, request or other communication from Landlord to Tenant with respect to any item of Rental (other than any "default notice" if required hereunder) may be sent to Tenant by regular United States mail.

## ARTICLE 27
## ESCALATION

Section 27.1. For the purposes of this Article 27, the following terms shall have the meanings set forth below.

(A) "Assessed Valuation" shall mean the amount for which the Real Property is assessed pursuant to applicable provisions of the New York City Charter and of the Administrative Code of the City of New York for the purpose of calculating all or any portion of the Taxes payable with respect to the Real Property.

(B) "Base Taxes" shall mean the Taxes payable for the twelve (12) month period commencing on January 1, 2000 and ending on December 31, 2000. Accordingly, Base Taxes shall mean fifty percent (50%) of the sum of (x) the Taxes payable for the Tax Year commencing

on July 1, 1999 and ending on June 30, 2000, and (y) the Taxes payable for the Tax Year commencing on July 1, 2000 and ending on June 30, 2001.

(C) "Taxes" shall mean the aggregate amount of real estate taxes and any general or special assessments (exclusive of penalties and interest thereon) imposed upon the Real Property (including, without limitation, (i) assessments made upon or with respect to any "air" and "development" rights now or hereafter appurtenant to or affecting the Real Property, (ii) any fee, tax or charge imposed by any Governmental Authority for any vaults, vault space or other space within or outside the boundaries of the Real Property, and (iii) any taxes or assessments levied after the date of this Lease in whole or in part for public benefits to the Real Property or the Building, including, without limitation, any Business Improvement District taxes and assessments) without taking into account any discount that Landlord may receive by virtue of any early payment of Taxes; provided, that if because of any change in the taxation of real estate, any other tax or assessment, however denominated (including, without limitation, any franchise, income, profit, sales, use, occupancy, gross receipts or rental tax) is imposed upon Landlord or the owner of the Real Property or the Building, or the occupancy, rents or income therefrom, in substitution for any of the foregoing Taxes, such other tax or assessment shall be deemed part of Taxes computed as if Landlord's sole asset were the Real Property. With respect to any Tax Year, all expenses, including attorneys' fees and disbursements, experts' and other witnesses' fees, incurred in contesting the validity or amount of any Taxes or in obtaining a refund of Taxes shall be considered as part of the Taxes for such Tax Year. Anything contained herein to the contrary notwithstanding, Taxes shall not be deemed to include (w) any taxes on Landlord's income, (x) franchise taxes, (y) estate or inheritance taxes or (z) any similar taxes imposed on Landlord, unless such taxes are levied, assessed or imposed in lieu of or as a substitute for the whole or any part of the taxes, assessments, levies, impositions which now constitute Taxes.

(D) "Tax Statement" shall mean a statement in reasonable detail setting forth a comparison of the Taxes for a Tax Year with the Base Taxes.

(E) "Tax Year" shall mean the period July 1 through June 30 (or such other period as hereinafter may be duly adopted by the Governmental Authority then imposing taxes as its fiscal year for real estate tax purposes), any portion of which occurs during the Term.

(F) "Gross Sales" shall mean the sum of all gross receipts, computed on a cash basis and in accordance with generally accepted auditing standards, consistently applied, derived from the operation of Tenant's business at the Premises or from outside catering for the applicable Sales Year in question, including, without limitation:

(1) the entire amount of the price charged for all food, beverages, goods, wares and merchandise (collectively, the "Merchandise") sold, and all charges for all services performed by Tenant from all business conducted at, upon or from the Premises by Tenant, whether made for cash, by check, on credit, charge accounts or otherwise, without reserve or deduction for inability or failure to collect the same, including, but not limited to,

transactions (i) where the orders therefor originate at or are accepted by Tenant from or at any place other than the Premises, but delivery or performance thereof is made at or from the Premises; all sales made and orders received in or at the Premises shall be deemed as made and complete therein whether or not delivery or performance thereof is made at or from the Premises, and all orders which result from solicitation off the Premises but which are conducted by personnel operating from or reporting to or under the control or supervision of Tenant, or any employee of Tenant and delivery or performance thereof is made at or from the Premises shall be deemed part of Gross Sales; (ii) by means of mechanical or other vending devices; and (iii) originating from whatever source, and which Tenant in the normal and customary course of Tenant's operations would credit or attribute to Tenant's business conducted in the Premises;

   (2) all proceeds of any "business interruption" insurance required to be carried by Tenant hereunder; and

   (3) all monies or other consideration in kind or otherwise, received by Tenant from Tenant's operations at, upon or from the Premises, which are neither included in or excluded from Gross Sales by other provisions of this definition, but without any duplication; and

   (4) all monies received in connection with Tenant's catering of food outside of the Premises.

Each charge or sale upon installment or credit shall be treated as a sale for the full or partial price, as the case may be, at the time when Tenant shall receive payment (whether full or partial) therefor. For the purpose of ascertaining the amount of Gross Sales upon which the payment of Percentage Rent is to be computed hereunder, the following shall be excluded from Gross Sales: (i) the amount of any local, county, State or Federal sales, luxury or excise tax on such sales collected by Tenant (but not by any vendor of Tenant), provided such tax is both added to the selling price (or absorbed therein) and paid to the taxing authority by Tenant, provided, however, no franchise or capital stock tax and no income or similar tax based upon income, profits, gross sales, as such, shall be included or deducted from Gross Sales, respectively, in any event whatsoever; (ii) gratuities and tips to Tenant's employees which are added to the customer's check or invoice and which Tenant is committed to, and in fact does, turn over to its employees, (iii) complimentary meals to customers of Tenant, provided that the cost of such complimentary meals does not exceed Three Hundred Sixty-Five Thousand Dollars ($365,000) per year; and (iv) sales of Merchandise accomplished over the internet. For purposes of determining Percentage Rent payable hereunder, "Tenant" shall be deemed to include (i) Tenant named herein, (ii) all assignees, subtenants, licensees, concessionaires and occupants of all or any portion of the Premises, and (iii) all affiliates of each of the foregoing.

  Section 27.2. (A) If the Taxes payable for any Tax Year (any part or all of which falls within the Term) shall represent an increase above the Base Taxes, then Tenant shall pay as additional rent for such Tax Year and continuing thereafter until a new Tax Statement is rendered

to Tenant, Tenant's Share of such increase (the "<u>Tax Payment</u>") as shown on the Tax Statement with respect to such Tax Year. Tenant shall be obliged to pay the Tax Payment regardless of whether Tenant is exempt in whole or part, from the payment of any Taxes by reason of Tenant's diplomatic status or for any other reason whatsoever. The Taxes shall be computed initially on the basis of the Assessed Valuation in effect at the time the Tax Statement is rendered (as the Taxes may have been settled or finally adjudicated prior to such time) regardless of any then pending application, proceeding or appeal respecting the reduction of any such Assessed Valuation, but shall be subject to subsequent adjustment as provided in Section 27.3 hereof.

(B) At any time during or after the Term, Landlord may render to Tenant a Tax Statement or Statements showing (i) a comparison of the Taxes for the Tax Year with the Base Taxes and (ii) the amount of the Tax Payment resulting from such comparison. On the first day of the month following the furnishing to Tenant of a Tax Statement, Tenant shall pay to Landlord a sum equal to 1/12th of the Tax Payment shown thereon to be due for such Tax Year multiplied by the number of months of the Term then elapsed since the commencement of such Tax Year. Tenant shall continue to pay to Landlord a sum equal to one-twelfth (1/12th) of the Tax Payment shown on such Tax Statement on the first day of each succeeding month until the first day of the month following the month in which Landlord shall deliver to Tenant a new Tax Statement. If Landlord furnishes a Tax Statement for a new Tax Year subsequent to the commencement thereof, promptly after the new Tax Statement is furnished to Tenant, Landlord shall give notice to Tenant stating whether the amount previously paid by Tenant to Landlord for the current Tax Year was greater or less than the installments of the Tax Payment for the current tax year in accordance with the Tax Statement, and (a) if there shall be a deficiency, Tenant shall pay the amount thereof within ten (10) days after demand therefor, or (b) if there shall have been an overpayment, Landlord shall credit the amount thereof against the next monthly installments of the Fixed Rent payable under this Lease. Tax Payments shall be collectible by Landlord in the same manner as Fixed Rent. Landlord's failure to render a Tax Statement shall not prejudice Landlord's right to render a Tax Statement during or with respect to any subsequent Tax Year, and shall not eliminate or reduce Tenant's obligation to make Tax Payments for such Tax Year.

<u>Section 27.3.</u> (A) Only Landlord shall be eligible to institute tax reduction or other proceedings to reduce the Assessed Valuation. In the event that, after a Tax Statement has been sent to Tenant, an Assessed Valuation which had been utilized in computing the Taxes for a Tax Year is reduced (as a result of settlement, final determination of legal proceedings or otherwise), and as a result thereof a refund of Taxes is actually received by or on behalf of Landlord, then, promptly after receipt of such refund, Landlord shall send Tenant a Tax Statement adjusting the Taxes for such Tax Year (taking into account the expenses mentioned in Section 27.1(C) hereof) and setting forth Tenant's Share of such refund and Tenant shall be entitled to receive such Share, at Landlord's option, either by way of a credit against the Fixed Rent next becoming due after the sending of such Tax Statement or by a refund to the extent no further Fixed Rent is due; provided, however, that Tenant's Share of such refund shall be limited to the portion of the Tax Payment, if any, which Tenant had theretofore paid to Landlord attributable to increases in Taxes

for the Tax Year to which the refund is applicable on the basis of the Assessed Valuation before it had been reduced.

(B)     In the event that, after a Tax Statement has been sent to Tenant, the Assessed Valuation which had been utilized in computing the Base Taxes is reduced (as a result of settlement, final determination of legal proceedings or otherwise) then, and in such event: (i) the Base Taxes shall be retroactively adjusted to reflect such reduction, and (ii) all retroactive Tax Payments resulting from such retroactive adjustment shall be due and payable when billed by Landlord. Landlord promptly shall send to Tenant a statement setting forth the basis for such retroactive adjustment and Tax Payments.

Section 27.4. The expiration or termination of this Lease during any Tax Year shall not affect the rights or obligations of the parties hereto respecting any payments of Tax Payments for such Tax Year, and any Tax Statement relating to such Tax Payment, may be sent to Tenant subsequent to, and all such rights and obligations shall survive, any such expiration or termination. In determining the amount of the Tax Payment for the Tax Year in which the Term shall expire, the payment of the Tax Payment for the Tax Year shall be prorated based on the number of days of the Term which fall within such Tax Year. Any payments due under such Tax Statement shall be payable within twenty (20) days after such Statement is sent to Tenant.

Section 27.5. (A) For each Sales Year during the Term, Tenant shall pay to Landlord, as additional rent, on or before the thirtieth (30th) day after the end of each year, an annual amount (the "Percentage Rent") equal to six percent (6%) of the difference between (i) Gross Sales made during each Sales Year and (ii) the Percentage Rent Threshold Amount with respect to such Sales Year.

(B)     The first "Sales Year" shall mean the period from the fourth (4th) anniversary of the Commencement Date through December 31 of such year. Each succeeding Sales Year shall commence on January 1 of the immediately succeeding calendar year, and end on December 31 of such calendar year. The final Sales Year shall end on the Expiration Date, and no Percentage Rent shall be payable with respect to any period after such date. If the first Sales Year or the final Sales Year under this Lease shall be shorter than a twelve (12) month period, then, solely for purposes of calculating Percentage Rent, the Percentage Rent Threshold Amount shall be deemed to be prorated based upon the number of days in such Sales Year.

(C)     The term "Percentage Rent Threshold Amount" shall mean, with respect to each calendar year during the period commencing on the fourth (4th) anniversary of the Commencement Date and ending on the Fixed Expiration Date, Five Million Dollars ($5,000,000).

Section 27.6. (A) Tenant shall submit to Landlord on or before the thirtieth (30th) day following the end of each Sales Year or partial Sales Year (including the last Sales Year, as to which Tenant's obligation shall survive the termination of this Lease) a written statement (the

"Annual Statement"), signed and certified as being true and correct by a corporate officer of Tenant, showing in reasonable detail Gross Sales during the preceding Sales Year, an itemization of all permissible exclusions therefrom except with respect to such Gross Sales which are voided in accordance with customary restaurant practices and no record thereof is maintained, and a calculation of the Percentage Rent payable with respect to the Sales Year in question based upon such Gross Sales. Each Annual Statement shall also be duly certified to be true and correct in compliance with the definition of Gross Sales and in accordance with generally accepted auditing standards consistently applied by an independent certified public accountant selected by Tenant and approved by Landlord, which approval shall not be unreasonably withheld. If an Annual Statement shall disclose that Percentage Rent is payable for the applicable Sales Year, then such Annual Statement shall be accompanied by the amount Percentage Rent payable as shown thereon.

(B)     The Annual Statement shall be in reasonable detail and shall be prepared in accordance with generally accepted accounting principles, consistently applied. The acceptance by Landlord of payments of Percentage Rent or Annual Statements thereof shall be without prejudice and shall in no event constitute a waiver of Landlord's right to claim a deficiency in the payment of Percentage Rent or to audit Tenant's books of account and records as set forth below.

Section 27.7. (A) Tenant shall prepare and keep for a period of not less than five (5) years following the end of each Sales Year during the Term, true and accurate books of account and records, conforming to generally accepted auditing standards, consistently applied, including, but not limited to, sales tax and other reports filed with governmental authorities, of all sales and other transactions by Tenant from which Gross Sales can be determined. Tenant shall record all sales, at the time each sale is made, whether for cash or credit, in cash register or registers containing locked and cumulative tapes (or other non-tamperable media if a computerized system is used) with accumulation capacity. Tenant shall use such system which is currently recognized and accepted in the restaurant industry and is reasonably approved by Landlord for Tenant's record-keeping, accounting and supervisor system (collectively, the "System") to generate transaction tapes which (i) record each transaction, including, without limitation, voids and "no sales", and (ii) are dated and numerically and sequentially related to all guest checks. All customer receipts shall be recorded in the System before the order can be obtained from the kitchen and shall be serially pre-numbered. Tenant shall keep all transaction tapes and all sales receipts, including, without limitation, all void sales receipts, for a period of not less than five (5) years following the end of each calendar year during the Term. All catering events (including outside catering events) shall be recorded by Tenant on function sheets which clearly describe the size and scope of such function. All deposits received by Tenant for catering events shall be recorded in a ledger relating such deposits to bank deposits for the same day. On the date of the catering event, the full sales amount, including the amount of the deposit, shall be recorded in the System.

(B) Landlord, at its sole cost and expense (except as hereinafter provided), shall have the right, with prior notice to Tenant, to cause a complete audit of any Annual Statement to be performed by an independent certified public accountant and in connection with such audit, to examine Tenant's books of account and records related to the Premises (including all supporting data and any other records pertaining to the Premises from which Gross Sales may be tested or determined). Tenant shall make all such books of account and records available for examination at the office where such books and records are regularly maintained (which shall be located in the City of New York) and shall produce the same at the request of Landlord upon reasonable prior notice. Landlord and Landlord's agent, at Landlord's sole cost and expense, shall have the right to copy and duplicate such information as Landlord may require. If any such audit discloses the actual Gross Sales exceed those reported, such determination shall be conclusively binding upon the parties unless within fifteen (15) days after receipt by Tenant of the written results of Landlord's accountant's audit, Tenant notifies Landlord that Tenant disputes the results of such audit. If Tenant does not so notify Landlord within such fifteen (15) day period, Tenant shall pay Landlord within three (3) days after the expiration of such fifteen (15) day period such Percentage Rent as may be so shown to be payable. If such audit shall reveal that the Percentage Rent paid based upon such Gross Sales shall have been understated by more than five percent (5%), then Tenant shall pay the fees of the accountant in connection with such audit, and the payment to be made to Landlord as a result of such understatement shall bear interest at the Applicable Rate. The furnishing by Tenant of any fraudulent statement more than one (1) time in any twelve (12) month period shall constitute an Event of Default under this Lease. In the event Tenant notifies Landlord within the time period specified above that Tenant disputes the results of Landlord's audit, and within thirty (30) days thereafter Landlord and Tenant are unable to agree on the amount of Percentage Rent payable for the period in question, such dispute shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Each of the arbitrators shall be certified public accountants with not less than ten (10) years experience in the auditing of restaurant accounts and records. Pending a final determination, Tenant shall continue to pay Percentage Rent provided by and in accordance with the terms and conditions hereof and, in addition thereto, shall pay to Landlord, without waiving any rights to contest such payment, the amount Landlord has determined to be due and owing pursuant to Landlord's audit and which forms the basis of the dispute or question. If, based upon the final determination hereunder, the payments made by Tenant on account of Landlord's audit which was the subject of the dispute or question were (i) less than the Percentage Rent finally determined to be due and payable, Tenant shall pay to Landlord the amount of such deficiency within ten (10) days after demand therefor, or (ii) greater than the Percentage Rent which is finally determined to be due, Landlord shall credit the amount of such excess against the immediately ensuing installments of Rental otherwise payable hereunder.

(C) If any audit shall be commenced by Landlord or there shall arise differences or disputes concerning Gross Sales then, and in any such event, Tenant's books of account and records (including all supporting data and any other records from which Gross Sales may be tested or determined) shall be preserved and retained by Tenant until the later of a final resolution or final determination of such dispute or difference or seven (7) years following the

end of the Sales Year in question. Any information obtained by Landlord as the result of such audit shall be treated as confidential, except in any litigation or proceeding between the parties and except further that Landlord may disclose such information to prospective purchasers, to prospective or existing Mortgagees, to prospective or existing Lessors and in any statement required to filed with the Securities and Exchange Commission, Internal Revenue Service, New York State Insurance Department or other similar Governmental Authorities or pursuant to any subpoena or judicial process.

## ARTICLE 28
## SERVICES

Section 28.1. Except as otherwise expressly provided in this Article 28, Landlord shall not be required to furnish any services to the Premises.

Section 28.2. Landlord, throughout the Term, shall have free access to any and all mechanical installations of Landlord, including but not limited to air-cooling, fan, ventilating and machine rooms, perimeter fan coil units and electrical closets. Tenant shall not construct partitions or other obstructions which may interfere with Landlord's free access thereto, or interfere with the moving of Landlord's equipment to and from the enclosures containing said installations. Neither Tenant, nor its agents, employees or contractors shall at any time enter the said enclosures or tamper with, adjust or touch or otherwise in any manner affect said mechanical installations.

Section 28.3. Tenant, at Tenant's expense, shall keep the Premises in good order, shall cause the Premises and entry area, all glass surfaces (interior and exterior) and all fixtures, furnishings and property of Tenant and any service entrance area (notwithstanding that Landlord has not leased to Tenant any rights in or to the exterior walls of the Building) to be cleaned daily, shall not at any time sweep any refuse, rubbish or dirt into the gutters, streets, lobby or other public areas of the Building and shall cause Tenant's refuse and rubbish to be removed daily. Tenant, at Tenant's expense, shall cause the Premises to be exterminated against infestation by vermin, roaches or rodents regularly, and, in addition, whenever there shall be evidence of any infestation. Tenant shall cause the removal of such refuse and rubbish and the furnishing of cleaning and exterminating services to Tenant to be performed in accordance with the Rules and Regulations, and Tenant agrees that Tenant shall not permit any Person to enter the Premises or the Building for such purposes, other than persons first approved by Landlord (which consent shall not be unreasonably withheld).

Section 28.4. Tenant shall maintain the sprinkler system located within the Premises at its sole cost and expense. If the New York Board of Fire Underwriters or the New York Fire Insurance Rating Organization or any Governmental Authority, bureau, department or official of the state or city government shall require or recommend that any changes, modifications, alterations or additional sprinkler heads or other equipment be made or supplied by reason of

Tenant's business, or the location of the partitions, trade fixtures, or other contents of the Premises, Tenant shall, at Tenant's cost and expense, promptly make and supply such changes, modifications, alterations, additional sprinkler heads or other equipment.

Section 28.5. Landlord reserves the right to stop service of the elevator, electrical, steam, plumbing or other mechanical systems or facilities in the Building when necessary, by reason of accident or emergency, or for repairs, additions, alterations, replacements or improvements in the judgment of Landlord desirable or necessary to be made, until said repairs, additions, alterations, replacements or improvements shall have been completed (which repairs, additions, alterations, replacements and improvements shall be performed in accordance with Section 4.3 hereof). Landlord shall have no responsibility or liability for interruption, curtailment or failure to supply water, electrical, plumbing or other Building Systems when prevented by Unavoidable Delays or by any Requirement of any Governmental Authority or due to the exercise of its right to stop service as provided in this Section 28.5, provided that Landlord shall use reasonable efforts to restore such services in as prompt a manner as reasonably possible. The exercise of such right or such failure by Landlord shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any compensation or to any abatement or diminution of Rental, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or its agents by reason of inconvenience or annoyance to Tenant, or injury to or interruption of Tenant's business, or otherwise.

ARTICLE 29
PARTNERSHIP TENANT

If Tenant is a partnership (including, without limitation, a limited liability partnership) or a professional corporation (or is comprised of two (2) or more Persons, individually or as co-partners of a partnership (including, without limitation a limited liability partnership), or as shareholders of a professional corporation) or if Tenant's interest in this Lease shall be assigned to a partnership (including, without limitation, a limited liability partnership) or a professional corporation (or to two (2) or more Persons, individually or as co-partners of a partnership, or shareholders of a professional corporation) pursuant to Article 12 hereof (any such partnership, professional corporation and such Persons are referred to in this Article 29 as "Partnership Tenant"), the following provisions shall apply to such Partnership Tenant: (a) the liability of each of the parties comprising Partnership Tenant shall be joint and several; (b) each of the parties comprising Partnership Tenant hereby consents in advance to, and agrees to be bound by (x) any written instrument which may hereafter be executed by Partnership Tenant or any successor entity, changing, modifying, extending or discharging this Lease, in whole or in part, or surrendering all or any part of the Premises to Landlord, and (y) any notices, demands, requests or other communications which may hereafter be given by Partnership Tenant or by any of the parties comprising Partnership Tenant; (c) any bills, statements, notices, demands, requests or other communications given or rendered to Partnership Tenant or to any of such parties shall be binding upon Partnership Tenant and all such parties; (d) if Partnership Tenant shall admit new

partners, shareholders or members, as the case may be, Partnership Tenant shall give Landlord notice of such event not later than ten (10) Business Days prior to the admission of such partner(s), shareholder(s) or member(s) together with an assumption agreement in form and substance satisfactory to Landlord pursuant to which each of such new partners, shareholders or members, as the case may be, shall, by their admission to Partnership Tenant, agree to assume joint and several liability for the performance of all of the terms, covenants and conditions of this Lease (as the same may have been or thereafter be amended) on Tenant's part to be observed and performed; it being expressly understood and agreed that each such new partner, shareholder or member (as the case may be) shall be deemed to have assumed joint and several liability for the performance of all of the terms, covenants and conditions of this Lease (as the same may have been or thereafter be amended), whether or not such new partner, shareholder or member shall have executed such assumption agreement, and that neither Tenant's failure to deliver such assumption agreement nor the failure of any such new partner or shareholder, as the case may be, to execute or deliver any such agreement to Landlord shall vitiate the provisions of this clause (d) of this Article 29).

## ARTICLE 30
## VAULT SPACE

Notwithstanding anything contained in this Lease or indicated on any sketch, blueprint or plan, any vaults, vault space or other space outside the boundaries of the Real Property are not included in the Premises. Landlord makes no representation as to the location of the boundaries of the Real Property. All vaults and vault space and all other space outside the boundaries of the Real Property which Tenant may be permitted to use or occupy are to be used or occupied under a revocable license, and if any such license shall be revoked, or if the amount of such space shall be diminished or required by any Governmental Authority or by any public utility company, such revocation, diminution or requisition shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rental, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord. Any fee, tax or charge imposed by any Governmental Authority for any such vaults, vault space or other space occupied by Tenant shall be paid by Tenant.

## ARTICLE 31
## SECURITY

Section 31.1. Tenant shall deposit with Landlord on the signing of this Lease an amount equal to the Security Amount for the 1st Security Period, or at Tenant's option, a "clean," unconditional, irrevocable and transferable letter of credit (the "Letter of Credit") in the same amount, satisfactory to Landlord, issued by and drawn on a bank satisfactory to Landlord and which is a member of the New York Clearing House Association, for the account of Landlord, for a term of not less than one (1) year, as security for the faithful performance and observance by

Tenant of the terms, covenants, conditions and provisions of this Lease, including, without limitation, the surrender of possession of the Premises to Landlord as herein provided. If an Event of Default shall occur and be continuing, Landlord may apply the whole or any part of the security so deposited, or present the Letter of Credit for payment and apply the whole or any part of the proceeds thereof, as the case may be, (i) toward the payment of any Fixed Rent, Escalation Rent or any other item of Rental as to which Tenant is in default, (ii) toward any sum which Landlord may expend or be required to expend by reason of Tenant's default in respect of any of the terms, covenants and conditions of this Lease, including, without limitation, any damage, liability or expense (including, without limitation, reasonable attorneys' fees and disbursements) incurred or suffered by Landlord, and (iii) toward any damage or deficiency incurred or suffered by Landlord in the reletting of the Premises, whether such damages or deficiency accrue or accrues before or after summary proceedings or other re-entry by Landlord. If Landlord applies or retains any part of the proceeds of the Letter of Credit or the security so deposited, as the case may be, Tenant, upon demand, shall deposit with Landlord the amount so applied or retained so that Landlord shall have the full deposit on hand at all times during the Term. If Tenant shall fully and faithfully comply with all of the terms, provisions, covenants and conditions of this Lease, the Letter of Credit or the security, as the case may be, shall be returned to Tenant after the Expiration Date and after delivery of possession of the Premises to Landlord. In the event of a sale or leasing of the Real Property or the Building, Landlord shall have the right to transfer the Letter of Credit or security, as the case may be, to the vendee or lessee and Landlord shall thereupon be released by Tenant from all liability for the return of such security or the Letter of Credit, as the case may be, and Tenant shall cause, at no cost to Landlord, the bank which issued the Letter of Credit to issue an amendment to the Letter of Credit or issue a new Letter of Credit naming the vendee or lessee as the beneficiary thereunder. Tenant shall look solely to the new landlord for the return of the Letter of Credit or the security, as the case may be. The provisions hereof shall apply to every transfer or assignment of the Letter of Credit or security made to a new landlord. Tenant shall not assign or encumber or attempt to assign or encumber the monies deposited herein as security and neither Landlord nor its successors or assigns shall be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance. Tenant shall renew any Letter of Credit from time to time, at least thirty (30) days prior to the expiration thereof, and deliver to Landlord a new Letter of Credit or an endorsement to the Letter of Credit, and any other evidence required by Landlord that the Letter of Credit has been renewed for a period of at least one (1) year. If Tenant shall fail to renew the Letter of Credit as aforesaid, Landlord may present the Letter of Credit for payment and retain the proceeds thereof as security in lieu of the Letter of Credit.

Section 31.2  Provided no Event of Default shall have occurred and be continuing on the first day of the 2nd Security Period and the 3rd Security Period, as the case may be, (a) if a Letter of Credit is on deposit, Tenant shall be entitled to replace the Letter of Credit on deposit with Landlord with a Letter of Credit in the Security Amount for the applicable Security Period, or (b) if Tenant shall have deposited with Landlord cash security in lieu of a Letter of Credit, provided that the Security Amount for the applicable Security Period is less than the security then on deposit for the immediately preceding Security Period, and further provided that Tenant shall

have fully and faithfully complied with all of the terms, provisions, covenants and conditions of this Lease, then Landlord shall refund to Tenant an amount equal to the difference between the Security Amount for the applicable Security Period and the security then on deposit for the immediately preceding Security Period.

## ARTICLE 32
## CAPTIONS

The captions are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Lease nor the intent of any provision thereof.

## ARTICLE 33
## PARTIES BOUND

The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective legal representatives, successors, and, except as otherwise provided in this Lease, their assigns.

## ARTICLE 34
## BROKER

Each party represents and warrants to the other that it has not dealt with any broker or Person in connection with this Lease other than H. Stender Realty ("Broker"). The execution and delivery of this Lease by each party shall be conclusive evidence that such party has relied upon the foregoing representation and warranty. Tenant shall indemnify and hold Landlord harmless from and against any and all claims for commission, fee or other compensation by any Person (other than Broker) who shall claim to have dealt with Tenant in connection with this Lease and for any and all costs incurred by Landlord in connection with such claims, including, without limitation, reasonable attorneys' fees and disbursements. Landlord shall indemnify and hold Tenant harmless from and against any and all claims for commission, fee or other compensation by any Person (including Broker) who shall claim to have dealt with Landlord in connection with this Lease and for any and all costs incurred by Tenant in connection with such claims, including, without limitation, reasonable attorneys' fees and disbursements. Landlord shall pay Broker all fees, commission and other compensation in connection with this Lease pursuant to a separate agreement between Landlord and Broker. The provisions of this Article 34 shall survive the Expiration Date.

## ARTICLE 35
## INDEMNITY

Section 35.1. Tenant shall not do or permit any act or thing to be done upon the Premises which may subject Landlord to any liability or responsibility for injury, damages to persons or property or to any liability by reason of any violation of any Requirement, and shall exercise such control over the Premises as to fully protect Landlord against any such liability. Except to the extent the same are due to the negligence or wilful misconduct of Landlord, Landlord's employees, agents or licensees, Tenant shall indemnify and save the Indemnitees harmless from and against (a) all claims of whatever nature against the Indemnitees arising from any act, omission or negligence of Tenant, its contractors, licensees, agents, servants, employees, invitees or visitors, (b) all claims against the Indemnitees arising from any accident, injury or damage whatsoever caused to any person or to the property of any person and occurring during the Term in or about the Premises, (c) all claims against the Indemnitees arising from any accident, injury or damage occurring outside of the Premises but anywhere within or about the Real Property, where such accident, injury or damage results or is claimed to have resulted from an act, omission or negligence of Tenant or Tenant's contractors, licensees, agents, servants, employees, invitees or visitors, and (d) any breach, violation or non-performance of any covenant, condition or agreement in this Lease set forth and contained on the part of Tenant to be fulfilled, kept, observed and performed. This indemnity and hold harmless agreement shall include indemnity from and against any and all liability, fines, suits, demands, costs and expenses of any kind or nature (including, without limitation, attorneys' fees and disbursements) incurred in or in connection with any such claim or proceeding brought thereon, and the defense thereof.

Section 35.2. If any claim, action or proceeding is made or brought against Landlord, which claim, action or proceeding Tenant shall be obligated to indemnify Landlord against pursuant to the terms of this Lease, then, upon demand by Landlord, Tenant, at its sole cost and expense, shall resist or defend such claim, action or proceeding in Landlord's name, if necessary, by such attorneys as Landlord shall approve, which approval shall not be unreasonably withheld. Attorneys for Tenant's insurer are hereby deemed approved for purposes of this Section 35.2. Notwithstanding the foregoing, Landlord may retain its own attorneys to defend or assist in defending any claim, action or proceeding involving potential liability of Five Million Dollars ($5,000,000) or more, and Tenant shall pay the reasonable fees and disbursements of such attorneys. The provisions of this Article 35 shall survive the expiration or earlier termination of this Lease.

## ARTICLE 36
## ADJACENT EXCAVATION-SHORING

If an excavation shall be made upon land adjacent to the Premises, or shall be authorized to be made, Tenant, upon reasonable advance notice, shall afford to the person causing or authorized to cause such excavation, a license to enter upon the Premises for the purpose of

doing such work as said person shall deem necessary to preserve the wall or the Building from injury or damage and to support the same by proper foundations, without any claim for damages or indemnity against Landlord, or diminution or abatement of Rental, provided that Tenant shall continue to have access to the Premises and the Building.

### ARTICLE 37
### MISCELLANEOUS

Section 37.1. This Lease is offered for signature by Tenant and it is understood that this Lease shall not be binding upon Landlord or Tenant unless and until Landlord and Tenant shall have executed and unconditionally delivered a fully executed copy of this Lease to each other.

Section 37.2. The obligations of Landlord under this Lease shall not be binding upon Landlord named herein after the sale, conveyance, assignment or transfer by such Landlord (or upon any subsequent landlord after the sale, conveyance, assignment or transfer by such subsequent landlord) of its interest in the Building or the Real Property, as the case may be, and in the event of any such sale, conveyance, assignment or transfer, Landlord shall be and hereby is entirely freed and relieved of all covenants and obligations of Landlord hereunder. The members, partners, shareholders, directors, officers and principals, direct and indirect, comprising Landlord (collectively, the "Parties") shall not be liable for the performance of Landlord's obligations under this Lease. Tenant shall look solely to Landlord to enforce Landlord's obligations hereunder and shall not seek any damages against any of the Parties. The liability of Landlord for Landlord's obligations under this Lease shall be limited to Landlord's interest in the Real Property and Tenant shall not look to any other property or assets of Landlord or the property or assets of any of the Parties in seeking either to enforce Landlord's obligations under this Lease or to satisfy a judgment for Landlord's failure to perform such obligations.

Section 37.3. Notwithstanding anything contained in this Lease to the contrary, all amounts payable by Tenant to or on behalf of Landlord under this Lease, whether or not expressly denominated Fixed Rent, Escalation Rent, additional rent or Rental, shall constitute rent for the purposes of Section 502(b)(7) of the Bankruptcy Code.

Section 37.4. Tenant's liability for all items of Rental shall survive the Expiration Date.

Section 37.5. Tenant shall reimburse Landlord as additional rent, within ten (10) days after rendition of a statement, for all expenditures made by, or damages or fines sustained or incurred by, Landlord, due to any default by Tenant under this Lease, with interest thereon at the Applicable Rate.

Section 37.6. This Lease shall not be recorded.

Section 37.7. Tenant hereby waives any claim against Landlord which Tenant may have based upon any assertion that Landlord has unreasonably withheld or unreasonably delayed any consent or approval requested by Tenant, and Tenant agrees that its sole remedy shall be an action or proceeding to enforce any related provision or for specific performance, injunction or declaratory judgment. In the event of a determination that such consent or approval has been unreasonably withheld or delayed, the requested consent or approval shall be deemed to have been granted; however, Landlord shall have no liability to Tenant for its refusal or failure to give such consent or approval. Tenant's sole remedy for Landlord's unreasonably withholding or delaying consent or approval shall be as provided in this Section 37.7.

Section 37.8. This Lease contains the entire agreement between the parties and supersedes all prior understandings, if any, with respect thereto. This Lease shall not be modified, changed, or supplemented, except by a written instrument executed by both parties.

Section 37.9. Tenant hereby (a) irrevocably consents and submits to the jurisdiction of any Federal, state, county or municipal court sitting in the State of New York in respect to any action or proceeding brought therein by Landlord against Tenant concerning any matters arising out of or in any way relating to this Lease; (b) irrevocably waives personal service of any summons and complaint and consents to the service upon it of process in any such action or proceeding by mailing of such process to Tenant at the address set forth herein and hereby irrevocably designates Maloney & Porcelli, 225 Broadway, New York, New York 10007, or other law firm located in Manhattan if disclosed to Landlord in writing (or if not so located, then upon any member of the law firm of Maloney & Porcelli, or their successor, if so located in Manhattan), to accept service of any process on Tenant's behalf and hereby agrees that such service shall be deemed sufficient; (c) irrevocably waives all objections as to venue and any and all rights it may have to seek a change of venue with respect to any such action or proceedings; (d) agrees that the laws of the State of New York shall govern in any such action or proceeding and waives any defense to any action or proceeding granted by the laws of any other country or jurisdiction unless such defense is also allowed by the laws of the State of New York; and (e) agrees that any final judgment rendered against it in any such action or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment or in any other manner provided by law. Tenant further agrees that any action or proceeding by Tenant against Landlord in respect to any matters arising out of or in any way relating to this Lease shall be brought only in the State of New York, county of New York. In furtherance of the foregoing, Tenant hereby agrees that its address for notices given by Landlord and service of process under this Lease shall be the Premises. Notwithstanding the foregoing provisions of this Section 37.9, Tenant may, by written notice to Landlord, change the designated agent for acceptance of service of process to any other law firm located in the City, county and State of New York.

Section 37.10. Unless Landlord shall render written notice to Tenant to the contrary in accordance with the provisions of Article 26 hereof, MRC Management LLC is authorized to act as Landlord's agent in connection with the performance of this Lease, including, without limitation. the receipt and delivery of any and all notices and consents in accordance with Article

26. Tenant shall direct all correspondence and requests to, and shall be entitled to rely upon correspondence received from, MRC Management LLC, as agent for the Landlord in accordance with Article 26. Tenant acknowledges that MRC Management LLC is acting solely as agent for Landlord in connection with the foregoing, and neither MRC Management LLC nor any of its direct or indirect members, partners, officers, shareholders, directors or employees shall have any liability to Tenant in connection with the performance of Landlord's obligations under this Lease and Tenant waives any and all claims against any such party arising out of, or in any way connected with, this Lease or the Real Property.

Section 37.11. (A) All of the Schedules and Exhibits attached hereto are incorporated in and made a part of this Lease, but, in the event of any inconsistency between the terms and provisions of this Lease and the terms and provisions of the Schedules and Exhibits hereto, the terms and provisions of this Lease shall control. Wherever appropriate in this Lease, personal pronouns shall be deemed to include the other genders and the singular to include the plural. All Article and Section references set forth herein shall, unless the context otherwise specifically requires, be deemed references to the Articles and Sections of this Lease.

(B) If any term, covenant, condition or provision of this Lease, or the application thereof to any person or circumstance, shall ever be held to be invalid or unenforceable, then in each such event the remainder of this Lease or the application of such term, covenant, condition or provision to any other Person or any other circumstance (other than those as to which it shall be invalid or unenforceable) shall not be thereby affected, and each term, covenant, condition and provision hereof shall remain valid and enforceable to the fullest extent permitted by law.

(C) All references in this Lease to the consent or approval of Landlord shall be deemed to mean the written consent or approval of Landlord and no consent or approval of Landlord shall be effective for any purpose unless such consent or approval is set forth in a written instrument executed by Landlord.

## ARTICLE 38
## RENT CONTROL

If at the commencement of, or at any time or times during the Term of this Lease, the Rental reserved in this Lease shall not be fully collectible by reason of any Requirement, Tenant shall enter into such agreements and take such other steps (without additional expense to Tenant) as Landlord may request and as may be legally permissible to permit Landlord to collect the maximum rents which may from time to time during the continuance of such legal rent restriction be legally permissible (and not in excess of the amounts reserved therefor under this Lease). Upon the termination of such legal rent restriction prior to the expiration of the Term, (a) the Rental shall become and thereafter be payable hereunder in accordance with the amounts reserved in this Lease for the periods following such termination, and (b) Tenant shall pay to

Landlord, if legally permissible, an amount equal to (i) the items of Rental which would have been paid pursuant to this Lease but for such legal rent restriction less (ii) the rents paid by Tenant to Landlord during the period or periods such legal rent restriction was in effect.

## ARTICLE 39
## TENANT'S SIGNS

Tenant shall not install any store front, exterior or interior signs, interior or exterior lighting schemes, awnings, security gates, exterior decorations, projections, curtains, blinds, shades, screens, advertisements, notices or lettering on glass (including any changes to any of the foregoing) in, on or about the Premises unless Landlord shall have approved Tenant's plans for any such installation or change as to quality, type, dimension, content, color, material, location, manner of installation and design, prior to the making of such installation or change. Any such installation or change shall be made and performed in accordance with the provisions of Article 3 hereof. Tenant agrees to remove immediately after demand by Landlord, and as often as such demand shall be made, any sign, display, or other material located in the Premises to which Landlord shall not approve, and further agrees to discontinue immediately, after demand by Landlord, and as often as such demand shall be made, the sale, exhibition, display (window or otherwise), or advertisement in or with respect to the Premises or any part thereof, of any article or material, or the manner of sale, exhibition, display or advertisement of same to which Landlord shall not approve. Tenant shall observe and comply with, and shall not permit the violation of, any rules Landlord may reasonably prescribe, on notice to Tenant, from time to time, with respect to Tenant's signs, awnings, exterior decorations, projections, curtains, blinds, shades, screen advertisements, notices and lettering. No Alterations to the store front whatsoever may be made at any time during the Term without Landlord's prior approval, which approval shall not be unreasonably withheld in accordance with Section 3.1 hereof. Tenant acknowledges Landlord's damages resulting from any breach of the provisions of this Article 41 are difficult, if not impossible, to ascertain and agrees that, among other remedies for such breach permitted by law or the provisions of this Lease, Landlord shall be entitled to apply to a court of competent jurisdiction to enjoin Tenant from any violation of said provisions.

## ARTICLE 40
## CONTINUOUS OPERATION

Section 40.1. Tenant acknowledges that its continuous operation at the Premises for the regular conduct of its business therein is of utmost importance to Landlord in the renewal of other leases in the Building, in the renting of vacant space in the Building, and in the maintenance of the character and quality of the Building. Tenant therefore covenants and agrees that it will with due dispatch and diligence and in accordance with the provisions of this Lease promptly open for business in the Premises and thereafter continuously, actively and diligently operate such business in the whole of the Premises (but in any event in compliance herewith)

between the hours of 11:30 A.M. and 11:30 P.M. on each Business Day (except as set forth in Section 2.1(C) hereof) and other days throughout the term of this Lease on which Tenant is required to be open for business under Section 2.1(C) hereof. Landlord and Tenant acknowledge and agree that Tenant may temporarily close its business in the Premises for the time reasonably required (i) to repair any damage to the Premises, (ii) to perform any Alteration or refurbish the Premises, (iii) due to a taking by eminent domain, (iv) due to strikes or other labor disputes, (v) due to Requirements or Unavoidable Delays, or (vi) for seasonal vacations consistent with restaurant industry practices (not to exceed five (5) consecutive days per vacation). Tenant acknowledges that Landlord is executing this Lease in reliance upon these covenants, which are a material inducement to Landlord to execute this Lease. Tenant further agrees that if it fails to so continuously conduct its business in the Premises as hereinabove set forth for a period in excess of ten (10) consecutive Business Days for reasons other than as set forth above, without the prior written consent of Landlord, then such failure shall be deemed to render the Premises abandoned, as that term is used in Article 16 of this Lease, except in the event that Tenant shall temporarily be prevented from continuously conducting its business in the Premises by conditions beyond the control of Tenant, such as acts of God or the elements, strikes, and labor disputes, and Tenant could not have reasonably prevented such condition by adequate planning and provision.

Section 40.2. The parties recognize and agree that the damage to Landlord resulting from any breach of the covenants in Section 40.1 hereof will be extremely substantial, will be far greater than the Rental payable for the balance of the term of this Lease, and will be impossible of accurate measurement. The parties therefore agree as follows:

(A) In the event of a breach or threatened breach of the said covenants, in addition to all of Landlord's other rights and remedies, at law or in equity or otherwise, Landlord shall have the right of injunction.

(B) If Tenant breaches any of the covenants in Section 40.1 hereof, and this Lease be terminated because of such default, then, in addition to all other rights and remedies available to Landlord under this Lease, at law or in equity, and anything in this Lease to the contrary notwithstanding:

(i) Landlord shall have the right to reenter the Premises and resume possession thereof, and to alter, reconstruct and rent all or any part of the Premises, at any Rental to which Landlord shall agree, foi any portion of or beyond the original term of this Lease.

(ii) Any and all furniture, fixtures, equipment, goods, wares, merchandise and any property of every kind and nature remaining in the Premises shall be conclusively presumed to have been abandoned by Tenant, and Landlord, without liability whatsoever or notice to any person, may enter the Premises and

remove therefrom any such furniture, fixtures, equipment, goods, wares, merchandise and property of every kind and nature and dispose of the same in such manner and upon such basis as Landlord may deem proper or advisable without any duty to account therefor to Tenant.

(iii) Any income received by Landlord on any such re-rental shall be the property of Landlord alone as compensation for the expenses in connection with the preparation and re-renting of the Premises, and, together with the rents and additional rents payable as aforesaid, as liquidated damages for the breach of Tenant, which damages cannot be computed, as aforesaid. Tenant shall have no right to any portion of such income, and such damages shall be cumulative for Tenant's default under this Lease otherwise provided for.

## ARTICLE 41
## OPERATING COVENANTS

Section 41.1. Tenant's advertising and public relations, if any, shall not diminish or detract from the character and reputation of the Building as a first-class office and retail building and shall meet the quality and standards in keeping with the caliber of the restaurant to be operated at the Premises in accordance with Section 2.1 hereof.

Section 41.2. Tenant shall provide Landlord, within ten (10) days after Landlord's request therefor, such financial information about Tenant, guarantors hereof, or Tenant's subtenants or assignees as Landlord may request.

Section 41.3. Tenant shall cause Terrance Brennan ("Brennan"), at all times during the Term, to personally plan and develop the business being operated at the Premises, personally oversee the training of staff to be employed at the Premises, and to be present at the Premises supervising the operation thereof on a regular basis for the first twenty-four (24) months after the Commencement Date (collectively, the "Operator Services"); provided, however, that in the event that Brennan shall die or become incapacitated, then Tenant, within thirty (30) days of such event, shall appoint a replacement, who shall be a reputable operator of a first class table quality restaurant with at least five (5) years experience in operating first-class table cloth quality restaurants in New York City and shall be subject to the prior approval of Landlord, which approval shall not be unreasonably withheld or delayed (such person being hereinafter referred to as the "Operator"). Tenant shall cause the Operator to personally perform the Operator Services. If Brennan becomes incapacitated, as aforesaid, then said appointment of the Operator shall be effective only during the period that Brennan shall be incapacitated, and from and after the date Brennan shall no longer be incapacitated, Tenant shall cause Brennan to personally perform the Operator Services. Tenant represents and warrants that Brennan is currently a principal of Tenant.

IN WITNESS WHEREOF, Landlord and Tenant have respectively executed this Lease as of the day and year first above written.

**TWO PARK COMPANY**, Landlord

By: M/H Two Park Associates L.P., general partner

By: Vornado M/H L.L.C., general partner

By: Vornado Realty L.P., member

By: Vornado Realty Trust, general partner

By: _____
Name:
Title: Irwin Goldberg, Vice President
Chief Financial Officer

**ARTISANAL, FROMAGERIE & BISTRO, LLC**, Tenant

By: _____
Name: Terrance Brennan
Title: managing member

Fed. Id. No. _____

State of New York )
               ) ss.:
County of New York )


    On the _8th_ day of _September_ in the year _2000_ before me, the undersigned, a Notary Public in and said State, personally appeared _TERRANCE BRENNAN_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_Carla Meyer Lois_
Notary Public

CARLA MEYER LOIS
Notary Public, State of New York
No 4694406
Qualified in Rockland County
Commission Expires July 31, _2001_

## Schedule Á

### RULES AND REGULATIONS

(1) The sidewalks, entrances, passages, courts, elevators, vestibules, stairways, corridors, or halls shall not be obstructed or encumbered by Tenant or used for any purpose other than ingress and egress to and from the Premises and for delivery of merchandise and equipment in prompt and efficient manner, using elevators and passageways designated for such delivery by Landlord.

(2) No awnings, air-conditioning units, fans or other projections shall be attached to the outside walls of the Building. No curtains, blinds, shades, or screens, other than those which conform to Building standards as established by Landlord from time to time, shall be attached to or hung in, or used in connection with, any window or door of the Premises, without the prior written consent of Landlord which shall not be unreasonably withheld or delayed. Such awnings, projections, curtains, blinds, shades, screens or other fixtures must be of a quality, type, design and color, and attached in the manner reasonably approved by Landlord. All electrical fixtures hung in offices or spaces along the perimeter of the Premises must be of a quality, type, design and bulb color approved by Landlord, which consent shall not be withheld or delayed unreasonably unless the prior consent of Landlord has been obtained for other lamping.

(3) No sign, advertisement, notice or other lettering shall be exhibited, inscribed, painted or affixed by Tenant on any part of the outside of the Premises or Building or on the inside of the Premises if the same can be seen from the outside of the Premises without the prior written consent of Landlord (which consent shall not be unreasonably withheld in accordance with the provisions of the Lease) except that the name of Tenant may appear on the entrance door of the Premises. In the event of the violation of the foregoing by Tenant, if Tenant has refused to remove same after reasonable notice from Landlord, Landlord may remove same without any liability, and may charge the expense incurred by such removal to Tenant. Interior signs on doors and directory tablet shall be of a size, color and style reasonably acceptable to Landlord.

(4) The exterior windows and doors that reflect or admit light and air into the Premises or the halls, passageways or other public places in the Building, shall not be covered or obstructed by Tenant.

(5) No showcases or other articles shall be put in front of or affixed to any part of the exterior of the Building, nor placed in the halls, corridors or vestibules, nor shall any article obstruct any air-conditioning supply or exhaust without the prior written consent of Landlord.

(6) The water and wash closets and other plumbing fixtures shall not be used for any purposes other than those for which they were constructed, and no sweepings, rubbish, rags, acids or other substances shall be deposited therein. All damages resulting from any misuse of the fixtures shall be borne by Tenant.

(7) Subject to the provisions of Article 3 of this Lease, Tenant shall not mark, paint, drill into, or in any way deface any part of the Premises or the Building. No boring, cutting or stringing of wires shall be permitted, except with the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed, and as Landlord may direct.

(8) No space in the Building shall be used for manufacturing.

(9) Tenant shall not make, or permit to be made, any unseemly or disturbing noises or disturb or interfere with occupants of this or neighboring buildings or premises or those having business with them whether by the use of any musical instrument, radio, television set, talking machine, unmusical noise, whistling, singing, or in any other way.

(10) Tenant, or any of Tenant's employees, agents, visitors or licensees, shall not at any time bring or keep upon the Premises any inflammable, combustible or explosive fluid, chemical or substance except such as are incidental to usual restaurant occupancy.

(11) No additional locks or bolts of any kind shall be placed upon any of the doors or windows by Tenant, nor shall any changes be made in existing locks or the mechanism thereof, unless Tenant promptly provides Landlord with the key or combination thereto. Tenant must, upon the termination of its tenancy, return to Landlord all keys of stores, offices and toilet rooms, and in the event of the loss of any keys furnished at Landlord's expense, Tenant shall pay to Landlord the cost thereof.

· (12) No bicycles, vehicles or animals of any kind except for seeing eye dogs shall be brought into or kept by Tenant in or about the Premises or the Building.

(13) All removals, or the carrying in or out of any safes, freight, furniture or bulky matter of any description must take place in the manner and during the hours which Landlord or its agent reasonably may determine from time to time. Landlord reserves the right to inspect all safes, freight or other bulky articles to be brought into the Building and to exclude from the Building all safes, freight or other bulky articles which violate any of these Rules and Regulations or the Lease of which these Rules and Regulations are a part.

(14) Tenant shall not occupy or permit any portion of the Premises demised to it to be occupied as an office for a public stenographer or typist, or for the possession, storage, manufacture, or sale of liquor, narcotics, dope, or as a barber or manicure shop, or as an employment bureau. Tenant shall not engage or pay any employees on the Premises, except those actually working for Tenant at the Premises, nor advertise for labor giving an address at the Premises.

(15) Tenant shall not purchase towels or other like service, or accept barbering or boot-blacking services in the Premises, from any company or persons not approved by Landlord, which approval shall not be withheld or delayed unreasonably and at hours and under regulations other than as reasonably fixed by Landlord.

(16) Landlord shall have the right to prohibit any advertising by Tenant which, in Landlord's reasonable opinion, tends to impair the reputation of the Building or its desirability as a building for first class office and retail use, and upon written notice from Landlord, Tenant shall refrain from or discontinue such advertising.

(17) Landlord reserves the right to exclude from the Building (other than the Premises) between the hours of 6 P.M. and 8 A.M. and at all hours on days other than Business Days all persons who do not present a pass to the Building signed or approved by Landlord. Tenant shall be responsible for all persons for whom a pass shall be issued at the request of Tenant and shall be liable to Landlord for all acts of such persons.

(18) Tenant shall, at its expense, provide artificial light for the employees of Landlord while making repairs or alterations in the Premises.

(19) The requirements of Tenant will be attended to only upon written application at the office of the Building. Building employees shall not perform any work or do anything outside of the regular duties, unless under special instructions from the office of Landlord.

(20) Canvassing, soliciting and peddling in the Building is prohibited and Tenant shall cooperate to prevent the same.

(21) There shall not be used in any space, or in the public halls of the Building, either by Tenant or by jobbers or others, in the delivery or receipt of merchandise, any hand trucks, except those equipped with rubber tires and side guards.

(22) Subject to the provisions of this Lease, Tenant shall not cause or permit any unreasonable odors of cooking or other processes or any unusual or objectionable odors to emanate from the Premises.

(23) Tenant shall keep the entrance door to the Premises closed at all times.

## EXHIBIT "A"

## FLOOR PLAN OF THE PREMISES

The floor plan annexed to and made a part of this Lease solely to indicate the Premises by outlining and diagonal marking. All areas, conditions, dimensions, and location are approximate.



PARK AVENUE

2 PARK AVENUE
BASEMENT

THE MENDIK COMPANY
330 MADISON AVENUE
NEW YORK N.Y. 10017

A

B

C

D

G

H

I

J

K

32ND STREET

33RD STREET

PARK AVENUE



MS

RCE MANAGEMENT SERVICES

IN AFFILIATION WITH

DG

DESIGN CONSORTIUM

2 PARK AVENUE
MEZZANINE FLOOR

THE MENDIK COMPANY
330 MADISON AVENUE
NEW YORK N.Y. 10017
(212) 557-1100

DIMENSIONS ARE APPROXIMATE AND ARE



32ND STREET

33RD STREET

A

A

B

C

D

E

F

G

H

I

J

K

PART PLAN UPPER LEVEL

PARK AVENUE

2 PARK AVENUE
GROUND FLOOR

RMS
RESOURCE MANAGEMENT SERVICES

IN AFFILIATION WITH

DC

DESIGN CONSORTIUM

SCALE:

0  6'  12'    24'              48'

ALL DIMENSIONS ARE APPROXIMATE AND ARE
SUBJECT TO NORMAL BUILDING VARIANCES.

THE MENDIK COMPANY
330 MADISON AVENUE
NEW YORK N.Y. 10017
(212) 557-1100

EXHIBIT "B"

LIST OF APPROVED CONTRACTORS IN CONNECTION
WITH THE INITIAL ALTERATIONS

*See Attached*

# APPROVED CONTRACTORS

Revised 4/25/00

| GENERAL CONTRACTORS | PHONE # | CONTACT PERSON |
|---|---|---|
| AMBASSADOR CONSTRUCTION | (212) 922-1020 | JAY KOVEN |
| BRISTOL CONSTRUCTION | (212) 244-6811 | GEORGE KATZMAN |
| JAMES E. FITZGERALD, INC. | (212) 930-3034 | HUGH O'CONNELL |
| LEHR CONSTRUCTION | (212) 353-1160 | GERALD LAZER |
| LEHR MC GOVERN BOVIS | (212) 592-6700 | RALPH ESPOSITO |
| MC CANN, INC. | (212) 586-8000 | BRUCE FAHEY |
| OCEAN VALLEY / LESAL INTERIORS | (718) 776-0077 | GARY SHERWOOD |
| STRUCTURE TONE | (212) 481-6100 | JOHN WHITE |
| TDX INTERIORS | (212) 279-1981 | JANINE KOURAKOS |
| TISHMAN INTERIORS | (212) 399-3600 | ROB BLACKMAN |
| TRI-STAR CORP. | (212) 486-0808 | BILL WEINER |
| MDA | (212) 302-5566 | DEREK SCHUSTER |

## SUB-CONTRACTORS

| ASBESTOS ABATEMENT | | |
|---|---|---|
| ABATEMENT INT. | (718) 994-2000 | BILL McKENZIE |
| ABTRON | (516) 364-4678 | JIM THURSTON |
| NAC | (212) 219-0880 | MIKE CAPUTO |

| AWNINGS | | |
|---|---|---|
| ACME AWNING CO. | (718) 409-1881 | KEN COHEN |

| BLINDS | | |
|---|---|---|
| DRAPERIES FOR BUSINESS | (718) 729-8310 | KEN HOHL |
| ULTIMATE SERVICES | (203) 531-0623 | DAVID MARINELLI |
| WEXLER SERVICES | (212) 245-1110 | VERA YOUNG |

| BOILERS | | |
|---|---|---|
| CONTROLLED COMBUSTION | (718) 367-9800 | JERRY WILLIAMS |
| MARINE WELDING | (718) 991-3203 | WILLIAM FALCO |

| CERAMIC/MARBLE | | |
|---|---|---|
| CORCORAN MARBLE | (516) 423-8737 | JOE CORCORAN |
| PORT MORRIS | (718) 378-6100 | CAROL NARO |
| QUARRY TILE | (212) 679-8889 | FRANK GIARAMITA |

## COMMUNICATIONS/TELECOMMUNICATIONS

| ADCOM COMMUNICATIONS | (718) 494-4400 | SAL CAPONE |
| FOREST DATA COM | (212) 318-1700 | PHIL ALTHEIM |
| HUGH O'KANE ELECTRIC | (212) 431-6007 | HUGH O'KANE |
| I-LITE ELECTRIC | (212) 262-9488 | ANTHONY IZZO |
| METROCOMM | (212) 459-9128 | DARIO GRISTINA |
| PETROCELLI ELECTRIC | (718) 937-1200 | MICHAEL SPATOLA |

## CONCRETE

| BRISTOL CONSTRUCTION | (212) 750-2087 | GEORGE KATZMAN |
| C&D | (718) 384-0999 | GARY BROWN |
| GRACIANO | (973) 857-0507 | THOMAS CORBO |
| MELVA | (718) 482-1932 | CHRIS BATALIAS |
| OCEAN VALLEY / LESAL INTERIORS | (718) 776-0077 | GARY SHERWOOD |

## CONVECTORS/COVERS

| WENIG CORP. | (718) 542-3600 | RAY ZIMMERMAN |
| HACK ENVIRONMENTAL | (914) 946-3800 | KEN HACK |
| AIRFLUX | (516) 752-1219 | JOHNATHAN FOGELMAN |

## DEMOLITION

| ADVANCE CARTING | (212) 691-3200 | GENE SKOWRONSKI |
| BREEZE DEMOLITION | (718) 266-7336 | DYAL RAMCHARAN |
| CASALINO DEMOLITION | (718) 478-2292 | ANNA CASALINO |
| DaCOSTA DEMOLITION | (718) 565-8588 | ERNIE DaCOSTA |
| GENERAL INDUSTRIAL | (718) 834-8100 | CHARLIE RAFFA |
| MANHATTAN DEMOLITION | (718) 361-0397 | JACK BORDOME |
| RITEWAY INTERNAL REMOVAL, INC. | (718) 458-8900 | MIKE TIAMUTOLO |
| SEASONS CONTRACTING | (201) 861-9600 | SAVATORE CARUCCI |

## DRYWALL/SHEETROCK

| CLK CONSTRUCTION | (212) 986-4580 | CORY KOVEN |
| DEJIL | (718) 939-3700 | SY LEVINE |
| ESS & VEE | (718) 786-1100 | TONY VERDERAME |
| JOHN MORESKY | (516) 735-7015 | JOHN MORESKY |
| NORDIC INTERIORS, INC | (718) 456-7000 | LLOYD JACOBSON |
| OCEAN VALLEY / LEASAL INTERIORS | (718) 776-0077 | GARY SHERWOOD |
| SWEENEY & HARKIN | (718) 392-0190 | DON MASTERSON |

## ELECTRIC

| CALL ELECTRIC | (718) 932-5344 | DAVE SPINDELL |
| C. W. GREENE | (212) 267-0440 | JAMES ANGUS |
| EGG ELECTRIC | (212) 633-9551 | ELLEN ASCHENDORF |
| FOREST ELECTRIC | (212) 318-1500 | PHIL ALTHEIM |
| GELLER ELECTRIC | (718) 729-2944 | AL SAMILENKO |
| I - LITE ELECTRIC | (212) 262-9488 | ANTHONY IZZO |
| R. B. SAMUELS ELECTRIC | (212) 686-6700 | DAVE SAMUELS |

## FLOORING

| | | |
|---|---|---|
| ASHLAND INDUSTRIES | (914) 777-4507 | CARMINE NOTARO |
| B C EXCHANGE | (212) 686-5100 | DAVE SIMON |
| LORRAINE FLOORING | (718) 482-0068 | STEPHEN VERDERAME |
| WEXLER SERVICES | (212) 245-1110 | VERA YOUNG |

## FOLDING WALLS

| | | |
|---|---|---|
| FLEXWALL | (516) 561-3900 | RON SARACO |
| MODERNFOLD DOORS | (212) 684-4210 | ROBERT STYLES |
| NATIONAL | (212) 924-1567 | EDMUND GRECCO |

## GLASS REPLACEMENT

| | | |
|---|---|---|
| EAST SIDE GLASS | (212) 674-8355 | MARK ROSEN |
| KNICKERBOCKER GLASS | (212) 247-8500 | SIDNEY GLASSER |
| SCHULDINER | (718) 386-5200 | DICK LAND |

## H.V.A.C

| | | |
|---|---|---|
| J.C.&F. SERVICES, INC. | (718) 296-6951 | GERALD LaCHANCE |
| JDP MECHANICAL | (718) 204-5500 | PETER MANOS SR. & JR. |
| NELSON AIR DEVICE | (718) 729-3801 | NELSON BLITZ |
| OMEGA COOLING | (212) 268-7100 | RON IRVING |
| PENGUIN AIR CONDITIONING | (718) 706-2503 | WILLIAM ASH |
| P. J. MECHANICAL | (212) 243-2555 | MITCHELL SINGER |
| P & L MECHANICAL | (212) 966-6054 | NICK PIZZONE |

## HARDWARE / DOOR LOCKS

| | | |
|---|---|---|
| MIDTOWN | (212) 730-2052 | BILL FERRARA |
| RAM TECH | (718) 476-2408 | ANTHONY ZAMPELLI |
| WEINSTEIN & HOLTZMAN | (212) 233-4651 | JEFF HYMOWITZ |

## MOVING COMPANIES

| | | |
|---|---|---|
| CENTRAL MOVING & STORAGE | (212) 268-8989 | GENE TOSCANI |
| GLOBE MOVING & STORAGE | (212) 925-3555 | GLEN PRESSLIER |
| MEGA VAN & STORAGE | (718) 875-7313 | JOHN WILLIAMS |
| TIME MOVING & STORAGE | (718) 855-1700 | JAMES McVIEGH |

## LATH & ACOUSTICS

| | | |
|---|---|---|
| ESS & VEE | (718) 786-1100 | TONY VERDERAME |
| SUPERIOR | (718) 894-2417 | KEN MC GUIGAN |

## LIGHTING/ELECTRICAL SUPPLIES

| | | |
|---|---|---|
| BENFIELD ELECTRIC | (718) 706-8600 | MICHAEL F. O'BRIEN |
| CONSERVE ELECTRIC | (718) 937-6671 | LARRY SULLIVAN |
| SPECLITE | (516) 822-8800 | JAMES WILLEY |
| PROJECT LIGHTING | (718) 417-8182 | TONY CAPRANZANO |
| MIDTOWN ELECTRIC SUPPLY | (212) 255-3388 | TIM GOLD |

3

CIROCCO & OZZIMO                        (516) 847-0185          GREG OZZIMO

## METAL / GLASS PARTITION
ACME                                    (718) 384-7800          JIM GRECO
A-VAL ARCHITECTURAL METAL               (718) 539-2391          VLADIMIR BLASKOVIC
LANDMARK                                (718) 495-7300          CHARLES GUTTMAN
METRALITE                               (718) 961-1770          DON SILVERMAN

## PAINTING
BOND PAINTING                           (212) 944-0070          STUART FELD
J. I. HASS                              (212) 687-6678          JAY HASS
L & L PAINTING COMPANY, INC.            (516) 349-1900          BRAD ZORFAS
STATE PAINTING & DECORATING CO., INC.   (212) 751-8330          STEPHEN WOLF
WEXLER SERVICES                         (212) 245-1110          VERA YOUNG

## PLUMBING
CREST PLUMBING & HEATING, INC.          (212) 967-2276          BILL BOWERMAN
PAR PLUMBING                            (516) 887-4000          SANDI DEUTSCH
M J M PLUMBING                          (212) 966-2444          MIKE CARBONE

## RAISED FLOOR
RAISED FLOORS                           (973) 778-2444          ERIC LAGERSTRUM
COMPUTER FLOORS                         (973) 340-3666          TOR SUNDLIN

## ROLLING/REVOLVING DOORS
AMERICAN REVOLVING DOORS                (718) 292-7798          KEITH JOHNSON
FRANKLIN SQ. IRON WORKS                 (201) 612-1995          RICHIE SINGER
MIRIC INDUSTRIES                        (212) 594-9898          MIKE PETRICO
MACKENZIE                               (212) 227-1630          GEORGE MACKENZIE

## ROOFING/WATERPROOFING
A BEST                                  (718) 779-3000          LON BEST
ARROW RESTORATION                       (718) 729-0411          MARSHALL GELLAR
BRISTOL CONSTRUCTION                    (212) 750-2087          GEORGE KATZMAN
C&D                                     (718) 384-0999          GARY BROWN
GRACIANO                                (973) 857-0507          THOMAS CORBO
KILROY METALS                           (718) 638-2503          CHARLES KROBOT
LAWRENCE WATERPROOFING CORP.            (718) 746-7600          SCOTT SMITH
MELVA                                   (718) 482-1932          CHRIS BATALIAS

4

| ARMOR GROUP | (973) 808-6884 | RONALD S. BERGER |
| CCTV SECURITY | (718) 937-0444 | WYNN GRANT |
| GTI/STI | (732) 512-1999 | KEN HOPKINS |
| TOUCHCOM | (212) 414-0073 | PATRICK BARRY |
| TSS | (212) 233-8505 | JOHN BONANNO |

## SIGNS
| ENGRAPHICS | (212) 691-0777 | SUSAN PERDOCH |
| FOREST SIGN CO. | (212) 319-0100 | RICHARD MCGOVERN |

## SPRINKLER
| SKYLINE FIRE SPRINKLER CORP. | (973) 696-2208 | CARL GUINTA |
| SIRINA FIRE PROTECTION | (516) 942-0400 | TONY FLOREZ |
| ABCO PEERLESS SPRINKLER | (516) 294-6850 | TIM BOWE |

## STRUCTURAL STEEL & STEEL WORK
| BURGESS STEEL PRODUCTS | (212) 563-6000 | EUGENE GUERIN |
| FRANKLIN SQ. IRON WORKS | (201) 612-1995 | RICHIE SINGER |
| HALLEN STEEL | (718) 784-1730 | STEVE DE GREGORY |
| KOENIG IRON WORKS | (212) 924-4333 | NORMAN ROSENBAUM |

## WINDOWS
| AIR MASTER | (914) 777-4500 | MARK WISNER |
| KILROY METAL | (718) 638-2503 | CHARLES KROBOT |
| NYTEC | (718) 361-2000 | ANTHONY BARBARISE |
| SKYLINE | (718) 491-3000 | STEVEN KRAUS |

## WOODEN FLOORS
| DESIGNED WOOD FLOORING CENTER | (212) 925-6633 | ARNOLD FEINBERG |
| ELITE FLOORING | (212) 228-1050 | ROBERT RUTLEDGE |

## WOODWORKERS
| INFRA-STRUCTURES | (516) 243-0700 | ROBERT LARSON |
| ISLAND RESTORATION | (516) 737-0020 | EDWARD RUFRANO |
| LANGENBACHER COMPANY | (718) 328-7600 | BILL BOYD |
| NASTASI WHITE | (718) 886-7100 | THOMAS NASTASI |
| NORDIC | (718) 456-7000 | LLOYD JACOBSON |

# EXHIBIT "C"

## TENANT'S PROJECTED START-UP
## & CAPITAL EXPENDITURES

*See Attached*



# ARTISANAL

## PROJECTED CAPITAL EXPENDITURES

( NB. These numbers are estimates only and may be higher.
Actuals will be substantiated with receipts)

**Purchase Price**: $425,000.00
**EQUIPMENT:**

| | |
|---|---|
| Kitchen: | $30,000.00 |
| Smallwares: | $35,000.00 |
| Office: | $15,000.00 |
| China,Glassware | |
| Silver | $50,000.00 |
| POS System | $5,000.00 |

### Renovations

**Furnishings** $200,000.00
Banquettes,Chairs, Bathrooms, Tables, Service Stations, Maitre d' Stand, Chrome Railings, Tempered Glass with Logo, Shelving, Faucets, Sinks, Toilets, Sconces, Lighting for Bar and Banquetes, Tile, Wall Tile.

**Bar Refrigeration:** $22,000.00

**Cheese Cave and Counters**: $60,000.00

**Labour:** $390,000.00

**Awning:** $12,000.00

**Security:** $5,000.00

**Lock Smith:** $1,000.00

**Total : $1,250,000.00**

Joe Porcelli:
Any questions fell free to call me ; the Chef is out of town...Mark Shay...724-8905



# AMENDMENT OF LEASE

THIS AMENDMENT OF LEASE (this "Amendment"), made as of the 31st day

of October, 2001, by and between **TWO PARK COMPANY**, a New York limited partnership,

having an office c/o Vornado Office Management LLC, 330 Madison Avenue, New York, New

York 10017 ("Landlord"), and **ARTISANAL, FROMAGERIE & BISTRO, LLC**, a New York

limited liability company, having an office at Two Park Avenue, New York, New York

("Tenant").

## W I T N E S S E T H:

WHEREAS, by Agreement of Lease, dated as of September 8, 2000 (the

"Lease"), Landlord did demise and let unto Tenant, and Tenant did hire and take from Landlord,

portions of the basement, mezzanine and ground floors (the "Premises"), as more particularly

described in the Lease, of the building known as and by the street address of Two Park Avenue,

New York, New York (the "Building"); and

WHEREAS, Landlord and Tenant desire to modify the Lease as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein,

and of the sum of Ten Dollars ($10.00) paid by Tenant to Landlord, and for other good and

valuable consideration, the mutual receipt and legal sufficiency of which are hereby

acknowledged, the parties hereto, for themselves, their legal representatives, successors and

assigns, hereby agree as follows:

1.　　Definitions.  All capitalized terms used herein shall have the

meanings ascribed to them in the Lease, unless otherwise defined herein.

2.    Modification of Lease. From and after the date hereof (the "Effective Date"), the Lease is hereby modified and amended as follows:

(a)    The Fixed Rent with respect to the Premises for the month of September, 2001, in the amount of Twenty-Five Thousand and 00/100 Dollars ($25,000.00), which was due September 1, 2001 as set forth in Section 1.1(1) of the Lease, shall be deferred until the six month period commencing on November 1, 2001 and ending on April 30, 2002 (the "Rent Deferral Period").

(b)    The Fixed Rent, with respect to the Rent Deferral Period only, shall be One Hundred Seventy-Five Thousand and 00/100 Dollars ($175,000.00), payable in advance in equal monthly installments of Twenty-Nine Thousand One Hundred Sixty-Six and 67/100 Dollars ($29,166.67) on the first (1st) day of each calendar month during the Rent Deferral Period, in the manner provided in the Lease. The Fixed Rent shall otherwise remain as set forth in the Lease.

3.    Brokerage. Tenant represents and warrants to Landlord that it has not dealt with any broker, finder or like agent in connection with this Amendment. Tenant does hereby indemnify and hold Landlord harmless of and from any and all loss, costs, damage or expense (including, without limitation, attorneys' fees and disbursements) incurred by Landlord by reason of any claim of or liability to any broker, finder or like agent who shall claim to have dealt with Tenant in connection herewith. The provisions of this Paragraph 3 shall survive the expiration or termination of the Lease, as amended by this Amendment.

4.    Limitation of Liability.    The obligations of Landlord under the Lease, as amended by this Amendment, shall not be binding upon Landlord named herein after the sale, conveyance, assignment or transfer by such Landlord (or upon any subsequent landlord after the sale, conveyance, assignment or transfer by such subsequent landlord) of its interest in the Building or the land upon which it is erected, as the case may be, and in the event of any such sale, conveyance, assignment or transfer, Landlord shall thereafter be and hereby is entirely freed and relieved of all covenants and obligations of Landlord under the Lease, as amended by this Amendment. The members, partners, shareholders, directors, officers and principals, direct and indirect, of Landlord (collectively, the "Parties") shall not be liable for the performance of Landlord's obligations under the Lease, as amended by this Amendment. Tenant shall look solely to Landlord to enforce Landlord's obligations under the Lease, as amended by this Amendment, and shall not seek any damages against any of the Parties. The liability of Landlord for Landlord's obligations under the Lease, as amended by this Amendment, shall be limited to Landlord's interest in the Building and the land upon which the Building is erected and Tenant shall not look to the property or assets of any of the Parties in seeking either to enforce Landlord's obligations under the Lease, as amended by this Amendment, or to satisfy a judgment for Landlord's failure to perform such obligations.

5.    Authorization.    Tenant represents and warrants to Landlord that its execution and delivery of this Amendment has been duly authorized and that the person executing this Amendment on behalf of Tenant has been duly authorized to do so, and that no other action or approval is required with respect to this transaction.

6.    Full Force and Effect of Lease.  Except as modified by this Amendment, the Lease and all covenants, agreements, terms and conditions thereof shall remain in full force and effect and are hereby in all respects ratified and confirmed.

7.    Entire Agreement.  The Lease, as amended by this Amendment, constitutes the entire understanding between the parties hereto with respect to the Premises thereunder and may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment of Lease as of the date first above written.

**TWO PARK COMPANY**, Landlord

By: M/H Two Park Associates L.P., general partner

    By: Vornado M/H L.L.C., general partner

        By: Vornado Realty L.P., member

            By: Vornado Realty Trust, general partner

            By: _____
                Joseph Macnow
                Executive Vice-President - Finance and
                Administration and Chief Financial Officer

**ARTISANAL, FROMAGERIE & BISTRO, LLC**, Tenant

By: _____
Name:
Title: managing partner

Fed. I.D. No.: _____

STATE OF NEW YORK          )
                          ) ss.:
COUNTY OF NEW YORK         )


      On the ___ day of _____ in the year 2001 before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.


                                                  _____

                                                  Notary Public



## SECOND AMENDMENT OF LEASE

This Second Amendment of Lease (this "Amendment"), dated as of the 1st day of July, 2007, by and between **PPF OFF TWO PARK AVENUE OWNER, LLC**, a Delaware limited liability company, having an office at c/o Morgan Stanley Real Estate Advisor, Inc., 1585 Broadway, New York, New York 10038 ("Landlord"), and **ARTISINAL, FROMAGERIE & BISTRO, LLC**, a New York limited liability company, having an office at Two Park Avenue, New York, New York 10016 ("Tenant").

## W I T N E S S E T H

WHEREAS, by Agreement of Lease, dated as of September 8, 2000, between Two Park Company, a New York partnership, and Tenant, as amended by that certain Amendment of Lease, dated October 31, 2001, (the Agreement of Lease as heretofore amended is hereinafter referred to as the "Lease"), Landlord's predecessor-in-interest did demise and let unto Tenant, and Tenant did hire and take from Landlord's predecessor-in-interest, portions of the basement, mezzanine and ground floors (the "Original Premises") of the building commonly known as Two Park Avenue, New York, New York (the "Building") as more particularly described in the Lease;

WHEREAS, Landlord wishes to lease to Tenant and Tenant wishes to hire from Landlord certain storage space adjacent to the loading dock of the Building for the temporary containment of Tenant's refuse, and, accordingly, to modify and amend the Lease in order to provide for the foregoing;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and of the sum of Ten Dollars ($10.00) paid by Tenant to Landlord, and for other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, the parties hereto, for themselves, their legal representatives, successors and assigns, hereby agree to further modify and amend the Lease as follows:

### Article I.
### Terms

Section 1.1. All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Lease.

### Article II.
### Demise of Storage Space

Section 2.1. Landlord hereby leases to Tenant and Tenant hereby hires from Landlord certain space consisting of approximately Two Hundred and Forty One (241) rentable square feet in the Building as shown on Exhibit A attached hereto and made a part hereof (the "Storage Space"), for a term commencing on July 1, 2007 (the "Storage Space Commencement Date") and ending on the Fixed Expiration Date or such earlier date upon which the Term of the Lease shall sooner expire (the "Storage Space Term").

## Article III.
## Storage Space Rent

Section 3.1. From and after the Storage Space Commencement Date, Tenant shall pay to Landlord an annual rent for the Storage Space (the "Storage Space Rent") in an amount equal to:

Four Thousand Dollars ($4,000.00) per annum payable in equal monthly installments of Three Hundred Thirty-Three Dollars and Thirty-Three Cents ($333.33) during the period commencing on the Storage Space Commencement Date and ending on the Fixed Expiration Date.

Storage Space Rent shall be due and payable by Tenant in equal monthly installments in advance on the first (1st) day of each calendar month during the Storage Space Term in accordance with and subject to the terms and conditions of the Lease for the payment of Fixed Rent.

## Article IV.
## Completion and Use of Storage Space

Section 4.1. Tenant agrees to accept the Storage Space in its "AS IS" condition on the Storage Space Commencement Date, and further agrees that Landlord shall not be required to perform any work, supply any materials, or incur any expense to prepare the Storage Space for Tenant's use and occupancy. If for any reason the Storage Space shall not be ready for occupancy by Tenant as of the Storage Space Commencement Date, Tenant hereby waives and releases Landlord from any and all claims arising out of such delay. The acceptance of possession of the whole or any part of the Storage Space by Tenant shall be conclusive evidence, as against Tenant, that Tenant accepts possession of the same and that the Storage Space was in good and satisfactory condition at the time such possession was so taken.

Section 4.2. As of the Storage Space Commencement Date, the Storage Space shall be deemed to be a part of the Premises for all purposes of the Lease, except (i) Tenant shall use the Storage Space only as storage space for the temporary containment of Tenant's refuse in connection with the business conducted by Tenant at the Original Premises pursuant to the Lease and for no other purpose, and (ii) as otherwise set forth herein.

## Article V.
## Refrigeration of Storage Space

Section 5.1. Subject to the approval of Landlord, during the Storage Space Term, Tenant shall install, maintain, service and repair a refrigeration and air-conditioning system serving the Storage Space, which system shall at all times maintain the Storage Space at a temperature reasonably required by Landlord and consistent with sound waste management practices for dignified, first-class restaurant establishments in Midtown Manhattan.

## Article VI.
## Services by Landlord to Storage Space

Section 6.1. Tenant acknowledges and agrees that Landlord shall not supply any services to the Storage Space, including, without limitation, air-conditioning, heat, hot or cold water, janitorial service, elevator service or any other similar or dissimilar service or utility (excepting electricity). Landlord shall not be liable in any respect for the failure or stoppage of services that Landlord may be obligated to supply, if any, and any such failure or stoppage shall not be construed as a constructive eviction of Tenant or as grounds for the abatement of Storage Space Rent and shall not relieve Tenant from the fulfillment of any term, covenant or agreement under the Lease.

## Article VII.
## Brokers

Section 7.1. Tenant represents and warrants to Landlord that Tenant has not dealt with any real estate broker, agent or finder in the negotiation or making of this Amendment. Tenant agrees to indemnify and hold Landlord harmless from and against any and all liabilities, losses, damages, claims, costs and expenses (including, without limitation, attorneys' fees) arising out of any claim, demand or proceeding for a real estate brokerage commission, finder's fee or other compensation made by any Person in connection with this Amendment arising from a breach of the foregoing representation. The provisions of this Article shall survive the expiration or earlier termination of the Lease and/or this Amendment.

## Article VIII.
## Relocation

Section 8.1. At any time and from time to time during the Storage Space Term, upon thirty (30) days' notice to Tenant, Landlord shall have the right to relocate the Storage Space at Tenant's expense to a new location within the Building, which new location shall be of at least the same rentable square footage and proximity to the loading to the dock of the Building as the existing Storage Space.

## Article IX.
## Miscellaneous

Section 9.1. Tenant represents and warrants that its execution and delivery of this Amendment has been duly authorized, that the individual executing this Amendment on behalf Tenant has been duly authorized to do so, and that no further action or approval is required by Tenant with respect to this transaction.

Section 9.2. This Amendment may be executed in counterparts, each of which when so executed and delivered shall be deemed an original, but all of which taken together shall constitute but one and the same instrument.

Section 9.3. This Amendment shall be construed and enforced in accordance with the laws of the State of New York, without regard to principles of conflict of law.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the day and year first written above.

**LANDLORD:**

PPF OFF TWO PARK AVENUE OWNER, LLC,
a Delaware limited liability company

By: PPF OFF TWO PARK AVENUE, LLC, a
Delaware limited liability company, its Member

    By: PPF OFF, LLC, a Delaware limited liability
    company, its Member

        By: PPF OP, LP, a Delaware limited
        partnership, its Member

            By: PPP OPGP, LLC, a Delaware
            limited liability company, its General
            Partner

                By: PRIME PROPERTY FUND,
                LLC, a Delaware limited liability
                company, its Member

                    By: MORGAN STANLEY
                    REAL ESTATE ADVISOR,
                    INC., a Delaware corporation, its
                    Member

                    By: _____
                    Name: Thomas D. Candy
                    Title: Executive Director

**TENANT:**

**ARTISINAL, FROMAGERIE & BISTRO, LLC,**
a New York limited liability company

By: _____
    Name: Terence Brown
    Title: after managing partner



32ND STREET

33RD STREET

Trash Room

A

F

K

PARK AVENUE

2 PARK AVENUE
BASEMENT

THE MENDIK COMPANY
330 MADISON AVENUE
NEW YORK N.Y. 10017

# **Exhibit B**

## CIVIL COURT OF THE CITY OF NEW YORK
## COUNTY OF NEW YORK: NON-HOUSING PART 52

PPF OFF TWO PARK AVENUE OWNER, LLC,

                    *Petitioner-Landlord,*

-against-

ARTISANAL FROMAGERIE & BISTRO, LLC,

Portions of the basement, mezzanine and ground floors in the building located at Two Park Avenue, New York, New York,

                    *Respondent-Tenant.*

**L&T Index No.: 50707/2016**

**REPLY AFFIDAVIT OF MARIA BLAKE IN FURTHER SUPPORT OF PETITIONER'S CROSS-MOTION FOR ENTRY OF AN ORDER OF SUMMARY JUDGMENT AWARDING PETITIONER POSSESSION AND USE AND OCCUPANCY PURSUANT TO CPLR § 409(B) AND RPAPL §745, AND ISSUANCE OF A WARRANT OF EVICTION PURSUANT TO RPAPL §749**

STATE OF NEW YORK     )
                            ) ss.:
COUNTY OF NEW YORK   )

FILED

MAY 03 2016

NEW YORK COUNTY
HOUSING COURT

**MARIA BLAKE**, being duly sworn, deposes and says:

1.    I submit this reply affidavit in further support of Two Park's cross-motion for entry of an order of summary judgment awarding Two Park possession and use and occupancy pursuant to CPLR § 409(b) and RPAPL § 745, and issuance of a warrant of eviction pursuant to RPAPL § 749 (the "Cross-Motion").[1]

### The Lease

2.    In its opposition to the Cross-Motion, Sarid Drory, principal of Artisanal, says he cannot admit that the Lease attached as Exhibit A to the Blake Affidavit is true and accurate. See Affidavit of Sarid Drory in Support of Respondent's Motion and in Opposition to Petitioner's Cross-Motion, dated April 15, 2016 ("Drory Aff.") ¶ 3. Mr. Drory also argues that since the Lease

---

[1] Capitalized terms not defined herein have the same meaning set forth in my affidavit dated April 4, 2016 (the "Blake Affidavit" or "Blake Aff.").

was entered into prior to my involvement with the Building, I could not lay a foundation for the accuracy and admissibility of the Lease, and therefore the Lease should not be considered. Id.

3.        This argument is unfounded and has no merit, as I am very familiar with Two Park's corporate records and I can confirm that the Lease attached as Exhibit A to the Blake Affidavit came out of Two Park's files and is the document that governs Two Park's relationship with Artisanal.[2] Therefore, it makes no difference whether I worked at the Building when the Lease was executed. See Reply Memorandum of Law in Support of Petitioner's Cross-Motion, dated May 2, 2016 ("Reply Br.") at 3, n.4. Moreover, Mr. Drory has been operating his business at the Premises for nearly two years and has never claimed that this document was not the Lease. Indeed, he has referenced the Lease and cited its provisions in correspondence to me including, for example, the letter dated October 16, 2014 that is attached hereto as **Exhibit 1**. Mr. Drory also does not identify any different document that he claims is the Lease.

**Use and Occupancy**

4.        Turning to Artisanal's arguments regarding use and occupancy, Artisanal concedes that liquidated damages provisions similar to the one in Article 20 of the Lease are enforceable. See Reply Affirmation of Jeffrey L. Goldman, dated April 15, 2016 ("Goldman Reply Aff.") ¶ 20. However, it argues that the liquidated damages provision in Article 20 is an unenforceable penalty because the amount it requires Artisanal to pay for use and occupancy is disproportionate to the damages Artisanal's holdover has actually caused Two Park. See id. ¶ 21. That is not the case, but more importantly, that is not a valid basis for avoiding the liquidated damages provision. See Reply Br. at 8-10.

---

[2] Exhibit A to the Blake Affidavit includes the: (i) Agreement of Lease signed September 8, 2000, (ii) Amendment of Lease signed October 31, 2001, and (iii) Second Amendment of Lease signed July 1, 2007 ("Second Amendment"), which together make up the complete Lease. There have been no other amendments to the Lease.

2

5.     Artisanal also complains that I did not provide a "detailed breakdown" of my calculation of the amount of use and occupancy owed by Artisanal. Goldman Reply Aff. ¶ 20. However, that calculation was made in accordance with the plain terms of Article 20 of the Lease, which states that use and occupancy is equal to the "greater of (i) two (2) times the aggregate of that portion of the *Fixed Rent*, *Escalation Rent* and *Rental* which was payable under the Lease during the last month of the Term, and (ii) two (2) times the then fair market rental value for the Premises." See Blake Aff. Ex. A. at 53-54 (emphasis added). Thus, when I submitted the Blake Affidavit, I first calculated the amount of "Fixed Rent," "Escalation Rent" and "Rental" that was due for September 2015, the last month of the Lease, i.e., the "Last Term Rent," and then multiplied that amount by two to reach the amount of use and occupancy due under Article 20. As described more fully below, "Fixed Rent," "Escalation Rent," and "Rental" are all defined terms in the Lease.

6.     The term "Fixed Rent" is defined in the Lease as $36,000 for each month during the "3rd Rental Period," which includes September 2015. See Blake Aff. Ex. A at 9. Beginning in July 2007, the monthly Fixed Rent was increased by $333.33 for "Storage Space Rent," as that term is defined under Section 3.1 of the Second Amendment. See Blake Aff. Ex. A, Second Amendment, at 2. Thus, the amount of Fixed Rent I used to calculate Last Term Rent was $36,333.33.

7.     The term "Escalation Rent" is defined in the Lease as "individually or collectively, the Tax Payment and the Percentage Rent." Blake Aff. Ex. A at 3.

8.     The term "Tax Payment" is defined in the Lease as Artisanal's share of any increase in real estate taxes relating to the Building over the amount of such taxes due during the first year of the Lease. See Blake Aff. Ex. A. at 7, 57-60. The Tax Payment due each month during the

3

second half of 2015 is $5,535.15, as shown in the statement sent to Mr. Drory on July 1, 2015, which is attached as **Exhibit 2**. However, I made an error in my initial calculation by including only $1,842.63 for the Tax Payment portion of the Last Term Rent.

9.     The term "Percentage Rent" is defined in the Lease as 6% of the difference between Artisanal's Gross Sales made during a Sales Year and $5,000,000. Blake Aff. Ex. A at 5, 61. As I explained in the Blake Affidavit, Artisanal has not provided Two Park with its Gross Sales for 2015, and thus I had to estimate the amount of Percentage Rent due for September 2015 by using the Percentage Rent that Artisanal paid for 2014. See Blake Aff. ¶ 17. That amount was *calculated by Artisanal itself* and checked by its accountants. Attached as **Exhibit 3** is a letter from Artisanal's accountant to Two Park dated March 26, 2015, which purports to calculate Percentage Rent due for 2014 as $117,168. I divided that number by 12 and used the resulting number, $9,764, as an estimate of the amount of the Percentage Rent attributable to September 2015. Thus, the total amount of Escalation Rent (i.e., the Tax Payment plus the estimated Percentage Rent) that I used to calculate the Last Term Rent was $11,606.63.

10.     Finally, the term "Rental" is defined in the Lease as "Fixed Rent, Escalation Rent, all additional rent and any other sums payable by [Artisanal under the Lease]." Blake Aff. Ex. A at 6. "Rental" includes, among other things, electricity and water usage in connection with the operation of the Premises. As reflected in the utility bills attached hereto as **Exhibit 4**, the amount of electricity and water usage by Artisanal for September 2015 was $16,045.53 and $11,900.69, respectively. However, I inadvertently omitted the electricity sales tax charge of $1,307.96 in my initial calculation. Thus, the amount that I included for electricity usage in calculating the Last Term Rent was only $14,737.57, and the total amount of "Rental" that I used to calculate Last Term Rent was only $26,638.26.

11.     To summarize, I calculated the Last Term Rent included in the Blake Affidavit by adding: (i) Fixed Rent of $36,333.33, (ii) estimated Escalation Rent (i.e., Tax Payment and estimated Percentage Rent) of $11,606.63, and (iii) Rental (i.e., electricity and water) of $26,638.26, for a total of $74,578.22, which I then doubled to reach a monthly use and occupancy amount of $149,156.44.  As also detailed above, however, I made two errors in my initial calculation by omitting: (i) real estate taxes in the amount of $3,692.52 and (ii) an electricity sales tax charge in the amount of $1,307.96, amounts which fall under the definition of Escalation Rent and Rental, respectively.  Correcting these errors increases Last Term Rent to $79,578.70, and increases the monthly amount of use and occupancy required under Article 20 to $159,157.40 (2 x 79,578.70).

12.     None of these amounts are controversial.  The amount of Fixed Rent is stated in the Lease, see Blake Aff. Ex. A at 53-54, Second Amendment at 2; my estimate of Percentage Rent was based on Artisanal's own calculations from last year, see **Exhibit 3** hereto; and, while the Lease was in effect, Artisanal was billed monthly for real estate taxes, electricity and water usage, and paid such charges without objection.  Attached as **Exhibit 5**, for example, is the invoice that was sent to Artisanal on February 24, 2015 reflecting such line items, as well as the record of Artisanal's payment of the full amount of that invoice.

13.     Artisanal has unlawfully remained in possession of the Premises for over seven months without paying the vast majority of the use and occupancy it owes under Article 20 of the Lease for the holdover period.  It is therefore crucial that Artisanal be required to immediately pay

use and occupancy for the holdover period to date, and continue making use and occupancy payments until it vacates the Premises.[3]

**Harm To Two Park From Artisanal's Continued Failure To Vacate The Premises**

14.     Artisanal's unlawful refusal to vacate the Premises has caused, and continues to cause, substantial harm to Two Park.

15.     Contrary to Artisanal's assertion, Two Park is in the process of negotiating a lease with a new tenant that has signed a letter of intent to lease the Premises beginning August 31, 2016. A redacted copy of the letter of intent is attached as **Exhibit 6**. Two Park will need between six and twelve weeks after Artisanal vacates to repair the substantial damage that Artisanal has done (and continues to do) to the Premises and otherwise get the Premises ready for the new Tenant. The holiday season is the most important time of the year for many businesses, and adequate lead-time is crucial to their ability to successfully operate and maximize profits during that period. It is therefore vital that Two Park be able to perform the repairs and deliver the Premises on time.

16.     Moreover, as Mr. Drory admits, he has repeatedly threatened Two Park's and its affiliates' representatives – including myself – with physical violence over the past year and interfered with Two Park's right to show the Premises to prospective tenants. He has also engaged in a pattern of making frivolous complaints and false accusations about the Building, and has even threatened to make false and derogatory statements to investors in the Fund that could severely damage its reputation. See, e.g., Blake Aff. Ex. I. Dealing with all of Mr. Drory's misconduct has required (and continues to require) a substantial amount of my time and attention – as well as the time and attention of other employees of Two Park and its affiliates – and has been (and continues

---

[3] As discussed below, Artisanal made one payment toward use and occupancy in the amount of $62,000, and that amount should be deducted from the total use and occupancy Artisanal owes for the period October 2015-May 2016. See Reply Br. at 11, n.13.

6

to be) very disruptive to our business. Two Park has also incurred (and is continuing to incur) a substantial amount of legal fees as a result of Artisanal's breaches of the Lease.

### Letter of Credit and Alleged Month-to-Month Tenancy

17. During the term of the Lease, Artisanal posted a $50,000 letter of credit (the "LOC") with Two Park as security for the Premises. Two Park is entitled to retain the proceeds of the LOC as security until "after [Artisanal's] delivery of possession of the Premises" under Section 31.1 of the Lease. Blake Aff. Ex. A at 67. However, the LOC was set to expire on September 6, 2015, i.e., before the Lease expired on September 30, 2015. Therefore, Two Park made a request to draw down the funds from the LOC on August 26, 2015. A copy of the draw-down request, which reflects the LOC's expiration date, is attached hereto as **Exhibit 7**. The LOC proceeds were received by Two Park on September 9, 2015, and have not been applied to any amounts due from Artisanal. Artisanal's claim that the LOC was applied to October 2015 rent, see Drory Aff. ¶ 4, is simply not accurate.

18. Artisanal's claim that Two Park accepted rent payments during the holdover period thereby creating a month-to-month tenancy, see Goldman Reply Aff. ¶ 16, is also wrong. Two Park accepted one wire transfer of $62,000 from Artisanal after the Expiration Date. That was in December 2015 after Mr. Drory indicated that he would sign a stipulation setting a specific date for Artisanal to vacate the Premises, which it never did. See Affirmation of Jonathan A. Grippo in Opposition to Respondent's Motion to Dismiss and in Support of the Cross Motion ¶¶ 8-9. That payment, however, goes toward the amount of use and occupancy that Artisanal owes for the holdover period under Article 20 of the Lease. Reply Br. at 3-5. It was never Two Park's intent to create a month-to-month tenancy with Artisanal.

**Decision Not To Renew The Lease**

19.    In his affidavit, Mr. Drory repeatedly accuses me of trying to "give the false impression" to the Court that the discussions of a potential Lease renewal began in October 2014 rather than August 2014. Drory Aff. ¶¶ 8, 13. However, I clearly and accurately stated in the Blake Affidavit that renewal discussions began "[i]n or around *August 2014*." Blake Aff. ¶ 4 (emphasis added). Additionally, Mr. Drory's allegations that Two Park engaged in "bad faith negotiations" and other alleged misconduct, see, e.g., Drory Aff. ¶¶ 7-19, are simply false.

20.    In any event, the renewal discussions are irrelevant because there is no dispute that Two Park notified Artisanal in writing that it was *not* renewing the Lease on February 11, 2015, i.e., nearly *eight months before the Lease expired*, giving Artisanal ample time to find a new location. See Blake Aff. Ex. C. Thus, Artisanal cannot excuse or extend its unlawful holdover based on the false claim that Two Park "pulled the rug out from under [Artisanal]," Drory Aff. ¶ 15, by exercising its discretion to decline to renew the Lease, which it had every right to do, over a year ago.

**Two Park Never Agreed to an August 2016 Vacate Date**

21.    Finally, contrary to Artisanal's claim, Goldman Reply Aff. ¶ 37, Two Park *never* agreed to allow Artisanal to remain in the Premises until August 2016.

_____

Maria Blake

Sworn to before me this
2nd day of May, 2016

_____
Notary Public

JULIE F ZEITLIN
Notary Public - State of New York
NO. 01ZE6149901
Qualified in New York County
My Commission Expires 07/17/2019

8

**Exhibit 1**



October 16, 2014

Ms. Maria Blake
PPF OFF Two Park Avenue Owner, LLC
c/o Morgan Stanley Real Estate Investing
1585 Broadway, 37th Floor
New York, NY 10036

Re: Artisanal Fromagerie & Bistro, LLC -- Agreement of Lease (the "Lease") dated September 8, 2000 between PPF OFF Two Park Avenue Owner, LLC as assignee of Two Park Company, ("Landlord"), and Artisanal, Fromagerie & Bistro, LLC, ("Tenant"), as amended

Dear Ms. Blake,
Per our discussion and pursuant to Section 12.1(A) of the Lease, Tenant hereby requests Landlord's consent to permit Sarid Drory and/or his investors to acquire greater than a 49% ownership interest in Tenant and to approve the resulting change of control of Tenant under the Lease. Upon Landlord's consent to the transfer, Landlord agrees that such change in control shall not constitute a breach of the terms of the Lease.

Further, the parties agree that Landlord's consent to waive Sections 12.8 and 12.9 of the Lease shall not preclude Landlord and Tenant from negotiating new provisions relating to a Sale of Business Assignment in an Amendment of the Lease with Tenant. Notwithstanding the foregoing, Tenant acknowledges it shall be responsible for the payment of the additional Assignment Rent as set forth in the Lease.

Kindly acknowledge your consent to the change of ownership requested by Tenant above by executing and returning a copy of this letter to Tenant.

Sincerely,


Sarid Drory
Artisanal Fromagerie & Bistro, LLC

Agreed and accepted by:

PPF OFF Two Park Avenue Owner, LLC, Landlord

By: _____     Date: October __, 2014
Name:

**Exhibit 2**



July 1, 2015

Artisanal Fromagerie
2 Park Avenue
New York, NY 10016

| | |
|---|---|
| Lease ID | **ny2p0003** |
| Unit | **011RT/111LL** |

**Re: Two Park Avenue - 2015/2016 Preliminary Real Estate Taxes**

## *** Additional Rent Based upon Real Estate Tax Escalation per Lease ***

| | | |
|---|---|---|
| Current Year Real Estate Taxes | | $ 10,808,372.16 |
| Base Year | **2000** | 4,220,341.00 |
| Increase over Base Year | | 6,588,031.16 |
| Your Pro Rata Share as per Lease | 1.0000% | 65,880.31 |
| Proration for days occupied | 92/365 | 16,605.45 |
| Your Share of the Tax Increase for the Current Fiscal Period | | 16,605.45 |
| Less: Amounts Previously Billed | | - |
| **Total Preliminary Real Estate Taxes for Fiscal 2015-2016** | | $ 16,605.45 |
| **Estimated Monthly Billing starting July 1, 2015** | | **$ 5,535.15** |

| | |
|---|---|
| Billable Assessed | 98,534,070.00 |
| Tax Rate | 10.6840% |
| Property Taxes | 10,527,380.04 |
| Bid Taxes | 280,992.12 |
| Tax Certiorari Fee | - |
| Gross Property Taxes | 10,808,372.16 |

If you have any questions regarding this statement, please feel free to call Noemi Nin @ (212) 481-3480 or noemi.nin@cushwake.com

**Exhibit 3**

# SECKENDORF HASSON & REILLY CPA'S, LLC

## CERTIFIED PUBLIC ACCOUNTANTS

Bruce S. Seckendorf, CPA
David M. Hasson, CPA
Robert P. Reilly, CPA

3000 Marcus Avenue, Suite 3 W 4
Lake Success, New York 11042
(516) 488-8400   Fax: (516) 488-8487

March 26, 2015

2 Park Avenue Management
2 Park Avenue
New York New York  10016

Gentlemen,

We are the accountants for Artisanal Fromagerie & Bistro LLC. Attached please find a copy of the Percentage Rent calculation for 2014, in accordance with the lease. Please note that these calculations have been checked by us, and we are in agreement with them. Sales per the calculation are in accordance with company records, for which there are appropriate records.

Please contact the undersigned with any further questions.

Sincerely,

David M. Hasson, CPA

**Artisanal Fromagerie & Bistro LLC**
## Percentage Rent
**January through December 2014**

|                              | Jan - Dec 14 |
|------------------------------|-------------:|
| **Income**                   |              |
|     **Comps, Discounts & Promos** | -228,698 |
|     **Sales** | 7,181,496 |
| **Total NET Income**         |    6,952,798 |
|                              |              |
| **Less : 5 million**         |   -5,000,000 |
|                              |              |
| **Excess of 5 million**      |    1,952,798 |
|                              |              |
| Multiply by   6 %            |              |
| *Payable to PPF*             |  **117,168** |

**Exhibit 4**

# Electric Service

**Amount Due This Period**

**$16,045.53**

Service Address: **2 Park Avenue**   Acct#: **0003**
Occupant Name: **Artisinal**
Tenant Number: **26455**

Bill To:

Remit To:

Artisinal
Fromagerie & Bistro - LLC
2 Park Avenue
New York, NY 10016

Cushman & Wakefield A/A/F
ATTN: Nancy Roman
PPF OFF Two Park Avenue Owner, LLC
2 Park Avenue
New York, NY 10016

For 37 days from August 24, 2015 to September 30, 2015        Average Cost: 0.121531/KWH + 41.185/KW + 4.000%

| Meter | | Energy (KWH) | | Demand (KW) | | | Charge |
|---|---|---|---|---|---|---|---|
| | | On Peak | Off Peak | Transmission | Primary | Secondary | |
| **005858** | Cur | 691566 | | | 23.000 | | |
| | Prior | 677216 | | | 0.000 | | |
| | Mult | 1.00 | | | 1.00 | | |
| | Use | 14350 | | | 23.000 | | |
| **005945** | Cur | 662218 | | | 94.000 | | |
| | Prior | 606718 | | | 0.000 | | |
| | Mult | 1.00 | | | 1.00 | | |
| | Use | 55500 | | | 94.000 | | |
| **081575** | Cur | 24411 | | | 10.500 | | |
| | Prior | 20867 | | | 0.000 | | |
| | Mult | 1.00 | | | 1.00 | | |
| | Use | 3544 | | | 10.500 | | |
| **Totals:** | | 73394 | | | 127.500 | | 14,170.74 |

Admin Fee@  4.000%          566.83
Sales Tax@ 8.875%          1,307.96

Total          $16,045.53



**Historical Usage**
On Peak KWH -- Off Peak KWH -- KW

| | Sep 23 14 | Oct 23 14 | Nov 21 14 | Dec 23 14 | Jan 26 15 | Feb 25 15 | Mar 26 15 | Apr 24 15 | May 26 15 | Jun 24 15 | Jul 24 15 | Aug 24 15 | Sep 23 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

URA GROUP
Utility Management          prepared by: Utilities Research Associates Group, Inc.
rates are based on a 30-day bill period. Where a bill is rendered for other than a 30-day period, the rates and charges are prorated on the basis of the number of elapsed days divided by 30.

# *Vater Service*

Amount Due This Period

rvice Address: **2 Park Avenue** Acct#: **0003**
:cupant Name: **Artisinal**
nant Number: **26455**

$11,900.69

II To:
Remit To:
Page 1 of 1

**Artisinal**
**Fromagerie & Bistro - LLC**
**2 Park Avenue**
**New York, NY 10016**

**Cushman & Wakefield A/A/F**
**ATTN: Nancy Roman**
**PPF OFF Two Park Avenue Owner, LLC**
**2 Park Avenue**
**New York, NY 10016**

r 37 days from August 24, 2015 to September 30, 2015

H=Hot, C=Cold, A=Air Conditioning, M=Master

| Meter | | Water | | Amount ($) | | | Charge |
|---|---|---|---|---|---|---|---|
| | | Readings | Cubic Feet | | Water | Sewer | |
| **33038139** | Cur | 684372 | | | | | |
| | Prior | 672312 | | | | | |
| | Mult | 10 | | | | | |
| | CuFt | 120600 | 120600 | | 4,594.86 | 7,305.83 | 11,900.69 |
| **Totals:** | | | 120600 | | 4,594.86 | 7,305.83 | 11,900.69 |
| | | | | | | Sales Tax | 0.00 |
| | | | | | | Total | $11,900.69 |



## Historical Usage
### Water (Cubic Feet)

Sep 23 14, Oct 23 14, Nov 21 14, Dec 23 14, Jan 26 15, Feb 25 15, Mar 26 15, Apr 24 15, May 26 15, Jun 24 15, Jul 24 15, Aug 24 15, Sep 23 15

**URA GROUP**
Utility Management

prepared by: **Utilities Research Associates Group, Inc.**

rges covered by this invoice are now due and payable. Late charges may be applied to the unpaid portion of your account.

**Exhibit 5**



**Cushman & Wakefield, Inc.**
**1290 Avenue of the Americas**
**7th Floor**
**New York, NY 10104-6178**

| Direct Inquiries To: | Remit To: PPF OFF Two Park Avenue Owner LLC |
|---|---|
| Building Office | Care Of: |
| 2 Park Avenue | PO Box 30941 |
| | New York, NY 10087-0941 |

Phone: (212)481-3480

Artisanal Fromagerie
2 Park Avenue
New York, NY 10016

Statement Date:     2/24/2015

Note: Payments received after 2/24/2015
      may not be reflected on this statement.

PLEASE MAKE CHECKS PAYABLE TO :            PPF OFF Two Park Avenue Owner LLC

| Date | Charge Code | Description | Balance | Running Balance |
|---|---|---|---|---|
| 02/01/2015 | parking | Garage/Parking (01/2015) | 300.00 | $300.00 |
| 02/01/2015 | parking | Garage/Parking (02/2015) | 300.00 | 600.00 |
| 02/01/2015 | salestax | Sales Tax (01/2015) | 55.13 | 655.13 |
| 02/01/2015 | salestax | Sales Tax (02/2015) | 55.13 | 710.26 |
| 03/01/2015 | submeter | 12/23-01/26/15 Electric | 9,719.11 | 10,429.37 |
| 03/01/2015 | salestax | 12/23-01/26/15 Electric Sales Tax | 862.57 | 11,291.94 |
| 03/01/2015 | water | 12/23-01/26/15 Water | 8,842.23 | 20,134.17 |
| 03/01/2015 | rent | Base Rent (03/2015) | 36,000.00 | 56,134.17 |
| 03/01/2015 | rent | Base Rent (03/2015) | 333.33 | 56,467.50 |
| 03/01/2015 | parking | Garage/Parking (03/2015) | 1,200.00 | 57,667.50 |

*Tear Here*                 *Tear Here*                 *Tear Here*

PLEASE MAKE CHECKS PAYABLE TO :     PPF OFF Two Park Avenue Owner LLC     **Return this Stub w/Payment**

| TENANT CODE: | ny2p0003 | TENANT NAME: | Artisanal Fromagerie |
|---|---|---|---|
| PROPERTY CODE: | ny2park | PROPERTY NAME: | Two Park Avenue |

| Date | Charge Code | Description | Charge Amt. | Please Check your paid charges |
|---|---|---|---|---|
| 02/01/2015 | parking | Garage/Parking (01/2015) | 300.00 | ( ) |
| 02/01/2015 | parking | Garage/Parking (02/2015) | 300.00 | ( ) |
| 02/01/2015 | salestax | Sales Tax (01/2015) | 55.13 | ( ) |
| 02/01/2015 | salestax | Sales Tax (02/2015) | 55.13 | ( ) |
| 03/01/2015 | submeter | 12/23-01/26/15 Electric | 9,719.11 | ( ) |
| 03/01/2015 | salestax | 12/23-01/26/15 Electric Sales Tax | 862.57 | ( ) |
| 03/01/2015 | water | 12/23-01/26/15 Water | 8,842.23 | ( ) |
| 03/01/2015 | rent | Base Rent (03/2015) | 36,000.00 | ( ) |
| 03/01/2015 | rent | Base Rent (03/2015) | 333.33 | ( ) |
| 03/01/2015 | parking | Garage/Parking (03/2015) | 1,200.00 | ( ) |


CUSHMAN & WAKEFIELD®

Cushman & Wakefield, Inc.
1290 Avenue of the Americas
7th Floor
New York, NY 10104-6178

| Direct Inquiries To: | Remit To: PPF OFF Two Park Avenue Owner LLC |
|---|---|
| Building Office | Care Of: |
| 2 Park Avenue | PO Box 30941 |
| | New York, NY 10087-0941 |

Phone: (212)481-3480

Artisanal Fromagerie
2 Park Avenue
New York, NY 10016

Statement Date: 2/24/2015

Note: Payments received after 2/24/2015
may not be reflected on this statement.

PLEASE MAKE CHECKS PAYABLE TO :          PPF OFF Two Park Avenue Owner LLC

| Date | Charge Code | Description | Balance | Running Balance |
|---|---|---|---|---|
| 03/01/2015 | rtc | RE Tax – Curr Yr estimate (03/2015) | 5,501.00 | $63,168.50 |
| 03/01/2015 | salestax | Sales Tax (03/2015) | 220.50 | 63,389.00 |
| | | **Total** | **$63,389.00** | |

*Tear Here*                          *Tear Here*                          *Tear Here*

PLEASE MAKE CHECKS PAYABLE TO :     PPF OFF Two Park Avenue Owner LLC     **Return this Stub w/Payment**

| TENANT CODE: | ny2p0003 | TENANT NAME: | Artisanal Fromagerie |
|---|---|---|---|
| PROPERTY CODE: | ny2park | PROPERTY NAME: | Two Park Avenue |

| Date | Charge Code | Description | Charge Amt. | Please Check your paid charges |
|---|---|---|---|---|
| 03/01/2015 | rtc | RE Tax – Curr Yr estimate (03/2015) | 5,501.00 | ( ) |
| 03/01/2015 | salestax | Sales Tax (03/2015) | 220.50 | ( ) |

Total                                              $63,389.00



**Receipt**                                                      Jump To [          ]

| Property | ny2park | Two Park Avenue | **Ctrl 92382  Batch 35269** | | **Data/Reports** |
| Unit | LL111 | 2 Park Avenue | Date Received | 03/09/2015 | Attachment |
| Tenant | ny2p0003 | Artisanal Fromagerie | Post Month | 03/2015 | Memo |
| | | Status=Current | Check Num. | 6007 | |
| Amount | 63,389.00 | | Cash Acct | 1102035 | |
| Payer | | | Payment Method | Check | |

| Pay | Charge Code | Acct | Date | Charge | Prior Paid | Ref | Description | Chg |
|---|---|---|---|---|---|---|---|---|
| 300.00 | parking | 4105030 | 02/01/2015 | 1,100.00 | 800.00 | :CAM PostTran Unit:0011 | Garage/Parking (02/2015) | 236028 |
| 55.13 | salestax | 2109930 | 02/01/2015 | 202.13 | 147.00 | :CAM PostTran Unit:0011 | Sales Tax (01/2015) | 236026 |
| 300.00 | parking | 4105030 | 02/01/2015 | 1,100.00 | 800.00 | :CAM PostTran Unit:0011 | Garage/Parking (01/2015) | 236024 |
| 55.13 | salestax | 2109930 | 02/01/2015 | 202.13 | 147.00 | :CAM PostTran Unit:0011 | Sales Tax (02/2015) | 236030 |
| 5,501.00 | rtc | 4103010 | 03/01/2015 | 5,501.00 | 0.00 | :Post Unit:0011 | RE Tax - Curr Yr estimate (03/2015) | 237346 |
| 1,200.00 | parking | 4105030 | 03/01/2015 | 1,200.00 | 0.00 | :Post Unit:0011 | Garage/Parking (03/2015) | 237347 |
| 220.50 | salestax | 2109930 | 03/01/2015 | 220.50 | 0.00 | :Post Unit:0011 | Sales Tax (03/2015) | 237348 |
| 36,000.00 | rent | 4101010 | 03/01/2015 | 36,000.00 | 0.00 | :Post Unit:0011 | Base Rent (03/2015) | 237345 |
| 333.33 | rent | 4101010 | 03/01/2015 | 333.33 | 0.00 | :Post Unit:LL111 | Base Rent (03/2015) | 237344 |
| 8,842.23 | water | 4103522 | 03/01/2015 | 8,842.23 | 0.00 | :Post Unit:0011 | 12/23-01/26/15 Water | 236497 |
| 9,719.11 | submeter | 4103520 | 03/01/2015 | 9,719.11 | 0.00 | :Load 0 | 12/23-01/26/15 Electric | 236519 |
| 862.57 | salestax | 2109930 | 03/01/2015 | 862.57 | 0.00 | :Load 0 | 12/23-01/26/15 Electric Sales Tax | 236520 |
| | Unapplied | | | | | | | |

**Deposit Information**                          **Notes**

Number    44                              03/09/2015 Cash receipt
Date      03/09/2015
Memo



[ NSF ]          [ Print Rec ]          [ Help ]

# Exhibit 6

**Jason Greenstone**
Retail Services Group

**CUSHMAN &**
**WAKEFIELD**
**Cushman & Wakefield, Inc.**
1290 Avenue of Americas
New York, NY 10014
(212) 841 7713 Direct
(212) 841 7500 Tel
Jason.Greenstone@cushwake.com

April 7, 2016

███████████████

█████████ ██ ██

████████████

RE:  ████████████ - **2 Park Avenue, New York, NY**

Dear ██████

We are pleased to submit the following proposal for ███████████ to lease of the ██████ space currently occupied by Artisanal at 2 Park Avenue.

Following your review and approval, please execute and return at your convenience. We look forward to proceeding with ███████████ 's tenancy.

Thank you,

Jason Greenstone

cc: Maria Blake, Morgan Stanley
Jacob Lewis, Morgan Stanley
Michael O'Neill, Cushman & Wakefield, Inc.

Cushman & Wakefield, Inc.

| | |
|---|---|
| **Property:** | 2 Park Avenue |
| **Tenant:** | A ███ to be operated by ██████████ . ████████████ |
| **Security Deposit:** | ██ █ ████████████ |
| **Guaranty:** | ████████ |
| **Landlord:** | PPF OFF Two Park Avenue Owner, LLC |
| **Premises:** | The Premises shall consist of Ground Floor, Mezzanine, and Lower Level space as noted below and as illustrated on the attached plans in Exhibit A. |

| | |
|---|---|
| Mezzanine | 3,296 sf |
| Mech. Mezzanine | 713 sf |
| Ground Floor | 4,225 sf |
| Lower Level | 1,032 sf |
| Total | 9,266 sf |

| | |
|---|---|
| **Use:** | ████████████████████████ |
| **Lease Term:** | ████████████████ |
| **Renewal Option:** | ████████████████████████ |
| **Lease Date:** | ████████████ |
| **Base Rent:** | ████████ |
| **Base Rent Escalations:** | ██████████ |
| **Percentage Rent:** | ████████████████████ |

No warranty or representation, express or implied, is made as to the accuracy of the information contained herein, and same is submitted subject to errors, omissions, change of price, rental, or other conditions, withdrawal without notice and to any special listing conditions, imposed by our principals.

Cushman & Wakefield, Inc.

**Rent Commencement Date:**

**Possession Date:** Upon substantial completion of Landlord's Work and delivery of Vacant Space estimated to be August 1, 2016.

**Real Estate Taxes:**

**Landlord's Work:**



**Tenant Improvements:**

No warranty or representation express or implied is made as to the accuracy of the information contained herein and same is submitted subject to errors, omissions, change of price, rental, or other conditions, withdrawal without notice and to any special listing conditions, imposed by our principals

**Cleaning & Maintenance:**

██████████████████████████████████
██████████████████████████████████
████████████████████████

**Assignment & Sublet:** ████ ██████████████████

**Legal Use & Occupancy:** ████████████████████████████
████████████████

**Operating Covenant:** █ ███████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
████████████████████████

█ ███████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
████████████████████████

**Hazardous Materials:** ██████████████████████████
██████████████

█ ███████████████████████████
██████████████████████████████████

**Restoration:** ██████████████████████████████
██████████████████████████████████
████████████████████████

**Signage:** █████████████████████████████████
██████████████████████████████████
████████████████

**Utilities:** ██████████████████████████████████

No warranty or representation express or implied is made as to the accuracy of the information contained herein and same is submitted subject to errors, omissions, change of price, rental, or other conditions, withdrawal without notice, and to any special listing conditions, imposed by our principals

**Brokerage:**

**Confidentiality:**

**AGREED AND ACCEPTED:**

By: ▮▮▮▮▮▮

Title: Vice President

Date: 4/13/16

**AGREED AND ACCEPTED:**

By: ▮▮▮▮▮▮

Title: Managing Partner

Date: 04/08/2016

No warranty or representation, express or implied, is made as to the accuracy of the information contained herein, and same is submitted subject to errors, omissions, change of price, rental, or other conditions, withdrawal without notice, and to any special listing conditions, imposed by our principals

Cushman & Wakefield, Inc.

## FLOOR PLAN – EXHIBIT A



**MEZZANINE**
**3,296 SF**

**GROUND FLOOR - 32ND ST**
**4,225 SF**

**BASEMENT STORAGE**
**1,032 SF**

**MECHANICAL MEZZANINE**
**713 SF**

No warranty or representation, express or implied, is made as to the accuracy of the information contained herein, and same is submitted subject to errors, omissions, change of price, rental, or other conditions, withdrawal without notice, and to any special listing conditions, imposed by our principals.

**Exhibit 7**

| Tran. Date Value Date | Description | Customer Ref. | Bank Ref. | Credit Amount | Report Time (ET) |
|---|---|---|---|---|---|
| 09/09/2015 09/09/2015 | LETTER OF CREDIT CDT | | 0205319111LC | 50,000.00 | 05:48 PM |

| | | |
|---|---|---|
| RS NO | : | T205319 SEQ# 111 |
| ACC NO | : | 000111 |
| DESCR | : | STANDBY LC SIGHT PAYMENT CREDIT |
| BENE | : | L/C BENEFICIARY |
| DRAFT AMT | : | 50,000.00 USD |
| TENOR | : | SIGHT |
| FX RATE | : | 1.000000000 /USDUSD EQUIV 50,000.00 |
| EXPIRATION | : | 09/06/15 |

Drawn under JPMorgan Chase, N.A. Letter of Credit Number T-205319 dated September 8, 2000.

Date: __August 26, 2015__

At Sight of this SOLE BILL OF EXCHANGE,

Pay to the order of  __PPF OFF Two Park Avenue Owner, LLC__  the sum of  __USD $50,000.00__

__***FIFTY THOUSAND DOLLARS AND NO CENTS***__  U.S. Dollars

To: JPMorgan Chase, N.A.                    From:    __PPF OFF Two Park Avenue Owner, LLC__
    131 S. Dearborn, 5th Floor
    Mail Code IL1-0236
    Chicago, IL  60603-5506
    Attn: Standby Letter of Credit Department

                                  Maria Blake,  Authorized Signer

*If so stated in the LC, form of this phrase must be identical to language specified in LC

**Back of draft**

    PPF OFF TWO PARK AVENUE OWNER, LLC

    Maria Blake,  Authorized Signer

# **Exhibit C**

**PPF OFF TWO PARK AVENUE OWNER, LLC**
**c/o Morgan Stanley Real Estate Advisor, Inc.**
**1585 Broadway**
**New York, New York 10036**

February 11, 2015

*VIA CERTIFIED MAIL*

Mr. Sarid Drory
Mr. Yair Noodle
Mr. Terrance Brennan
Artisanal Fromagerie & Bistro, LLC
Artisanal Fromagerie & Bistro 2015, LLC
Artisanal Burger House 2015, LLC
2 Park Avenue
New York, NY 10016

      Re:   2 Park Avenue, New York, New York, 10016 (the "Property")

Gentlemen,

     Thank you for your interest in the Property as a potential location for the operation of your restaurants.

     We regret to inform you, however, that after careful consideration, PPF OFF Two Park Avenue Owner, LLC ("Landlord") has chosen not to pursue an extension of that certain Agreement of Lease dated September 8, 2000 (as amended, the "Lease"; capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease), by and between Landlord and Artisanal, Fromagerie & Bistro, LLC ("Tenant"), nor to pursue a new lease with Tenant, Artisanal, Fromagerie & Bistro 2015, LLC, Artisanal Burger House 2015, LLC or any affiliate or related entity of the foregoing entities at the Property.

     If Tenant is so inclined, Landlord would be amenable to discussing the possibility of entering into a short-term extension of the Lease to accommodate Tenant in connection with Tenant's surrender of the Premises in accordance with the terms and conditions of the Lease.

     Thank you.

Sincerely,

**PPF OFF TWO PARK AVENUE OWNER, LLC**, a
Delaware limited liability company

By: PPF OFF TWO PARK AVENUE, LLC, a
    Delaware limited liability company, its Member

    By: PPF OFF, LLC, a Delaware limited liability
        company, its Member

        By: PPF OP, LP, a Delaware limited partnership,
            its Member

            By: PPF OPGP, LLC, a Delaware limited
                liability company, its General Partner

                By: PRIME PROPERTY FUND, LLC,
                    a Delaware limited liability
                    company, its Member

                    By: MORGAN STANLEY REAL
                        ESTATE ADVISOR, INC., a
                        Delaware corporation, its
                        Investment Advisor

By: _____
    Name: *Maria T Blake*
    Title: *Vice President*

# **Exhibit D**

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: NON-HOUSING PART 52
------------------------------------------------------------------- X
PPF OFF TWO PARK AVENUE OWNER, LLC,
                                    *Petitioner-Landlord*,
        -against-

ARTISANAL FROMAGERIE & BISTRO, LLC,

Portions of the basement, mezzanine and ground
floors in the building located at Two Park Avenue,
New York, New York,

                                    *Respondent-Tenant*.
------------------------------------------------------------------- X

FILED

APR 5 2016

NEW YORK COUNTY
HOUSING COURT/

L&T Index No.: 50707/2016

**AFFIRMATION OF JONATHAN A.
GRIPPO IN OPPOSITION TO
RESPONDENT'S MOTION TO
DISMISS AND IN SUPPORT OF
PETITIONER'S CROSS-MOTION
FOR ENTRY OF AN ORDER OF
SUMMARY JUDGMENT
AWARDING PETITIONER
POSSESSION AND USE AND
OCCUPANCY, AND ISSUANCE OF
A WARRANT OF EVICTION**

**JONATHAN A. GRIPPO**, an attorney duly admitted to practice in the Courts of the

State of New York, affirms the following to be true under the penalties of perjury:

1.      I am an attorney with the law firm of Goulston & Storrs PC, attorneys for the

petitioner, PPF OFF Two Park Avenue Owner, LLC (the "Two Park"). I am familiar with the

facts and circumstances of this proceeding. I submit this affirmation in opposition to Artisanal's

motion to dismiss the proceeding and in support of Two Park's cross-motion for (i) entry of an

order of summary judgment awarding petitioner possession and use and occupancy pursuant to

CPLR § 409(b) and RPAPL § 745, and (ii) the issuance of a warrant of eviction pursuant to

RPAPL § 749 against respondent, Artisanal Fromagerie & Bistro, LLC ("Artisanal").

2.      This summary holdover proceeding arises out of Artisanal's ongoing unlawful

possession of certain premises on Park Avenue in Manhattan (the "Premises") owned by Two

Park following expiration of the relevant Lease over six months ago.

3.      Prior to commencing this proceeding, Two Park has consistently made good faith

efforts to reach an agreement with Artisanal that would enable the parties to avoid and, more

recently, resolve litigation, including by attempting to negotiate a short extension of the Lease.

1

4.	These efforts started in June 2015. At that time, Artisanal was represenetd by the law firm, Pryor Cashman LLP ("Pryor Cashman"). On June 30, 2015, I provided to Pryor Cashman a copy of a proposed Stipulation of Settlement (the "Stipulation").

5.	Pryor Cashman provided cursory comments to the Stipulation more than a month after I forwarded the Stipulation. However, we were unable to discuss the comments with Pryor Cashman because we were advised that soon after receiving the comments, Artisanal retained other counsel, Herrick, Feinstein LLP ("Herrick"), in August 2015, to finalize the Stipulation.

6.	This change in counsel delayed matters because Herrick required additional time to review the Stipulation. Notwithstanding the delay, we revised the Stipulation based on our discussions with Herrick, agreeing to certain revisions that Herrick proposed. However, before having the opportunity to finalize the Stipulation with Herrick, Artisanal changed counsel again in November 2015 by going *back* to Pryor Cashman.

7.	After losing approximately three months in trying to finalize the Stipulation with Herrick, we once again worked with Pryor Cashman to resolve this matter. Indeed, we made several revisions to the Stipulation proposed by Pryor Cashman, even though the proposed revisions required changes to terms that were already agreed to by Herrick.

8.	Ultimately, and after three weeks of trying to finalize the Stipulation, we understood we had an agreement in place when, on December 17, 2015, upon Pryor Cashman's request, we provided an execution copy of the Stipulation to Pryor Cashman.

9.	However, following the transmittal of the execution copy of the Stipulation, we never heard back from Pryor Cashman, despite our numerous attempts to follow-up with counsel.

10.    Finally, after several weeks of no contact with Pryor Cashman, we commenced the proceeding on January 8, 2016.

11.    The parties first appeared in Court on January 22, 2016, where we learned that yet again, Artisanal changed counsel. On January 22nd, Artisanal appeared by present counsel, Belkin Burden Wenig & Goldman, LLP ("<u>Belkin</u>").

12.    Tellingly, Belkin never contacted me to discuss the matter during the time period between when we served the notice of petition and petition and the January 22nd appearance date.

13.    At the January 22nd appearance, Belkin requested that the matter be adjourned. The Court granted the adjournment over the objection of Two Park and set the matter down for a February 23, 2016 appearance.

14.    Once again, during the time that the matter was adjourned Belkin never contacted me. Instead, on February 22nd, a day before the parties were to appear at the adjourned appearance date, counsel emailed to me a copy of Artisanal's motion to dismiss.

DATED: April 4, 2016

_____
Jonathan A. Grippo

## ATTORNEY'S CERTIFICATION

JONATHAN A. GRIPPO, an attorney admitted to practice before the courts of the State of New York and an associate at Goulston & Storrs PC, attorneys for the petitioners referenced herein, certifies that, to the best of his knowledge, information and belief, formed after an inquiry reasonable under the circumstances, neither the presentation of the within affirmation, nor the contentions contained therein, is "frivolous," as that term is defined in Section 130-1.1(a) of the Uniform Rules.

Dated: New York, New York
      April 4, 2016

_____
JONATHAN A. GRIPPO

56001818_2

# Exhibit E

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK: NON-HOUSING PART 52

-------------------------------------------------------------------------------- x

PPF OFF TWO PARK AVENUE OWNER, LLC,

                   *Petitioner-Landlord,*

  -against-

ARTISANAL FROMAGERIE & BISTRO, LLC,

Portions of the basement, mezzanine and ground floors in the
building located at Two Park Avenue, New York, New York,

                   *Respondent-Tenant.*

-------------------------------------------------------------------------------- x

L&T    Index    No.:
**50707/2016**



FILED

APR - 5 2016

NEW YORK COUNTY
HOUSING COURT

## MEMORANDUM OF LAW IN OPPOSITION TO
## RESPONDENT'S MOTION TO DISMISS AND IN SUPPORT OF
## PETITIONER'S CROSS-MOTION FOR ENTRY OF AN ORDER OF SUMMARY
## JUDGMENT AWARDING PETITIONER POSSESSION AND USE AND OCCUPANCY
## PURSUANT TO CPLR § 409(B) AND RPAPL § 745, AND ISSUANCE OF A WARRANT
## OF EVICTION PURSUANT TO RPAPL § 749

**ROPES & GRAY LLC**
Gregg L. Weiner, Esq.
1211 Avenue of the Americas
New York, NY 10036-8704
(212) 596-9000

**GOULSTON & STORRS PC**
Jonathan A. Grippo, Esq.
885 Third Avenue, 18th Fl.
New York, New York 10022
(212) 878-6900

*Attorneys for PPF OFF Two Park
Avenue Owner, LLC*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND ........................................................................................... 3

I.     The Lease ............................................................................................................. 3
II.    Service ................................................................................................................. 4

       A.    Personal Delivery Of The Petition to Artisanal's Manager......................... 5
       B.    Taping The Petition To Artisanal's Front Door............................................5
       C.    Mailing The Petition........................................................................................6

III.   Two Park's Prior Dealings With Artisanal ........................................................... 6

IV.    Artisanal's Delay Tactics .................................................................................... 9

       LEGAL ARGUMENT ........................................................................................... 10

POINT I
ARTISANAL'S MOTION TO DISMISS SHOULD  BE DENIED BECAUSE ARTISANAL
WAS PROPERLY SERVED  PURSUANT TO TWO ALTERNATIVE METHODS
AUTHORIZED BY RPAPL § 735 ................................................................................. 10

       A.    Substitute Service Was Properly Effectuated On January 11, 2016 ........................... 12

             1.   The Substitute Service Affidavit Is Not "A Nullity" .......................................... 13
             2.   Substitute Service Does Not Require Delivery To An "Officer or Member"
                  Of A Corporate Respondent................................................................................. 14
             3.   Mr. Pariente Asserts No Facts That Refute Mr. Drepaul's Account
                  Of Substitute Service ........................................................................................... 14

       B.    Conspicuous Service Was Properly Effectuated On January 12, 2016 ..................... 16

             1.   Mr. Pariente's Conclusory Statement That Artisanal Did Not Receive
                  A Copy Of The Petition Taped To The Door Is Irrelevant As A Matter
                  Of Law .................................................................................................................. 17
             2.   The "Reasonable Application" Test For Conspicuous Service Is Met Here ..... 18

POINT II
PETITIONER'S CROSS-MOTION FOR ENTRY OF AN ORDER OF SUMMARY
JUDGMENT AWARDING TWO PARK POSSESSION AND USE AND OCCUPANCY
PURSUANT TO CPLR 409(B) AND RPAPL §745, AND ISSUANCE OF A WARRANT OF
EVICTION PURSUANT TO RPAPL §749, SHOULD BE GRANTED .................................... 21

    A.    The Court Should Enter An Order Of Summary Judgment Awarding Two Park
          Possession And Issue A Warrant Of Eviction ..................................................... 21
    B.    The Court Should Enter Summary Judgment Awarding Two Park Use And
          Occupancy ......................................................................................................... 23

CONCLUSION.............................................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

CASES

161 Williams Assocs. v. Coffee,
 122 Misc. 2d 37, 469 N.Y.S.2d 900 (Civ. Ct. 1983) .............................................20

417 E. Realty Assoc. v. Ryan,
 110 Misc.2d 607, 442 N.Y.S.2d 880 (Special Term, Civ. Ct., N.Y. Cty. 1981) ....................10

809-811 Kings Highway, LLC v. Pulse Laser Skin Care,
 25 Misc.3d 130(A), 901 N.Y.S.2d 906 (Sup. Ct. App. Term 2009).......................19

Am. Sav. & Loan Assn. v. Twin Eagles Bruce,
 208 A.D.2d 446, 617 N.Y.S.2d 717 (1st Dep't 1994) ...........................................12, 17

Beacway Operating Corp. v. Concert Arts Soc'y., Inc.,
 123 Misc.2d 452, 474 N.Y.S.2d 227 (Civ. Ct., NY Cty. 1984).........................................24, 25

BHNJ Realty Corp. v. Rivera,
 144 Misc. 2d 241, 543 N.Y.S.2d 883 (Civ. Ct. 1989) .............................................20

Brooklyn Hgts. Realty Co. v. Gliwa,
 92 AD 2d. 602, 459 N.Y. S. 2d 793 (1983) ...........................................................20

Chatham Green Mgmt. Corp. v. AAFE Mgmt. Co.,
 2003 WL 22299083 (Civ. Ct., NY Cty. 2003).................................................24

Citimortgage, Inc. v. Pembelton,
 **39** Misc. 3d 454, 960 N.Y.S.2d 867 (Sup. Ct. 2013)...........................................12, 19

De La Barrera v. Handler,
 290 A.D.2d 476, 736 N.Y.S.2d 249 (2d Dep't 2002) ...........................................17

E.F.L. Baking Corp. v Lowy Family Irrevocable Trust,
 2008 N.Y. Misc. LEXIS 9485, 2008 NY Slip Op 32494(U) (N.Y. Sup. Ct. Sept. 2,
 2008) .................................................................................................................23

Eight Assocs. v. Hynes,
 102 A.D.2d 746, 476 N.Y.S.2d 881 (1st Dep't 1984) ...........................................20

Eklecco Newco, LLC v. Schlomit, Inc.,
 13 Misc. 3d 133(A), 831 N.Y.S.2d 347, 2006 WL 2919156 (App. Term 2006)....................23

Federal Realty Ltd. Partnership v. Choices Women's Medical Center, Inc.,
 289 A.D.2d 439, 735 N.Y.S.2d 159 (2d Dep't 2001) .........................................25

Fisher Ave. Realty Partners, L.P. v. Hausch,
    186 Misc. 2d 609, 720 N.Y.S.2d 322 (2nd Dep't 2000)........................................23

Great Plains Capital Corp. v. Levi,
    36 Misc. 3d 1236(A), 960 N.Y.S.2d 50, 2012 N.Y. Misc. LEXIS 4163, 2012 NY Slip
    Op 51673(U), 2012 WL 3740723 (N.Y. Civ. Ct. 2012)........................................20

In re Dodge's Trust,
    25 N.Y.2d 273, 250 N.E.2d 849 (1969)........................................22, 24

Jewish Child Care Ass'n of N.Y. v. City of New York,
    129 Misc. 2d 871, 493 N.Y.S.2d 936 (Civ. Ct. 1985)........................................22, 23

LeRoy v. Sayers,
    217 A.D.2d 63, 635 N.Y.S.2d 217 (1st Dep't 1995)........................................25

Maher v. Marpet Dev. Co.,
    49 A.D.2d 884, 373 N.Y.S.2d 213 (2nd Dep't 1975)........................................22

Manhattan Embassy Co. v. Embassy Parking Corp.,
    164 Misc. 2d 977, 627 N.Y.S.2d 245, 1995 N.Y. Misc. LEXIS 227 (N.Y. Civ. Ct.
    1995)........................................13

Masaryk Towers Corp. v. Vance,
    12 Misc.3d 1172(A), 820 N.Y.S.2d 843 (N.Y. Civ. Ct., NY Cty. 2006)........................................19

Matter of Baer v. Lipson,
    194 A.D.2d 787, 599 N.Y.S.2d 618 (2d Dep't 1993)........................................12

Matter of Gallo v. City of New York,
    36 Misc.3d 1204(A), 954 N.Y.S.2d 759 (Sup. Ct. Queens Cty. 2012)........................................19

Naman v. Sylveen Realty Co.,
    222 A.D.2d 564, 636 N.Y.S.2d 344 (2d Dep't 1995)........................................19

New York Univ. v. Farkas,
    121 Misc. 2d 643, 468 N.Y.S.2d 808 (Civ. Ct. 1983)........................................22

Nick & Duke LLC v. John Hollings Inc.,
    11 Misc.3d 1063(A), 816 N.Y.S.2d 698 (Civ. Ct., N.Y. Cty. 2006)........................................15

Nussbaum Resources I. v. Gilmartin,
    195 Misc.2d 145, 756 N.Y.S2d 408 (Civ. Ct., N.Y. Co. 2003), rev'd on other
    grounds, 4 Misc. 3d 80, 781 N.Y.S. 2d 552 (1st Dep't 2004)........................................12

NYCTL 1998–1 Trust & Bank of N.Y. v. Rabinowitz,
    7 A.D.3d 459, 777 N.Y.S.2d 483 (1st Dep't 2004)........................................12

Parkchester Apts. Co. v. Hawkins,
    111 Misc.2d 896, 447 N.Y.S.2d 194 (Sup. Ct. App. Term, 1st Dep't 1981)....................19, 21

SABA Realty Partners LLC v APEX Limousines Inc.,
    32 Misc. 3d 1229(A), 936 N.Y.S.2d 61, 2011 N.Y. Misc. LEXIS 3897.................................11

Saba Realty Partners LLC v. International Gold Star Inc.,
    29 Misc.3d 850, 906 N.Y.S.2d 732 (Civ. Ct., Kings Cty. 2010)............................................25

Schwartz v. Certified Mgmt. Corp.,
    117 A.D.2d 521, 498 N.Y.S.2d 135 (1986) ........................................................................20

South Street Seaport v. Ry-Allie Candy Corp.,
    14 Misc.3d 1208(A), 836 N.Y.S.2d 490 (Civ. Ct. N.Y. Cty., 2006) ......................................15

Teri-Nichols Inst. Food Merchants, LLC v. Elk Horn Holding Corp.,
    64 A.D.3d 424, 883 N.Y.S.2d 31(1st Dep't 2009) ............................................................25

Thirty-Third Equities Co. LLC v. Americo Grp., Inc.,
    294 A.D.2d 222, 743 N.Y.S.2d 10 (1st Dep't 2002) ........................................................25

Union Theological Seminary v. Harris,
    1 Misc.3d 909(A) (Civ. Ct. NY Cty. 2003) .................................................................25, 26

STATUTES

CPLR 311.............................................................................................................................15

CPLR 311 and 311-a............................................................................................................11

CPLR 409(b).....................................................................................................................1, 24

Article 4 of the CPLR .........................................................................................................22

CPLR § 308(4) ....................................................................................................................19

CPLR § 311-a .....................................................................................................................11

CPLR § 404(a) ................................................................................................................22, 24

CPLR § 409(b) ...............................................................................................................22, 28

Real Property Actions and Proceedings Law ("RPAPL") § 735 ........................................... passim

RPAPL 745 (2)(a)................................................................................................................24

RPAPL 745 (2)(a) and Article 20 .......................................................................................27

RPAPL § 735 and Section 37.9 ..........................................................................................17

RPAPL §745 ........................................................................................................1, 22

RPAPL §745 (2)(a) ............................................................................................3, 26

RPAPL §745(2)(a) and Article 20 ...........................................................................28

RPAPL § 749 ...........................................................................................1, 22, 24, 28

**OTHER AUTHORITIES**

Conspicuous Service. Goldman Aff. ¶¶ 13-17 .......................................................17

N.Y. Slip Op. 50215(U), 880 N.Y.S.2b 877, 877 .................................................20

N.Y. Slip Op 50625(U), 3 .....................................................................................20

NY Slip Op 51497(U), 2 .........................................................................................11

Petitioner PPF OFF Two Park Avenue Owner, LLC ("Two Park"), respectfully submits this memorandum of law: (i) in opposition to the motion to dismiss pursuant to New York Civil Practice Law and Rules ("CPLR") § 3211(a)(8) and Real Property Actions and Proceedings Law ("RPAPL") § 735, filed by Respondent Artisanal Fromagerie & Bistro, LLC ("Artisanal") on February 19, 2016; and (ii) in support of Two Park's cross-motion for entry of an order of summary judgment awarding Two Park possession and use and occupancy pursuant to CPLR 409(b) and RPAPL §745, and issuance of a warrant of eviction pursuant to RPAPL § 749.

## PRELIMINARY STATEMENT

This summary holdover proceeding arises out of Artisanal's ongoing unlawful possession of certain premises on Park Avenue in Manhattan owned by Two Park following expiration of the relevant Lease ***over six months ago***. Artisanal, which operates a high-end restaurant at the premises, was properly served with the petition and notice of petition via two alternative methods prescribed by RPAPL § 735 – first by hand delivery of the papers to Artisinal's manager, Shimon Pariente, on January 11, 2016 and, again, on January 12, 2016, by affixing a copy of the papers upon Artisanal's front door. See Affidavit of Baldeo C. Drepaul, dated April 4, 2016 ("Drepaul Aff."), Ex. E (date, time, and GPS-stamped photograph of petition and notice of petition taped to Artisanal front door). Additionally, the papers were mailed to Artisanal at the premises as required under both RPAPL § 735 and the notice provision of the Lease, pursuant to which Artisanal "irrevocably waive[d] personal service of any summons and complaint" and consented to service by mail. Thus, there is no merit to Artisanal's motion to dismiss, which appears to be premised on the nonsensical notion that Two Park's use of alternative methods of service somehow rendered each ineffective. That is not the law.

Two Park pursued multiple alternative methods to effectuate service because it anticipated that Artisanal, given its past conduct, was likely to pursue every possible tactic to stave off eviction for as long as possible. Two Park's concerns in this regard arose as a result of its interactions with Artisanal's principal, Sarid Drory, over the past year. Specifically, during the period leading up to and following the expiration of the Lease, Mr. Drory has behaved, and continues to behave, in an increasingly confrontational manner, including by repeatedly threatening to physically harm Two Park's and its affiliates' employees, agents and representatives, and refusing to permit Two Park access to the premises – as required under the Lease – in order to exhibit the premises to prospective tenants. *See* Affidavit of Maria Blake, dated April 4, 2016 ("Blake Aff."), Ex. H (email from Mr. Drory to Two Park attorney Jonathan Grippo stating "So let's see your young face to try and get into my premises. I want to see you. Let's see which hospital Ull end up."). Although Two Park has made every attempt to accommodate Artisanal and assist it in making a smooth transition to another location, Mr. Drory's threatening behavior has escalated, and his tactics to delay Artisanal's inevitable removal from the premises have continued. Artisanal's frivolous motion to dismiss is merely the most recent example of such delay tactics.

In sum, Artisanal – a sophisticated commercial tenant whose lease expired over six months ago – has raised (and can raise) no factual issues that would render further proceedings regarding possession and use and occupancy necessary. There can be no dispute that Artisanal has been properly served, the Lease has expired, the parties have not entered into any renewal or extension, Artisanal has failed to vacate the premises, and the Lease provides for use and occupancy during the holdover period. The affidavits of service filed by the process server constitute prima facie evidence that Two Park properly effectuated service of Artisanal through

two alternative methods authorized by RPAPL § 735, and Artisanal has failed to identify any facts sufficient to rebut that presumption or entitle Artisanal to a traverse hearing. Accordingly, the Court should: (i) deny the motion to dismiss; (ii) enter an order of summary judgment awarding Two Park possession; (iii) issue a warrant of eviction; and (iv) award Two Park use and occupancy calculated in accordance with RPAPL §745 (2)(a) and the relevant Lease provision.

## FACTUAL BACKGROUND

### I. The Lease

Two Park – a limited liability company in which Morgan Stanley Prime Property Fund (the "Fund") holds a beneficial interest – is the owner of a building located at 2 Park Avenue, New York, New York (the "Building"). Blake Aff. ¶ 2. On or about September 8, 2000, Two Park's predecessor-in-interest and Artisanal entered into a 15-year lease (the "Lease") covering portions of the basement, mezzanine and ground floors in the Building (the "Premises"). Id.

Pursuant to Section 37.8, the "Lease shall not be modified, changed, or supplemented, except by a written instrument executed by both parties." Blake Aff., Ex. A at 71. Approximately one year before the Lease expired, Two Park sent Artisanal a non-binding term sheet outlining the terms of a potential renewal of the Lease (the "Term Sheet"), which was executed by Artisanal on October 31, 2014, but was never executed by Two Park. Blake Aff., Ex. B. Two Park, however, decided not to renew the Lease, and provided Artisanal with written notice of its decision on February 11, 2015 (the "Non-Renewal Notice"). Blake Aff., Ex. D.

Section 14.2 of the Lease provides that Two Park is entitled to "exhibit the Premises to prospective tenants" during the nine-month period leading up to the expiration of the lease on September 30, 2015 (the "Expiration Date"). Blake Aff., Ex. A at 46. Article 20 of the Lease

3

provides that Artisanal must quit and surrender the Premises upon the Expiration Date, that the damage to Two Park resulting from any failure by Artisanal to timely surrender possession of the Premises will be "extremely substantial," and that, in the event of such a failure, Two Park is entitled to use and occupancy in an amount equal to the greater of: (i) twice the aggregate of that portion of the Fixed Rent, Escalation Rent and Rental that was payable under the Lease during the last month of the Term (the "Last Term Rent"), which was approximately $74,578.22, see Blake Aff. ¶¶ 16-17; and (ii) twice the then fair market rental value for the Premises. Id. at 53-54. Article 20 expressly provides that its provisions shall survive the Expiration Date. Id. at 54. The Expiration Date has now passed but Artisanal has not vacated the Premises. Blake Aff. ¶ 3.

Pursuant to Section 37.9 of the Lease, Artisanal: (i) "irrevocably waive[d] personal service of any summons and complaint"; (ii) "consent[ed] to the service upon it of process in any such action or proceeding by mailing of such process"; and (iii) "agree[d] that its address for . . . service of process under th[e] Lease shall be the Premises." Blake Aff, Ex. A at 71.

## II.   Service

### A.   Personal Delivery Of The Petition To Artisanal's Manager

On January 11, 2016, Two Park's process server, Baldeo Drepaul, personally delivered the notice of petition and petition (collectively, the "Petition") to Artisanal's manager, Shimon Pariente at the Premises. Drepaul Aff. ¶¶ 5-11.[1] Mr. Drepaul identified himself as a process server, and Mr. Pariente stated that he was the manager of the restaurant, but declined to give his name. Drepaul Aff. ¶ 8; Drepaul Aff., Ex. C. Mr. Drepaul attempted to hand the Petition to Mr. Pariente and, when he refused to take it, Mr. Drepaul placed the Petition on the restaurant's host stand and stated that he was serving Mr. Pariente with the Petition. Drepaul Aff. ¶ 10.

---

[1]   A copy of Two Park's notice of petition and petition (collectively, the "Petition") is attached as Exhibit A to Drepaul Aff. as Exhibit A.

**B.    Taping The Petition To Artisanal's Front Door**

While he was leaving the Premises after delivering the Petition to Mr. Pariente on January 11, 2016, Mr. Drepaul saw an individual who appeared to be an employee of Artisanal take the Petition off of the host stand and toss it onto one of the tables located in Artisanal's outdoor dining area. Drepaul Aff. ¶ 12. Indeed, the copy of the Petition that Mr. Drepaul served on January 11, 2016 (which had a blue backing) can be seen on such table in a date, time, and GPS-stamped photograph that Mr. Drepaul took outside of Artisanal when he left. Drepaul Aff. ¶ 13; Drepaul Aff., Ex. B. Upon learning of this incident, Two Park's counsel directed Mr. Drepaul to serve Artisanal *again* through an alternative method authorized by the relevant statute. Drepaul Aff. ¶¶ 15-16. Accordingly, Mr. Drepaul went back to the Premises later in the afternoon on January 11, 2016, and again on the morning of January 12, 2016. Drepaul Aff. ¶¶ 17, 20; Drepaul Aff. Exs. D-F. On each of his second and third visits to Artisanal, Mr. Drepaul identified himself as a process server and asked the employee who greeted him if the employee was authorized to accept personal service on behalf of Artisanal. Drepaul Aff. ¶¶ 18, 21. Both such employees indicated that they were not so authorized. Id. As Mr. Drepaul was leaving Artisanal for the third time, on the morning of January 12, 2016, he taped a copy of the Petition to, and then took a photograph of, the front door of the Premises. Drepaul Aff. ¶ 23; Drepaul Aff., Ex. E.

**C.    Mailing The Petition**

On January 11, 2016, and again on January 12, 2016, Mr. Drepaul mailed a copy of the Petition to Artisanal at the Premises via both first class and certified mail. Drepaul Aff. ¶¶ 14, 24; Drepaul Aff., Exs. C, F.

## III.    Two Park's Prior Dealings With Artisanal

Two Park's decision to employ multiple alternative methods of service was informed by the history of its interactions with Artisanal and its principal, Mr. Drory, over the past year.  For example, in or around April 2015, after Two Park had informed Artisanal that it would not renew the Lease, Mr. Drory began preventing Two Park from exhibiting the Premises to prospective tenants, as provided for under Section 14.2 of the Lease, including by threatening physical violence.  For example, on April 21, 2015, Jose Toro, the Building manager, notified Mr. Drory that Two Park representatives would need to enter the Premises to conduct a walk through with prospective tenants.    Blake Aff., Ex. F.    Mr. Drory responded by sending threatening and defamatory emails to Mr. Toro; Two Park's Vice President, Maria Blake; and Two Park's broker, Gene Spiegelman, in which Mr. Drory made clear that he would not permit Two Park to show the Premises to prospective tenants.  Blake Aff., Exs. D-F.  Specifically, in his email to Mr. Toro, Mr. Drory stated:

> Be advised because of Maria [Blake] and Morgan Stanley cause misleading and fraud of $12M on my property. Company. And brand name. Artisanal fromagerie & bistro. And artisanal 2015 LLC. You are not allowed to enter my property. Only in cause of emergency. And concerned to the law and to me as the only owner. You are trespassing. And the police and 911 will be there in 60 seconds. I don't believe I'm gonna need it because I have my own body guard with license on my premises. I believe in the next hour you'll have something to read. That u and ur boss understand which situation she's in. She never can hurt anymore to me and my brand name . . .

Blake Aff., Ex. F.

Mr. Drory also threatened Ms. Blake, stating in his email to her, among other things:

> Dear Maria,

6

For few months Ive been really quiet. Watching and listening to all your actions. I didn't believe a woman in your position gonna make so many mistakes. By today you crossing all the red lines.

. . .

Ur face is gonna be on the news. Dear Maria. I don't need any favor from u after u mislead me and defraud me. I'm telling u right now u have 72hrs to send me an extension for 24 months. After u cheating lying and scamming us.

. . .

I'm gonna teach u a lesson that u never gonna steal defraud no one in the world.

Blake Aff., Ex. D.

In his email to Mr. Spiegelman, Mr. Drory again threatened physical violence:

dear Gene,

I watching you close to a year. As you know i was a Lieutenant in the Special Forces in Lebanon. You can fuck 100 people, but the 101 gonna stop you!!! And i mean stop you big time. In the last 10months, you present Morgan Stanley, and you help Maria and you been a partner with her in scamming me, mislead me, and creating tortious interference with my business. you lying to us, i have a stable, successful and amazing business. . . . let me tell you something. you scamming, lying and bullshitting Jeff Lagowitz [Artisanal's broker]. He is a kind and honest man. and i can promise you, that right now, that you have big tsunami after your fucking ass . . . .

you and maria think that this is a game, but i can promise you, when i said tsunami, go to the internet, see how it looks like. a tsunami swell. im going all over you . . .

its gonna hurt so much, the same torture, you tortured me and my group.

Blake Aff., Ex. E.

A few months later, on September 19, 2015, Mr. Drory attempted to provoke a

physical confrontation with Jonathan Marquez, a security guard in the Building, after Mr.

Marquez informed Mr. Drory that the Building's garage was closed for weekend deliveries. Mr. Marquez recounted the incident, in which he was derided and physically threatened by Mr. Drory, in an email to Mr. Toro:

> Mr. Drory became belligerent, he told me "you think your tough, I'm tough, I know people, you think standing behind there is going to protect you" he continued telling me "you have no fucking idea the people I know, "all it takes is one phone call", he went on and on . . .Mr. Drory was not open to listening and continued to use every curse word he could think of to show his frustration. He was being incoherent, falsely alleging that he gives me $300.00 for Christmas as well as free food all the time, asking "who does that for you" and answering his own question "nobody" . . .He verbally threatened me implying physical harm simply for doing my job . . .

Blake Aff., Ex. G.

The most recent example of Mr. Drory's threatening behavior occurred less than two weeks ago, when representatives of Two Park once again attempted to schedule a walk-through of the Premises with a prospective tenant. As he had done before, Mr. Drory responded with an email, this time to Two Park's counsel, Jonathan Grippo, and Mr. Toro, threatening physical violence if Two Park attempted to access the Premises. The email stated:

> Listen grippo
>
> U young unprofessional fucking asshole. You can send tomorrow anyone you want. I have enough cops and bodyguards with badge and guns sleeping at premises tonight and every nite. YoUr more than welcome. I'm happy your threatening my lawyer and me. Why don't you come yourself and try to enter my premises. I want to see your face. Leave poor Jose out of it. Because you. Your a big shot. So let's see your young face to try and get into my premises. I want to see you. Let's see which hospital Ull end up. Maybe you don't know the law bit MY PREMISES. You giving Jose and the other people stupid instruction and orders. So why don't u Come by yourself. Please come. Than choose the hospital. I want to see you try and enter my premises. U piece of nerdy asshole. U coward. Everyone waiting for you. Let's see if you have the balls. To get into my home without my permission to get onto my premises. Than pick the hospital

2. Jose if you want to embarrass yourself you can come tomorrow with whoever. Ull see what happens. I want to see you enter my premises without my authorization. And keep listening to you're asshole lawyer. It's going to be fun.

Blake Aff., Ex. H.

Mr. Drory's threatening behavior has prevented Two Park from exercising its right to display the Premises to prospective tenants and has given rise to serious ongoing concerns about the physical safety of Two Park's property staff and brokers, as well as other representatives and employees of Two Park and the Fund. Blake Aff. ¶ 14.

## IV.    Artisanal's Delay Tactics

Notwithstanding Mr. Drory's behavior, Two Park has consistently made good faith efforts to reach an agreement with Artisanal that would enable the parties to avoid and, more recently, resolve litigation, including by attempting to negotiate a short extension of the Lease to facilitate any transition by Artisanal to a new location. Blake Aff. ¶ 7; Blake Aff., Ex. C; Grippo Aff. ¶¶ 3-9.[2] Artisanal, however, has taken advantage of such efforts by repeatedly employing tactics designed to delay its inevitable removal from the Premises for as long as possible. Blake Aff., ¶ 7; Grippo Aff. ¶¶ 3-14.

For example, during the six month period from August 2015 through January 2016, Artisanal changed counsel *three times* – from Pryor Cashman LLP ("Pryor Cashman") to Herrick, Feinstein LLP ("Herrick") in August 2015; from Herrick *back to* Pryor Cashman in November 2015; and, finally, from Herrick to Belkin Burden Wenig & Goldman, LLP ("Belkin") in January 2016 following the commencement of this special proceeding.  Grippo

---

[2] "Grippo Aff." refers to the Affirmation of Jonathan A. Grippo in Opposition to Respondent's Motion to Dismiss and in Support of Petitioner's Cross-Motion for Entry of an Order of Summary Judgment Awarding Petitioner Possession and Use and Occupancy, and Issuance of a Warrant of Eviction.

Aff. ¶¶ 4-6, 11. The parties' progress in reaching an agreement regarding an extension was set back each time Artisanal changed counsel. Grippo Aff. ¶ 4-7.

Finally, on December 17, 2015 – more than two and a half months after the Expiration Date – Artisanal's counsel indicated that the parties had reached an agreement in principle and asked Two Park's counsel to send an execution version of the document memorializing the deal. Grippo Aff. ¶ 8. Two Park's counsel promptly did so, but received no response from Artisanal or its counsel. Grippo Aff. ¶¶ 8-9. After weeks of unsuccessful attempts to contact Artisanal's counsel, Two Park was left with no choice but to commence the Holdover Proceeding on January 8, 2016. Grippo Aff. ¶¶ 9-10. Since being served with process in this special proceeding, Artisanal has continued its delay tactics, including by requesting a continuance based on its most recent counsel change, and by filing a frivolous motion to dismiss. Grippo Aff. ¶¶ 11-14.

## LEGAL ARGUMENT

### POINT I

### ARTISANAL'S MOTION TO DISMISS SHOULD BE DENIED BECAUSE ARTISANAL WAS PROPERLY SERVED PURSUANT TO TWO ALTERNATIVE METHODS AUTHORIZED BY RPAPL § 735

The sole issue that must be resolved by a court in determining whether service was properly effectuated is whether "its manner is calculated to adequately and fairly apprise the respondent of the impending lawsuit." 417 E. Realty Assoc. v. Ryan, 110 Misc.2d 607, 610, 442 N.Y.S.2d 880 (Special Term, Civ. Ct., N.Y. Cty. 1981). Pursuant to RPAPL § 735, service of the notice of petition and petition in a summary proceeding to recover possession of real property "shall be made":

(i)     "by personally delivering them to the respondent" ("Personal Service");[3] or

(ii)    "by **delivering [them] to and leaving [them] personally with a person of suitable age and discretion who . . . is employed at the property sought to be recovered**, if upon reasonable application admittance can be obtained and such person found who will receive it" ("Substitute Service"); or

(iii)   "if admittance cannot be obtained and such person found, **by affixing a copy of the notice and petition upon a conspicuous part of the property sought to be recovered**" ("Conspicuous Service"); provided that,

(iv)    where Substitute Service or Conspicuous Service is employed, a copy of the petition and notice of petition is "mail[ed] to the respondent both by registered or certified mail and by regular first class mail."

RPAPL § 735 (emphasis added). Where, as here, the respondent is a limited liability company, service must occur "at the property sought to be recovered." Id. Additionally, Article 37.9 of the Lease provides that Artisanal "irrevocably waive[d] personal service of any summons and complaint" and that service of process on Artisanal may be effectuated by mailing such process to the Premises. Blake Aff., Ex. A at 71.

A proper affidavit of service constitutes prima facie evidence of the sufficiency of the service. NYCTL 1998–1 Trust & Bank of N.Y. v. Rabinowitz, 7 A.D.3d 459, 460, 777 N.Y.S.2d 483 (1st Dep't 2004). When a petitioner files an affidavit of service that alleges proper service of process, the respondent must plead a sufficiently detailed and specific statement to be entitled to a hearing on service of process. Matter of Baer v. Lipson, 194 A.D.2d 787, 599 N.Y.S.2d 618 (2d Dep't 1993). The mere claim of improper service of process without more is insufficient to rebut an affidavit of service in proper form. Nussbaum Resources I. v. Gilmartin, 195 Misc.2d

---

[3]   In order to effectuate Personal Service on a limited liability company, such as Artisanal, delivery must be made to: (i) "any member of the limited liability company"; (ii) "any manager of the limited liability company"; (iii) "any other agent authorized by appointment to receive process"; or (iv) "any other person designated by the limited liability company to receive process." CPLR § 311-a; SABA Realty Partners LLC v APEX Limousines Inc., 32 Misc. 3d 1229(A), *7, 1229A, 936 N.Y.S.2d 61, 61, 2011 N.Y. Misc. LEXIS 3897, ***14, 2011 NY Slip Op 51497(U), 2 (N.Y. Sup. Ct. 2011) (stating that in holdover proceeding, "CPLR § 311-a. CPLR 311 and 311-a allow for managing and other authorized agents to receive [Personal] [S]ervice on behalf of the corporation and company").

145, 756 N.Y.S2d 408 (Civ. Ct., N.Y. Co. 2003), rev'd on other grounds, 4 Misc. 3d 80, 781

N.Y.S. 2d 552 (1st Dep't 2004). Finally, the mere denial of receipt of service is insufficient to

rebut the presumption of proper service created by properly executed affidavit of service and a

conclusory denial not accompanied by further probative facts does not require a traverse hearing.

Am. Sav. & Loan Assn. v. Twin Eagles Bruce, 208 A.D.2d 446, 446, 617 N.Y.S.2d 717 (1st Dep't

1994); Citimortgage, Inc. v. Pembelton, 39 Misc. 3d 454, 458, 960 N.Y.S.2d 867 (Sup. Ct. 2013).

The Affidavits of Service attached as Exhibits B and E to the Drepaul Affidavit (the

"Substitute Service Affidavit" and "Conspicuous Service Affidavit," respectively) constitute

prima facie evidence that Two Park properly effectuated service of Artisanal through two

alternative methods authorized by RPAPL § 735. Artisanal has failed to identify any facts

sufficient to rebut that presumption or entitle it to a traverse hearing. Accordingly, Artisanal's

motion to dismiss should be denied.

**A.   Substitute Service Was Properly Effectuated On January 11, 2016**

The Substitute Service Affidavit states that Mr. Drepaul visited the Premises at

approximately 12:19 p.m. on January 11, 2016 and personally delivered a copy of the Petition to,

and left such copy with, an individual who was between 51 and 65 years of age, and who Mr.

Drepaul knew to be an employee of Artisanal. Drepaul Aff., Ex. B. Mr. Drepaul subsequently

learned that the individual to whom he delivered the Petition on January 11, 2016 was Artisanal

manager Shimon Pariente. Drepaul Aff. ¶¶ 8, 21-22.[4]

Artisanal argues that the presumption of proper service created by the Substitute Service

Affidavit is rebutted here because allegedly: (i) the Constructive Service Affidavit renders the

---

[4]   The fact that Mr. Pariente refused to take the Petition when Mr. Drepaul attempted to hand it do him, requiring
Mr. Drepaul to place the Petition on the host stand, does not render service ineffective. See Manhattan Embassy
Co. v. Embassy Parking Corp., 164 Misc. 2d 977, 982, 627 N.Y.S.2d 245, 248, 1995 N.Y. Misc. LEXIS 227, *9
(N.Y. Civ. Ct. 1995) (holding that the "expressed unwillingness [of the respondent's employee] to accept service of
the notice of termination did not invalidate that service as a matter of law").

Substitute Service Affidavit "a nullity," see Affirmation of Jeffrey L. Goldman in Support of Respondent's Motion, dated Feb. 19, 2016 ("Goldman Aff.") ¶ 4; (ii) no attempt was made to serve an officer or member of Artisanal, see Goldman Aff. ¶ 6; and (iii) Mr. Drepaul did not leave a copy of the Petition with any person, see id. Each of these arguments is meritless as a matter of law.

1. **The Substitute Service Affidavit Is Not "A Nullity"**

Artisanal first argues that the Substitute Process Affidavit is "a nullity; as if it never occurred," because Mr. Drepaul purportedly "swor[e] under oath" in the Conspicuous Service Affidavit "that as of January 12, 2016, he was not able to previously obtain either [P]ersonal [Service] or [S]ubstitute[] [S]ervice on [Artisanal]." See Goldman Aff. ¶ 4. The falsity of this statement is evident on the face of the document it purports to describe, which contains no representation or affirmation by Mr. Drepaul that service had not previously been effectuated as of January 12, 2016. See Drepaul Aff., Ex. F. Indeed, the Conspicuous Service Affidavit does not even mention Mr. Drepaul's first visit to Artisanal at 12:19 p.m. on January 11, 2016 during which Substitute Service was effectuated, and instead refers only to Mr. Drepaul's second and third visits to Artisanal on January 11, 2016 *at 3:47 p.m.* and on January 12, 2016, respectively. See id.

Moreover, the opinion expressed by Mr. Goldman in his affirmation that "[i]f [Mr. Drepaul] believed he had satisfied the legal requirements to effectuate [S]ubstitute [S]ervice . . . he would not have thereafter attempted [to effectuate] [C]onspicuous [S]ervice," is both irrelevant and unfounded. Goldman Aff. ¶ 4 n.1. Artisanal cites no authority in support of the proposition that service may not be effectuated by multiple alternative means, or that doing so gives rise to an inference that the first method employed was unsuccessful; nor is Two Park aware of any such authority. Although Mr. Drepaul properly effectuated Substitute Service on

his first visit to Artisanal, the incident he witnessed in which an employee picked up the Petition and threw it outside the restaurant prompted Two Park to effectuate service on Artisanal *a second time* through an alternative means authorized by statute. Drepaul Aff. ¶¶ 12, 15-16. If anything, Artisanal's motion to dismiss demonstrates the wisdom of the belt-and-suspenders approach to service taken by Two Park in this instance.

2. **Substitute Service Does Not Require Delivery To An "Officer or Member" Of A Corporate Respondent**

Artisanal's second argument, that Substitute Service was not effectuated "because no attempt was made to serve an officer or member of [Artisanal]," Goldman Aff. ¶ 6, is also legally meaningless, as RPAPL § 735 contains no such requirement. Rather, to properly effectuate Substitute Service, RPAPL § 735 requires only that the person to whom the relevant papers are delivered, and with whom such papers are left, be "*of suitable age and discretion*" and "*employed at the property sought to be recovered*." (emphasis added) See also, e.g., South Street Seaport v. Ry-Allie Candy Corp., 14 Misc.3d 1208(A), *6, 836 N.Y.S.2d 490 (Civ. Ct. N.Y. Cty., 2006) (holding that "[t]here is no requirement that a notice of petition and petition be served only by personal service and in compliance with CPLR 311."); Nick & Duke LLC v. John Hollings Inc., 11 Misc.3d 1063(A), *3, 816 N.Y.S.2d 698 (Civ. Ct., N.Y. Cty. 2006) (holding that "[t]he service provisions of the CPLR, including CPLR 311, do not apply to summary proceedings, and in the case of a corporate respondent, service pursuant to the RPAPL alone is sufficient") (internal citations omitted). Artisanal does not dispute that Mr. Pariente meets both of those criteria.

3. **Mr. Pariente Asserts No Facts That Refute Mr. Drepaul's Account Of Substitute Service**

Artisanal's final argument regarding the sufficiency of Substitute Service on January 11, 2016 is based on Mr. Goldman's assertion that the process server did not leave a copy of the

Petition "with any person, let alone a person authorized or willing to accept service." Goldman Aff. ¶ 6. Specifically, Mr. Goldman contends that "no copy of a notice of petition and petition was given to nor dropped at the feet of any employee" and "no process server asked if [Mr. Pariente] was employed [by Artisanal]." Goldman Aff. ¶ 19. Although Mr. Goldman claims that these assertions are "detailed in" an affidavit submitted by Mr. Pariente in support of the motion to dismiss (the "Pariente Affidavit"), the Pariente Affidavit in fact does not contain these statements. Compare Goldman Aff. ¶ 19 with Pariente Aff.

Notably, in his affidavit, Mr. Pariente *does not deny that he received legal papers from a person identifying himself as a process server on January 11, 2016*. See Pariente Aff. To the contrary, Mr. Pariente's affidavit merely states that: (i) "a person *who never identified himself*" came to Artisanal and asked Mr. Pariente if Sarid Drory was there, Pariente Aff. ¶ 3; (ii) Mr. Pariente responded that Mr. Drory was not there, id.; (iii) *this unidentified person* did not ask if Mr. Pariente worked at Artisanal, id.; (iv) *this unidentified person* did not give Mr. Pariente any papers or an envelope, id. ¶ 4; and (v) at some point after his exchange with this unidentified person, Mr. Pariente "observed what appeared to be legal papers covered with mud stuffed into the fifth planter far away from [Artisanal's] outside entrance door," id. ¶ 5.[5]

Even if each of the statements in the Pariente Affidavit is accepted as true, there is no support for an inference that the unidentified person referred to therein is Mr. Drepaul, or that anything contained in the Substitute Service Affidavit, or Mr. Drepaul's Affidavit submitted in opposition to the motion to dismiss, is inaccurate. Indeed, in light of the statements in the Pariente Affidavit, it is unclear why Mr. Pariente believes that the unidentified person he

---

[5] Mr. Pariente does not assert that he saw the "person who never identified himself" – or anyone else for that matter – place any papers in the planter.

describes was a process server at all, as opposed to someone simply asking for Mr. Drory for some other purpose.[6]

Thus, Substitute Service was properly effectuated as a matter of law, and the motion to dismiss must be denied regardless of whether Conspicuous Service was properly made (which, for the reasons discussed below, it was).

**B. Conspicuous Service Was Properly Effectuated On January 12, 2016**

In the unlikely event the Court were to find that there is a factual dispute concerning whether Substitute Service had been properly effectuated on January 11, 2016, Artisanal still would not be entitled to a dismissal, or even a traverse hearing, because Conspicuous Service was properly effectuated on January 12, 2016 as a matter of law.

In the Conspicuous Service Affidavit, Mr. Drepaul states that he visited the Premises at approximately 3:47 p.m. on January 11 and at 9:55 a.m. on January 12, 2016 and, on each occasion, attempted to find an employee who was authorized to accept Personal Service of the Petition on behalf of Artisanal. Drepaul Aff. Ex. F; see also Drepaul Aff. ¶¶ 17-18; 20-21. When each employee with whom Mr. Drepaul spoke during these two visits stated that he was not so authorized, Mr. Drepaul taped the Petition to the front door of the restaurant, and followed up with a second mailing of the Petition to Artisanal at the Premises in accordance with the requirements of RPAPL § 735 and Section 37.9 of the Lease. Drepaul Aff. Ex. E-F; see also ¶¶ 17-18, 20-24.

Artisanal argues that the presumption of proper service created by the Conspicuous Service Affidavit is rebutted here because allegedly: (i) Artisanal did not receive any papers that were posted on the door, see Pariente Aff. ¶ 2; and (ii) Mr. Drepaul failed to make a reasonable

---

[6] Indeed, although Mr. Pariente's affidavit arguably suggests that his brief encounter with the "person who never identified himself" took place on the same day that Mr. Drepaul effectuated Substitute Service, even that is not explicitly stated. See Pariente Aff. ¶ 3.

application to effectuate Personal Service or Substitute Service prior to resorting to Conspicuous Service.  Goldman Aff. ¶¶ 13-17.  Both arguments fail.

1. **Mr. Pariente's Conclusory Statement That Artisanal Did Not Receive A Copy Of The Petition Taped To The Door Is Irrelevant As A Matter Of Law**

Contrary to Mr. Goldman's mischaracterization of the Pariente Affidavit, Mr. Pariente does not "swear[] [that] no copy [of the Petition] was ever affixed to the door." Compare Goldman Aff. ¶ 4 with Pariente Aff. ¶ 2.  Nor could Mr. Pariente possibly have the requisite personal knowledge to support such an infinitely broad statement.  Rather, the Pariente Affidavit merely states that Artisanal "[a]t no time . . . *receive[d]* any papers that were posted on the door." Pariente Aff. ¶ 2 (emphasis added).  Such conclusory denials of receipt, however, are insufficient to rebut the presumption of proper service created by the Conspicuous Service Affidavit, as RPAPL § 735 contains no requirement that the respondent actually receive a copy of the papers served via the Conspicuous Service method, provided that a copy of such papers is "affix[ed] . . . upon a conspicuous part of the property sought to be recovered," and subsequently mailed to the Premises.  RPAPL § 735; see also e.g., De La Barrera v. Handler, 290 A.D.2d 476, 477, 736 N.Y.S.2d 249 (2d Dep't 2002) ("Mere denials of receipt are insufficient to rebut the presumption of proper service created by a properly-executed affidavit of service."); Am. Sav. & Loan Assn. v. Twin Eagles Bruce, 208 A.D.2d 446, 446-47, 617 N.Y.S.2d 717 (1st Dep't 1994) (rejecting respondent's "conclusory denial" of service where he offered no "further probative facts" about the service).  Artisanal has failed to identify any facts that could potentially call into question the statements in the Conspicuous Service Affidavit that Mr. Drepaul followed that procedure here. Nor could Artisanal plausibly do so in light of the *date, time, and GPS coordinate-stamped photograph of the front door of Artisanal with the Petition taped to it*, which is submitted as Exhibit E to the Drepaul Aff.

**2.     The "Reasonable Application" Test For Conspicuous Service Is Met Here**

Artisanal next argues that Conspicuous Service was inadequate because Mr. Drepaul did not make a "reasonable application" to effectuate Personal Service or Substitute Service prior to resorting to Conspicuous Service on January 12, 2016. Goldman Aff. ¶¶ 13-17. This argument fails for multiple reasons. First, and most importantly, any discussion of whether a reasonable **attempt** was made to effectuate Substitute Service is nonsensical where, as here, Substitute Service **was successfully effectuated** prior to the use of the Conspicuous Service method. See Point I.A, supra.

Second, even leaving aside Mr. Drepaul's successful effectuation of Substitute Service at 12:19 p.m. on January 11, 2016, his two subsequent visits to Artisanal – on January 11, 2016 at 3:47 p.m and on January 12, 2016 at 9:55 a.m. – during which he unsuccessfully attempted to serve Artisanal **for the second time** via the Personal Service method – satisfied the "reasonable application" test for Conspicuous Service as a matter of law.

It is well settled that courts do not employ a "due diligence" standard to determine whether a process server has made a "reasonable application" to effect Personal or Substitute Service in ordinary actions imposed by CPLR § 308(4). Parkchester Apts. Co. v. Hawkins, 111 Misc.2d 896, 897, 447 N.Y.S.2d 194 (Sup. Ct. App. Term, 1st Dep't 1981). Rather, the process server must have at least a "reasonable expectation of success" in finding a person eligible to accept service on the premises. See Naman v. Sylveen Realty Co., 222 A.D.2d 564, 565, 636 N.Y.S.2d 344, 345 (2d Dep't 1995).

Courts require "[a] lower grade of effort" to satisfy the "reasonable application" requirement to the extent that the process server "may ring once (or twice if so moved) and if such mild, lawful efforts come to naught, he may proceed with posting and mailing." Parkchester Apartments Co., 111 Misc.2d at 897. Courts have routinely held that two attempts at

Personal or Substitute Service before resorting to Constructive Service satisfy the "reasonable application" test. See, e.g., 809-811 Kings Highway, LLC v. Pulse Laser Skin Care, 25 Misc.3d 130(A), *1, 901 N.Y.S.2d 906 (Sup. Ct. App. Term 2009); Matter of Gallo v. City of New York, 36 Misc.3d 1204(A), *8, 954 N.Y.S.2d 759 (Sup. Ct. Queens Cty. 2012). Upon satisfying the "reasonable application" test, affixing a copy of the notice and petition upon a conspicuous part of the property (usually the entrance door of the actual premises sought to be recovered) or placing a copy under the door is deemed proper Conspicuous Service. Masaryk Towers Corp. v. Vance, 12 Misc.3d 1172(A), *3, 820 N.Y.S.2d 843 (N.Y. Civ. Ct., NY Cty. 2006).

Artisanal's argument that the "reasonable application" test was not satisfied here is premised entirely on its contention that Mr. Drepaul's attempt to effectuate Personal Service on the morning of January 12, 2016 "is defective as a matter of law" because it occurred approximately an hour before Artisanal opened for business. Goldman Aff. ¶¶ 5, 15, 17.[7] In support of this contention, Artisanal cites wholly inapposite cases where the court found that the "reasonable application test" had not been met in circumstances that were drastically different than those at issue here. See Goldman Aff. ¶¶ 11-16. For example, in ZOT, LLC v. Crown Assoc., the restaurant at issue was closed-down entirely as a result of a collapsed roof at the time service was attempted. 2009 N.Y. Slip Op. 50215(U), 880 N.Y.S.2b 877, 877 (App. Term 2d Dept. 2009). Similarly, in Palumbo v. Estate of Clark, the process server made one attempt to serve a bar at 6:22 a.m. and found no one at the premises. 94 Misc.2d 1, 403 N.Y.S.2d 874 (Civ.

---

[7] Mr. Goldman's single, wholly conclusory statement that "Respondent disputes" that Mr. Drepaul attempted to effectuate Substitute Service for a second time at 3:47 p.m. on January 11, 2016, Goldman Aff. ¶ 5, as to which he has no personal knowledge, should be disregarded by the Court. Citimortgage, Inc. v. Pembelton, 39 Misc. 3d 454, 459, 960 N.Y.S.2d 867 (Sup. Ct. 2013) ("Bare, conclusory and unsubstantiated denials of receipt of process are insufficient to rebut the presumption of proper service created by the affidavit of the plaintiff's process server and to require a traverse hearing"); Great Plains Capital Corp. v. Levi, 36 Misc. 3d 1236(A), *6, 1236A, 960 N.Y.S.2d 50, 50, 2012 N.Y. Misc. LEXIS 4163, *17, 2012 NY Slip Op 51673(U), 6, 2012 WL 3740723 (N.Y. Civ. Ct. 2012) (holding that a "vague and conclusory denial of service of process is insufficient to rebut the Process Server's affidavit which asserts that the Defendant was personally served with the summons and complaint").

Ct. Bronx Cty. 1978). And in 30-40 Assocs. Corp. v. Destefano, the landlord knew that the tenant had been removed from his apartment, and was in jail, at the time the process server attempted to serve tenant at the apartment. 2003 N.Y. Misc. LEXIS 220, *1, 2003 N.Y. Slip Op 50625(U), 3 (N.Y. App. Term Mar. 3, 2003).[8]

In stark contrast to the circumstances at issue in the cases Artisanal mistakenly relies upon, when Mr. Drepaul visited Artisanal near the time when it officially opened (at 9:55 a.m. with a scheduled opening at 11:00 a.m.), the front door was unlocked and there were several employees inside – including Mr. Pariente. Drepaul Aff. ¶ 20. Upon entering the Premises, Mr. Drepaul asked the employee who greeted him if he was authorized to accept Personal Service of the Petition on behalf of Artisanal but he said that he was not. Drepaul Aff. ¶ 21. Tellingly, the Pariente Affidavit does not dispute those facts, but rather merely reiterates Artisanal's mantra that it does not open for business during the weekdays until 11:00 a.m. Pariente Aff. ¶ 2. Artisanal cites no authority suggesting the existence of a bright line rule that a business must be open to the public at the time Personal or Substitute Service is attempted in order to satisfy the reasonable application test, and Two Park is aware of none. The mere fact that Artisanal did not begin serving food to customers until just over an hour after Mr. Drepaul's visit to the Premises cannot convert his reasonable attempt to effectuate Personal Service into one that was "predestined to failure." Indeed, Mr. Pariente's actual presence at the restaurant at 9:55 a.m.

---

[8] The other cases cited by Artisanal are similarly inapposite. See Eight Assocs. v. Hynes, 102 A.D.2d 746, 476 N.Y.S.2d 881 (1st Dep't 1984) (process server made one attempt to serve a residential tenant on a weekday at noon, a time when most people are at work); Brooklyn Hgts. Realty Co. v. Gliwa, 92 AD 2d. 602, 459 N.Y. S. 2d 793 (1983) (same); Schwartz v. Certified Mgmt. Corp., 117 A.D.2d 521, 498 N.Y.S.2d 135, 135 (1986) (landlord knew that tenant was subletting, and thus no longer living in, the apartment at the time the process server attempted to serve the tenant there); BHNJ Realty Corp. v. Rivera, 144 Misc. 2d 241, 543 N.Y.S.2d 883 (Civ. Ct. 1989) (granting petitioner's motion to re-serve respondent in a manner prescribed by the court after petitioner learned that respondent was incarcerated); 161 Williams Assocs. v. Coffee, 122 Misc. 2d 37, 469 N.Y.S. 2d 900 (Civ. Ct. 1983) (conspicuous service not effectuated because place where petition was affixed could not reasonably be expected to be used as an entrance to the premises); Parkchester Apts., 111 Misc. 2d 896 (finding that conspicuous service *had* been properly effectuated where process server rang bell of tenant's apartment at 7:35 a.m., received no answer, waited seven minutes and then rang again before taping papers to door).

when Mr. Drepaul visited Artisanal conclusively confirms Mr. Drepaul's judgment that his attempt to serve Artisanal at that time had more than a "reasonable expectation of success."

*    *    *

In sum, Artisanal's motion to dismiss should be denied because Artisanal fails to raise any facts sufficient to rebut the presumption that Two Park properly effectuated *both* Substitute Service on January 11, 2016 *and* Constructive Service on January 12, 2016.

## POINT II

### PETITIONER'S CROSS-MOTION FOR ENTRY OF AN ORDER OF SUMMARY JUDGMENT AWARDING TWO PARK POSSESSION AND USE AND OCCUPANCY PURSUANT TO CPLR 409(B) AND RPAPL §745, AND ISSUANCE OF A WARRANT OF EVICTION PURSUANT TO RPAPL §749, SHOULD BE GRANTED

**A.     The Court Should Enter An Order Of Summary Judgment Awarding Two Park Possession And Issue A Warrant Of Eviction**

Summary proceedings were "designed to provide the landlord with a simple, expeditious and inexpensive means of regaining possession of his premises in cases where the tenant . . . wrongfully held over without permission after the expiration of the term." New York Univ. v. Farkas, 121 Misc. 2d 643, 644, 468 N.Y.S.2d 808, 810 (Civ. Ct. 1983); Maher v. Marpet Dev. Co., 49 A.D.2d 884, 884, 373 N.Y.S.2d 213, 214 (2nd Dep't 1975) (explaining that summary proceedings are usually considered the most "expeditious" alternative). As a result, summary holdover proceedings are governed by Article 4 of the CPLR, under which a respondent has no "right" to file an answer following a denial of his motion to dismiss. In re Dodge's Trust, 25 N.Y.2d 273, 286, 250 N.E.2d 849 (1969).

Rather, the language of CPLR § 404(a) is permissive, stating that the court "*may* permit the respondent to answer . . . within five days after service of the order [denying the motion to dismiss] with notice of entry." Jewish Child Care Ass'n of N.Y. v. City of New York, 129 Misc. 2d 871, 872, 493 N.Y.S.2d 936 (Civ. Ct. 1985) (emphasis added); see also In re Dodge's Trust,

25 N.Y.2d 273, 286, 250 N.E.2d 849, 857 (1969). Moreover, CPLR § 409(b) provides that the court in a summary proceeding *"shall make a summary determination* upon the pleadings, papers and admissions to the extent that no triable issues of fact are raised," and "may make any orders permitted on a motion for summary judgment." (emphasis added).

Courts have repeatedly relied on these provisions of Article 4 to hold that where a landlord's claim of possession raises no disputed facts requiring a trial, the court should grant summary judgment of possession to the landlord without allowing the tenant to answer. For example, the petitioner in Jewish Child Care Ass'n brought a summary proceeding for repossession, and the respondent moved to dismiss based on its contention that it had received insufficient notice. 129 Misc. 2d at 877. In addition to denying respondent's motion to dismiss, the court declined to grant respondent the opportunity to submit an answer, and entered summary judgment of possession in favor of petitioner. The court explained its conclusion as follows:

> Since there are no triable issues of fact, this court can conceive of no basis for exercising its discretion under CPLR 404(a) to now permit respondent [] to answer and continue litigation of the issues of law finally disposed of on this motion. In fact, to the contrary, *where – as here – the motion raised no triable issues of fact, CPLR 409(b) mandates the court to make a summary determination upon the pleadings, papers and admissions as on a motion for summary judgment* . . . Accordingly, respondent[]'s motion is not only denied, as aforesaid, but the petitioner [] shall also have summary judgment of possession.

Id. at 877-78 (emphasis added). See also Fisher Ave. Realty Partners, L.P. v. Hausch, 186 Misc. 2d 609, 610, 720 N.Y.S.2d 322 (2nd Dep't 2000) (affirming lower court's decision to deny tenant's motion to dismiss, decline to allow tenant to answer, and award summary judgment to the landlord because "there were no issues for trial with respect to landlord's claim to recover possession"); Eklecco Newco, LLC v. Schlomit, Inc., 13 Misc. 3d 133(A), *1, 831 N.Y.S.2d 347, 2006 WL 2919156, at *1 (App. Term 2006) (affirming lower court's denial of tenant's

motion to dismiss, entry of summary judgment awarding landlord possession, and issuance of warrant of eviction in holdover summary proceeding).

Artisanal's motion to dismiss is based exclusively on its assertion that Two Park failed to properly serve the Petition in accordance with RPAPL § 735 (which, for the reasons discussed above, is wholly without merit). Like the motion to dismiss in Jewish Child Care Ass'n, Artisanal's motion "raise[s] no triable issues of fact" relevant to Two Park's right to possession. Indeed, the only facts relevant to the issue of possession are: (i) the expiration of the Lease on September 30, 2015, (ii) the lack of any agreed upon renewal or extension of the Lease, and (iii) Artisanal's failure to vacate the Premises upon the Expiration Date. Each of those facts is undisputed. Accordingly, the Court should decline to grant Artisanal the opportunity to answer under CPLR § 404(a), enter summary judgment of possession in Two Park's favor pursuant to CPLR 409(b), and issue a warrant of eviction pursuant to RPAPL § 749. See E.F.L. Baking Corp. v Lowy Family Irrevocable Trust, 2008 N.Y. Misc. LEXIS 9485, *6, 2008 NY Slip Op 32494(U), 5 (N.Y. Sup. Ct. Sept. 2, 2008) (stating that after awarding a judgment of possession, the court "shall issue a warrant directing law enforcement to remove all persons from the premises").[9]

**B.      The Court Should Enter Summary Judgment Awarding Two Park Use And Occupancy**

RPAPL 745 (2)(a) states, in relevant part:

In a summary proceeding . . . upon the thirtieth day after the first appearance of the parties in court less any days that the proceeding

_____

[9]  Any attempt by Artisanal to dispute the facts surrounding Mr. Drory's escalating abusive and threatening behavior would not render summary judgment inappropriate. While Mr. Drory's conduct makes removing Artisanal from the Premises all the more critical, Two Park is by no means required to prove such conduct in order to demonstrate its entitlement to possession. See, e.g. In re Dodge's Trust, 25 N.Y.2d 273, 286-87, 250 N.E.2d 849 (1969) (holding that even if "the answer would refute the factual background set forth by the petitioner, . . . [such factual background] ha[s] no bearing on the simple legal issue involved," and thus "no useful purpose can be served by any answer interposed").

has been adjourned upon the request of the petitioner, whichever occurs sooner, ***the court shall direct that the respondent***, upon an application by the petitioner, ***deposit with the court within five days sums of rent or use and occupancy accrued from the date the petition and notice of petition are served upon the respondent, and all sums as they become due for rent and use and occupancy***, which may be established without the use of expert testimony . . .[10]

(emphasis added).

"It is well settled that a holdover tenant retaining possession is liable for use and occupancy of the premises for the period during which the tenant is in possession." Beacway Operating Corp. v. Concert Arts Soc'y., Inc., 123 Misc.2d 452, 453, 474 N.Y.S.2d 227 (Civ. Ct., NY Cty. 1984); Union Theological Seminary v. Harris, 1 Misc.3d 909(A), *2 (Civ. Ct. NY Cty. 2003). "When a valid lease has terminated and the tenant adversely occupies the premises, the tenant must remit payment for the "use and occupancy" of the space . . . [s]uch payment is not "rent," but a means to prevent unjust enrichment to the occupant for its holding over . . . ." Saba Realty Partners LLC v. International Gold Star Inc., 29 Misc.3d 850, 853, 906 N.Y.S.2d 732, 735 (Civ. Ct., Kings Cty. 2010) (citing Lake Park 135 Crossways Park Drive, LLC v. Wheatley Capital Inc., 28 Misc.3d 1215(A) (Dist. Ct. Nassau Cty. 2010)).

Contracting parties, when entering into a lease arrangement, may agree to liquidated damages clauses for use and occupancy provided that they are neither unconscionable nor contrary to public policy. LeRoy v. Sayers, 217 A.D.2d 63, 635 N.Y.S.2d 217 (1st Dep't 1995). Such clauses will be enforced if the sum stated is reasonably proportionate to the anticipated loss. Chatham Green Mgmt. Corp. v. AAFE Mgmt. Co., 2003 WL 22299083, *4 (Civ. Ct., NY Cty. 2003). In Thirty-Third Equities Co. LLC v. Americo Grp., Inc., 294 A.D.2d 222, 222, 743

---

[10]  The statute further states that an award of use and occupancy may not be made if a respondent has properly interposed certain defenses. One of those defenses, and the only one interposed by Artisanal, is a defense that the Court lacks jurisdiction over Artisanal as a result of the purported defects in service. As demonstrated above, however, this defense has no merit.

N.Y.S.2d 10 (1st Dep't 2002), the First Department held that a contractual use and occupancy amount set at two and one-half times the base rent after the expiration of a five-year lease was reasonable. Indeed, courts have found that liquidated damages as high as *three times* the stated rent are enforceable. Federal Realty Ltd. Partnership v. Choices Women's Medical Center, Inc., 289 A.D.2d 439, 440, 735 N.Y.S.2d 159 (2d Dep't 2001); Teri-Nichols Inst. Food Merchants, LLC v. Elk Horn Holding Corp., 64 A.D.3d 424, 425, 883 N.Y.S.2d 31(1st Dep't 2009).

Here, the parties agreed to a liquidated damages amount for use and occupancy of the Premises that Artisanal is required to pay to Two Park in the event Artisanal unlawfully holds over in the Premises. Specifically, Article 20 provides that Artisanal shall pay Two Park

> on account of use and occupancy of the Premises for each month and/or for each portion of any month during which Respondent holds over in the Premises after the expiration of the Lease, a sum equal to the greater of (i) two (2) times the aggregate of that portion of the Fixed Rent, Escalation Rent and Rental which was payable under the Lease during the last month of the Term, and (ii) two (2) times the then fair market rental value for the Premises.

Blake Aff., Ex. A at 53-54.

As an initial matter, Two Park's motion for use and occupancy is indisputably timely, as the parties first appeared in court on January 22, 2016. See Grippo Aff. ¶ 11. Accordingly, the requisite 30 days have elapsed in order to bring this cross-motion. See RPAPL § 745(2)(a). As set forth in the Blake Affidavit, the value of two times the Last Term Rent totaled approximately $149,156.44. See Blake Aff. ¶¶ 16-17.

Based on the foregoing, and in accordance with RPAPL 745 (2)(a) and Article 20 of the Lease, Artisanal is liable to Two Park for use and occupancy in the amount of $149,156.44 per month beginning on October 1, 2015.[11]

---

[11] Artisanal is also liable to Two Park for additional amounts under the terms of the Lease, including, but not limited to, amounts incurred by Two Park in connection with repairing damage to the Building caused by alterations

**CONCLUSION**

By virtue of the foregoing, Two Park respectfully requests that the Court: (i) deny Artisanal's motion to dismiss, (ii) enter an order of summary judgment awarding Two Park possession pursuant to CPLR §409(b); (iii) issue a warrant of eviction pursuant to RPAPL §749; (iv) award Two Park use and occupancy calculated in accordance with RPAPL §745(2)(a) and Article 20 of the Lease; and (v) award such other relief as the Court deems just and proper.

Dated: New York, New York
April 4, 2016

Respectfully submitted,

**ROPES & GRAY LLP**

By: _Gregg L. Weiner / LMC_
Gregg L. Weiner
1211 Avenue of the Americas
New York, NY 10036-8704
(212) 596-9000

**GOULSTON & STORRS PC**

By: _Jonathan A. Grippo / LMC_
Jonathan A. Grippo
885 Third Avenue, 18th Floor
New York, New York 10022
(212) 878-6900

*Attorneys for Petitioner PPF OFF Two Park Avenue Owner, LLC*

---

made by Artisanal and/or by Artisanal's carelessness, omission, or neglect, see Blake Aff., Ex. A § 4.1, as well as reasonable attorneys' fees and disbursements incurred by Two Park in connection with Two Park's default under the Lease, see Blake Aff, Ex. A. § 18.1. Two Park reserves all rights to seek an award of such amounts at the appropriate time.

# **Exhibit F**



CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

---

PPF OFF TWO PARK AVENUE OWNER, LLC,     L&T No. 50707/16

                 Petitioner-Landlord,
    against                                          DECISION & ORDER

ARTISANAL FROMAGERIE & BISTRO, LLC,

2 Park Ave.,
New York, NY 10016
                 Respondent-Tenant.

---

Anthony Cannataro, J.:

In this holdover proceeding, respondent moves to dismiss for failure to establish personal jurisdiction. Petitioner cross-moves for summary judgment seeking a judgment of possession as well as a money judgment for use and occupancy.

Factual Background

On September 8, 2000, respondent entered into a lease for the premises with petitioner's predecessor-in-interest. The lease expired on September 30, 2015, and was not renewed.

Section 1.1 of the lease establishes the base rent for the period from September 30, 2010 to September 30, 2015 at $36,000 per month. Section 27.5 of the lease provides for an additional rent that is 6% of all of respondent's annual gross sales after the first $5,000,000. There is also an escalation rent that accounts for rising taxes.



Section 37.9 of the lease states that the tenant submits to jurisdiction in any New York court for a proceeding brought by the landlord on a matter arising from the lease, and waives personal service of the summons and complaint. The tenant consents to service by mail to the address of the premises.

Article 20 of the lease contains the following provisions:

"Tenant expressly waives. . . any right which Tenant or any such person may have under the provisions of Section 2201 of the New York Civil Practice Law and Rules. . . in connection with any holdover summary proceedings which Landlord may institute to enforce the foregoing provisions. . . . The parties recognize and agree that the damage to Landlord. . . will exceed the amount of the monthly installments. . . and will be impossible to accurately measure. . . . Tenant shall pay to Landlord on account of use and occupancy. . . a sum equal to the greater of (i) two (2) times the aggregate of that portion of the Fixed Rent, Escalation Rent and Rental which was payable under this lease during the last month of the Term, and (ii) two (2) times the then fair market rental value for the Premises. . . . [N]o acceptance by Landlord of payments from Tenant after the Expiration Date shall be deemed to be other than on account of the amount to be paid by Tenant in accordance with the provisions of this Article 20."

Service upon respondent was first attempted on January 11, 2016. Mr. Pariente, the manager of respondent, refused to accept process. On January 12, 2016, service was attempted again, and a copy of the summons and complaint were mailed to respondent at the premises.

Arguments

Respondent moves to dismiss by alleging failure to serve properly on January 11 and January 12. There is a great deal of disagreement regarding what exactly happened on those two days, which prompts respondent to suggest that, at a minimum,

2



a traverse hearing is needed. Petitioner disagrees pointing out, among other assertions, that respondent consented to service by mail in Sections 37.9 of the lease.

Petitioner cross-moves for summary judgment seeking possession and use and occupancy, attaching the lease and pointing out that it has expired and has not been renewed. Petitioner seeks use and occupancy at $149,156.44 per month, twice the total rent for the last month of the term, or $74,578.22.

Respondent argues that it has the right to first file an answer to the petition, pursuant to CPLR § 3211 and CPLR § 404(a). Respondent further argues that because it has been billed by petitioner and paid the bill, a month-to-month tenancy has been established. Finally, respondent asserts that petitioner cannot prove that the lease it has attached is the actual lease that respondent signed with petitioner's predecessor-in-interest. Regarding petitioner's request for use and occupancy, respondent contends that it only paid $36,000 in rent for the final month of the term, and that such a high calculation of use and occupancy is unreasonable and disproportionate to the damages incurred by petitioner.

Petitioner asserts that there is no absolute right to file an answer following denial of a motion to dismiss. The court may permit an answer to be interposed, but the law does not require it. Petitioner points to CPLR § 409(b) regarding summary proceeding determinations. Further, petitioner points out that under Article 20 of the lease any billing and payments between the landlord and the tenant following the conclusion of the term are deemed to be use and occupancy, not rent. On the doubling of rent as a measure of use and occupancy, petitioner argues that courts routinely uphold liquidated damages provisions in leases.

Respondent requests a stay on the warrant of eviction pursuant to CPLR § 2201, needing more time to relocate. Petitioner points out in response that respondent

3



waived that right in Article 20 of the lease, and further argues that a stay would substantially harm petitioner by delaying the entrance of a new tenant.

## Discussion

### I. Respondent's Motion to Dismiss

There is a great deal of dispute as to what exactly happened on January 11 and 12, 2016. However, both parties agree that the process server attempted to serve Mr. Pariente on his first visit and that Mr. Pariente refused to accept service. The parties further agree that some form of second attempt at service was made the following day. Both sides agree that a copy of the papers was mailed on January 12, 2016.

As petitioner points out, paragraph 37.9 of the lease states that the tenant waives personal service and consents to service by mail, which is permissible under law (see, Alfred E. Mann Living Trust v ETIRC Aviation S.a.r.l., 17 A.D.3d 137, 140 [1st Dept 2010]). As it is conceded that service by mail was made on January 12, 2016, petitioner has established personal jurisdiction over respondent by serving in the manner prescribed by the lease.

### II. Petitioner's Cross Motion for Summary Judgment

"The proponent of a summary judgment motion must make a *prima facie* showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact" (*Alvarez v. Prospect Hosp.*, 68 N.Y.2d 320, 324 [1986]). The opposition to a motion for summary judgment must "assemble and lay bare her affirmative proof to demonstrate the existence of genuine, triable issues" (*Corcoran Group, Inc. v Morris*, 107 A.D.2d 622, 624 [1st Dept 1985] affd, 64

4



N.Y.2d 1034 [1985]). "[M]ere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient" (*Zuckerman v. City of New York*, 49 N.Y.2d 557, 562 [1980]), and "a shadowy semblance of an issue" will not defeat the motion (*see Gordian v Consol. Edison Co. of New York, Inc.*, 60 A.D.3d 600, 601 [1st Dept 2009]). Petitioner has averred and shown in evidence that the lease expired on September 30, 2015, and was not renewed, and that it is therefore entitled by law to possession and use and occupancy. Respondent has raised a host of arguments in opposition to petitioner's cross motion, which this Court will address in seriatim.

First, respondent argues that it has the right to file an answer to a petition before summary judgment is decided, pursuant to CPLR § 3211 and CPLR § 404(a). However, § 404(a) says that a respondent may respond in an answer or a motion to dismiss, and that if a motion to dismiss is denied, "the court may permit the respondent to answer." CPLR § 3211 goes into more depth about motions to dismiss. This Court has Respondent's objections in point of law in its motion and reply papers, and is disinclined to delay proceedings further by permitting service of additional, redundant papers (*see In re Dodge's Trust*, 25 N.Y.2d 273, 286-87 [1969]; *In re Application of Cunningham*, 75 A.D.2d 521, 522 [1st Dept 1980]).

Second, respondent argues that a month-to-month tenancy has been created because petitioner billed respondent and respondent paid the bill. This might raise a triable issue but for the fact that the lease accounts for such an event. Article 20 of the lease provides that any acceptance by the landlord of payment after the expiration of the lease is use and occupancy, not rent. The lease therefore precludes a month-to-month tenancy from being established in the manner proposed by respondent (*See* RPL § 232-c [Acceptance of rent after the expiration of a term creates a month-to-month tenancy unless an agreement provides otherwise]).

5



Third, as a last resort argument, respondent states that petitioner cannot prove that the lease it has attached is the actual lease that respondent signed with petitioner's predecessor-in-interest. However, respondent has not provided any affirmative proof to substantiate this argument especially, as one might expect to see, in the form of an alternative lease for the premises. This assertion barely meets the criteria for "unsubstantiated allegations or assertions" which the Court of Appeals long ago held cannot be successfully used to defeat a *prima facie* showing of entitlement to summary judgment (*Zuckerman*, 49 N.Y.2d at 562 [1980]). This argument only warrants discussion insofar as it exemplifies that sort of semantic gamesmanship that will rarely, if ever, suffice to defeat summary judgement.


III. Use and Occupancy

Article 20 of the lease sets use and occupancy for a holdover at the greater of either two times the last month's rent, or two times the fair market value. Petitioner alleges that the total rent for the last month of the term was $74,578.22, and it is therefore entitled to use and occupancy at $149,156.44 per month.

Both sides have argued the reasonableness of this figure and provided case law to support their respective positions, but most persuasive is the binding Court of Appeals case that both parties cited. "A liquidated damage provision has its basis in the principle of just compensation for loss. A clause which provides for an amount plainly disproportionate to real damage is not intended to provide fair compensation but to secure performance by the compulsion of the very disproportion" (*Truck Rent-A-Center, Inc. v Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 [1977] [internal citation omitted]). The Court of Appeals stated that a liquidated damages provision could not be upheld if it were found to be disproportionate to the damage incurred by the non-breaching party.

6



Following this guideline, this Court need only look at the language in the lease which provides for such a calculation to determine whether it meets the standard of "fair compensation".

The lease mandates that the tenant pay the greater of either two times the last month's rent or two times the fair market value. The amount requested is two times the alleged total rent for the last month, which this Court infers from the language of the lease to be equal to or greater than twice the fair market value. Respondent argues that fair market value would be a reasonable estimation of the actual damages suffered by petitioner for not being able to lease the premises to a new tenant. At a glance, this provision calls for an amount that is "plainly disproportionate" to that value, and one that the Court of Appeals instructs is designed to "secure performance by the compulsion of the very disproportion" (*Id.*).

While this Court acknowledges that petitioner has cited to cases where other courts have upheld exorbitant liquidated damages provisions, it is unprepared to enforce a provision here that is of a type that the Court of Appeals has so unequivocally disapproved – at least absent a hearing to determine the fair value for use and occupancy (*see, e.g., Truck Rent-A-Center, Inc.*, 41 N.Y.2d at 424; *Equitable Lumber Corp. v IPA Land Development Corp.*, 38 N.Y.2d 516, 521 [1976] [A liquidated damages provision is valid if it is proportional to either the damages anticipated by the parties in the event of a breach, or the actual damages incurred by the non-defaulting party as a result of the breach]).

## IV. A Stay on the Warrant of Eviction

Respondent requests a stay on the warrant of eviction pursuant to CPLR § 2201. The arguments on this issue are replete with *ad hominem* attacks from both sides, but in substance boil down to respondent's claim of not having enough time to relocate



and petitioner's claim that it needs to free up the space for the next tenant. Petitioner further argues that respondent has waived its right to seek a stay under article 20 of the lease, and is therefore precluded from requesting a stay. Given the determination the other issues above, there is no need for a stay any longer. Accordingly, it is

> ORDERED that Respondent's motion to dismiss is denied; and it is further

> ORDERED that Petitioner's cross motion for summary judgment is granted; and it is further

> ORDERED that the warrant of eviction shall issue forthwith; and it is further

> ORDERED that the parties shall appear in Part 52 on _10/3/16_ , 2016 for a hearing to determine a fair value of past use and occupancy to be paid by respondent.

> This constitutes the decision and order of this court.

Dated: 8/10/16

ENTER:

Anthony Cannataro, JCC

8

# **Exhibit G**



# Belkin Burden Wenig & Goldman, LLP

A T T O R N E Y S   A T   L A W

270 Madison Avenue
New York, NY 10016
Tel 212. 867. 4466
Fax 212. 297. 1859

495 Post Road East
Westport, CT 06880
Tel 203. 227. 1534
Fax 203. 227. 6044

www.bbwg.com

Jeffrey L. Goldman
*Partner*
212. 867. 4466 Ext 312
jgoldman@bbwg.com

August 15, 2016

**BY HAND**

John Z. Wang, Esq.
Court Attorney to Hon. Anthony Cannataro
Supervising Judge, Civil Court
111 Centre Street, Room 838
New York, New York 10013

> Re: PPF Off Two Park Avenue Owner LLC
> v. Artisanal Fromagerie & Bistro LLC
> Index No. L&T 50707/2016
> **ALL PROCEEDINGS STAYED**

Dear Mr. Wang:

    As you are aware, my firm represents Respondent in the above-referenced proceeding. I enclose the Notice of Bankruptcy Case Filing with the United States Bankruptcy Court, Southern District of New York, filed August 12, 2016 at 3:41 PM. By virtue of this filing, all actions in the above-referenced proceeding are stayed pending further order of the Bankruptcy Court.

    Respectfully submitted,

*Jeffrey L. Goldman*

Jeffrey L. Goldman

Enclosure

cc:  **BY HAND (w/enclosure)**

    Gregg L. Weiner, Esq.
    Ropes & Gray LLP
    1211 Avenue of the Americas
    New York, New York 10036
    Attorneys for Petitioner

United States Bankruptcy Court
Southern District of New York

## Notice of Bankruptcy Case Filing



A bankruptcy case concerning the debtor(s) listed
below was filed under Chapter 11 of the United
States Bankruptcy Code, entered on 08/12/2016 at
3:41 PM and filed on 08/12/2016.

**ARTISANAL FROMAGERIE & BISTRO LLC**
2 PARK AVENUE
New York, NY 10016
Tax ID / EIN: 13-4134358

The case was filed by the debtor's attorney:

**Arnold Mitchell Greene**
Robinson Brog Leinwand Greene
Genovese & Gluck, P.C.
875 Third Avenue
9th Floor
New York, NY 10022
(212) 603-6300

The case was assigned case number 16-12337-jlg to Judge James L. Garrity.

In most instances, the filing of the bankruptcy case automatically stays certain collection and other
actions against the debtor and the debtor's property. Under certain circumstances, the stay may be
limited to 30 days or not exist at all, although the debtor can request the court to extend or impose a stay.
If you attempt to collect a debt or take other action in violation of the Bankruptcy Code, you may be
penalized. Consult a lawyer to determine your rights in this case.

If you would like to view the bankruptcy petition and other documents filed by the debtor, they are
available at our *Internet* home page http://ecf.nysb.uscourts.gov or at the Clerk's Office, One Bowling
Green, New York, NY 10004-1408.

You may be a creditor of the debtor. If so, you will receive an additional notice from the court setting
forth important deadlines.

**Vito Genna**
**Clerk, U.S. Bankruptcy**
**Court**

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/12/2016 15:57:26 | | | |
| **PACER Login:** | rb2609:3018045:0 | **Client Code:** | 099994-0000 |
| **Description:** | Notice of Filing | **Search Criteria:** | 16-12337-jlg |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

Fill in this information to identify your case:

United States Bankruptcy Court for the:

SOUTHERN DISTRICT OF NEW YORK

Case number *(if known)* _____ Chapter **11**

☐ Check if this an
amended filing

## Official Form 201
# Voluntary Petition for Non-Individuals Filing for Bankruptcy       4/16

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).
For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | | |
|---|---|---|---|
| 1. | Debtor's name | **ARTISANAL FROMAGERIE & BISTRO LLC** | |

| | | |
|---|---|---|
| 2. | All other names debtor used in the last 8 years | |
| | Include any assumed names, trade names and *doing business as* names | |

| | | |
|---|---|---|
| 3. | Debtor's federal Employer Identification Number (EIN) | **13-4134358** |

4. **Debtor's address**

**Principal place of business**

**2 PARK AVENUE**
**New York, NY 10016**
Number, Street, City, State & ZIP Code

**New York**
County

**Mailing address, if different from principal place of business**

P.O. Box, Number, Street, City, State & ZIP Code

**Location of principal assets, if different from principal place of business**

Number, Street, City, State & ZIP Code

5. **Debtor's website (URL)**

6. **Type of debtor**

■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

7. **Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor.
See http://www.uscourts.gov/four-digit-national-association-naics-codes.

     7225

8. **Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check all that apply:*

  ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,566,050 (amount subject to adjustment on 4/01/19 and every 3 years after that).

  ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

  ☐ A plan is being filed with this petition:

  ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

  ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

  ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

9. **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

■ No.

☐ Yes.

| District | _____ | When | _____ | Case number | _____ |
| District | _____ | When | _____ | Case number | _____ |

10. **Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list

■ No

☐ Yes.

| Debtor | _____ | | | Relationship | _____ |
| District | _____ | When | _____ | Case number, if known | _____ |

| 11. | Why is the case filed in this district? | Check all that apply: |
|---|---|---|

■ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

---

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

■ No

☐ Yes.   Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (Check all that apply.)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.
What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____
Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No

☐ Yes.   Insurance agency _____
         Contact name _____
         Phone _____

---

### Statistical and administrative information

**13. Debtor's estimation of available funds**

Check one:

■ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

---

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ■ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

---

**15. Estimated Assets**

| | | |
|---|---|---|
| ■ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

---

**16. Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ■ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

Request for Relief, Declaration, and Signatures

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is trued and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   **August 12, 2016**
              MM / DD / YYYY

X /s/ SARID DRORY                                    SARID DRORY
Signature of authorized representative of debtor     Printed name

Title   **MANAGING MEMBER**

**18. Signature of attorney**

X /s/ A. MITCHELL GREENE                             Date **August 12, 2016**
Signature of attorney for debtor                          MM / DD / YYYY

**A. MITCHELL GREENE**
Printed name

**ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.**
Firm name

**875 THIRD AVENUE**
**New York, NY 10022**
Number, Street, City, State & ZIP Code

Contact phone   **(212) 603-6300**        Email address

Bar number and State

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

In re:                                                    Chapter 11

**ARTISANAL FROMAGERIE**
**& BISTRO LLC,**                                         Case No.

                        Debtor.

------------------------------------------------------X

## CERTIFICATION OF RESOLUTION

I, the undersigned, Sarid Drory, as Managing Member of Artisanal Fromagerie & Bistro

LLC (the "Company"), do hereby certify that at a meeting of the Company duly called and held

on **August 12, 2016**, the following resolutions were adopted and recorded in the Minute Book of

the Company, and they have not been modified or rescinded, and are still in full force and effect:

> **"RESOLVED,** that in the judgment of the Company it is
> desirable and in the best interest of the Company, its creditors,
> partners and other interested parties, that a petition be filed by the
> Company for relief under Chapter 11 of title 11 of the United
> States Code (the "Bankruptcy Code"); and it is further

> **"RESOLVED,** that the form of petition under Chapter 11
> presented to this meeting is approved and adopted in all respects,
> and that Sarid Drory, as Managing Member of the Company, is
> authorized to execute and verify a petition substantially in such
> form and to cause the same to be filed with the United States
> Bankruptcy Court for the Southern District of New York at such
> time as he shall determine; and it is further

> **"RESOLVED,** that Sarid Drory, as Managing Member of
> the Company, is authorized to execute and file all petitions,
> reorganization schedules, lists and other papers and to take any and
> all other actions which he may deem necessary or proper in
> connection with such Chapter 11 case, and, in that connection, that
> the firm of Robinson Brog Leinwand Greene Genovese & Gluck
> P.C. be retained and employed as legal counsel for the Company
> under a general retainer, in addition to such special counsel as may
> hereafter become necessary or proper with a view to the successful
> conclusion of such Chapter 11 case."

{00807227.DOC;1 }652181

**IN WITNESS WHEREOF,** I have hereunto set my hand and seal of the Company this 12th day of **August, 2016**.

By:_____
**Sarid Drory**
**Managing Member**

# United States Bankruptcy Court
## Southern District of New York

In re   ARTISANAL FROMAGERIE & BISTRO LLC

Debtor(s)

Case No. _____

Chapter   11

## VERIFICATION OF CREDITOR MATRIX

I, the MANAGING MEMBER of the corporation named as the debtor in this case, hereby verify that the attached list of creditors is true and correct to the best of my knowledge.

Date:   **August 12, 2016**

**/s/ SARID DRORY**
**SARID DRORY/MANAGING MEMBER**
Signer/Title

AVAYA
PO BOX 93000
CHICAGO, IL 60673

CON EDISON STEAM
FDR STATION
PO BOX 1701
NEW YORK, NY 10116

CORP. COUNSEL FOR NYC
100 CHURCH STREET
NEW YORK, NY 10007

FOSTER & WOLKIND PC
80 FIFTH AVENUE
SUITE 1401
NEW YORK, NY 10011

HERRICK FEINSTEIN LLP
2 PARK AVENUE
NEW YORK, NY 10016

HRI CONSULTING
378 WILLIS AVENUE
MINEOLA, NY 11501

INTERNAL REVENUE SERVICE
PO BOX 7346
PHILADELPHIA, PA 19114

JOHN S. MARKET
25-20 50TH AVENUE
1ST FL.
LONG ISLAND CITY, NY 11101

KNOT
11106 MOCKINGBIRD DRIVE
OMAHA, NE 68137

MEAT & FISH
PO BOX 36383
CHARLOTTE, NC 28236

METROPOLITAN ELEVATOR
C/O DE BRAGGA AND SPITLER INC.
65-77 AMITY STREET
JERSEY CITY, NJ 07304


MICROS
1200 HARBOR BOULEVARD
10TH FL.
UNION CITY, NJ 07087


MONEYWORKS
120 WEST 45TH STREET
SUITE 1000B
NEW YORK, NY 10036


NEW YORK STATE DEPT. OF FIN.
ATTN: BANKRUPTCY SPECIAL PROC
PO BOX 5300
ALBANY, NY 12205


NYC DEPT. OF FINANCE
345 ADAMS STREET, 3RD FL.
ATTN: LEGAL AFFAIRS
BROOKLYN, NY 11201


OFFICE OF THE ATTORNEY GENERAL
THE CAPITOL
ALBANY, NY 12224


OGLETREE DEAKINS
1745 BROADWAY
22ND FL.
NEW YORK, NY 10019


PAY O MATIC
LOSS PREVENTION DEPT.
166-30 JAMAICA AVE., 2ND FL.
JAMAICA, NY 11432


PLS
800 JORIE BOULEVARD
OAK BROOK, IL 60523


PPF OFF TWO PARK AVENUE OWNER
2 PARK AVENUE
NEW YORK, NY 10016

STEPHANIE SCHULMAN
240 PARK AVENUE SOUTH
2D
NEW YORK, NY 10003


US ATTY OFFICE -SDNY
86 CHAMBERS STREET
ATTN: TAX AND BANKRUPTCY
NEW YORK, NY 10007


US FOOD
PO BOX 641871
PITTSBURGH, PA 15264


YELLOWSTONE CAPITAL LLC
160 PEARL STREET
5TH FL.
NEW YORK, NY 10005

# Exhibit H



ROPES & GRAY LLP
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704
WWW.ROPESGRAY.COM

August 16, 2016

Gregg L. Weiner
T +1 212 596 9396
F +1 646 728 2759
gregg.weiner@ropesgray.com

**BY HAND**

John Wang, Esq.
Law Clerk for The Honorable Anthony Cannataro
Civil Court of the City of New York,
County of New York: Non-Housing Part 52
111 Centre Street
New York, NY 10013-4390

Re:  PPF OFF Two Park Avenue Owner, LLC v. Artisanal Fromagerie & Bistro, LLC, L&T
Index No: 50707/2016

Dear Mr. Wang:

We represent Petitioner in the above-referenced action, and I write in response to Respondent's
letter to the court yesterday regarding Respondent's filing of a voluntary petition for bankruptcy on
August 12, 2016 (the "Petition").  Respondent's assertion that the filing of the Petition stayed all
proceedings in this case is incorrect.

Section 362(b)(10) of the Bankruptcy Code clearly provides that the filing of a voluntary petition
for bankruptcy:

> ***does not operate as a stay . . . of any act by a lessor to the debtor
> under a lease of nonresidential real property that has terminated
> by the expiration of the stated term** of the lease before the
> commencement of or during a case under this title **to obtain
> possession of such property.***"

11 U.S.C. § 362(b)(1) (attached hereto as Exhibit A) (emphasis added).

As this Court recently found, and as is unambiguous under the Lease, the Lease expired by its terms
on September 30, 2015.  Decision & Order, dated Aug. 10, 2016 at 1.  Thus, there is no stay that

bars Petitioner from taking steps to obtain possession of its property.  Accordingly, the Court may proceed to issue a warrant of eviction.[1]

Petitioner respectfully requests an immediate conference to address any dispute regarding Respondent's erroneous claim as to the applicability of the stay.  Given the extended period in which Artisanal has held over and occupied the premises without paying use and occupancy, and in light of the additional harm Petitioner will suffer from any further delay in obtaining possession of the premises, we appreciate the Court addressing this issue promptly.


Respectfully submitted,

Gregg L. Weiner


cc:     Jeffrey L. Goldman

---

[1] Petitioner agrees that further proceedings regarding the amount of use and occupancy owed by Respondent are currently stayed as a result of the filing of the Petition.

EXHIBIT A

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or Preempted    Prior Version's Limitation Recognized by    In re Medical Care Management Co.,    Bkrtcy.M.D.Tenn.,    Jan. 02, 2003

KeyCite Yellow Flag - Negative Treatment    Proposed Legislation

> United States Code Annotated
>   Title 11. Bankruptcy (Refs & Annos)
>     Chapter 3. Case Administration (Refs & Annos)
>       Subchapter IV. Administrative Powers

11 U.S.C.A. § 362

§ 362. Automatic stay

Effective: December 22, 2010

Currentness

**(a)** Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--

**(1)** the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

**(2)** the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

**(3)** any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

**(4)** any act to create, perfect, or enforce any lien against property of the estate;

**(5)** any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

**(6)** any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

**(7)** the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

**(8)** the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

**(b)** The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay--

**(1)** under subsection (a) of this section, of the commencement or continuation of a criminal action or proceeding against the debtor;

**(2)** under subsection (a)--

**(A)** of the commencement or continuation of a civil action or proceeding--

**(i)** for the establishment of paternity;

**(ii)** for the establishment or modification of an order for domestic support obligations;

**(iii)** concerning child custody or visitation;

**(iv)** for the dissolution of a marriage, except to the extent that such proceeding seeks to determine the division of property that is property of the estate; or

**(v)** regarding domestic violence;

**(B)** of the collection of a domestic support obligation from property that is not property of the estate;

**(C)** with respect to the withholding of income that is property of the estate or property of the debtor for payment of a domestic support obligation under a judicial or administrative order or a statute;

**(D)** of the withholding, suspension, or restriction of a driver's license, a professional or occupational license, or a recreational license, under State law, as specified in section 466(a)(16) of the Social Security Act;

**(E)** of the reporting of overdue support owed by a parent to any consumer reporting agency as specified in section 466(a)(7) of the Social Security Act;

**(F)** of the interception of a tax refund, as specified in sections 464 and 466(a)(3) of the Social Security Act or under an analogous State law; or

**(G)** of the enforcement of a medical obligation, as specified under title IV of the Social Security Act;

**(3)** under subsection (a) of this section, of any act to perfect, or to maintain or continue the perfection of, an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b) of this title or to the extent that such act is accomplished within the period provided under section 547(e)(2)(A) of this title;

**(4)** under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit or any organization exercising authority under the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, opened for signature on January 13, 1993, to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power;

**[(5) Repealed.** Pub.L. 105-277, Div. I, Title VI, § 603(1), Oct. 21, 1998, 112 Stat. 2681-886]

**(6)** under subsection (a) of this section, of the exercise by a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency of any contractual right (as defined in section 555 or 556) under any security agreement or arrangement or other credit enhancement forming a part of or related to any commodity contract, forward contract or securities contract, or of any contractual right (as defined in section 555 or 556) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such contracts, including any master agreement for such contracts;

**(7)** under subsection (a) of this section, of the exercise by a repo participant or financial participant of any contractual right (as defined in section 559) under any security agreement or arrangement or other credit enhancement forming a part of or related to any repurchase agreement, or of any contractual right (as defined in section 559) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements;

**(8)** under subsection (a) of this section, of the commencement of any action by the Secretary of Housing and Urban Development to foreclose a mortgage or deed of trust in any case in which the mortgage or deed of trust held by the Secretary is insured or was formerly insured under the National Housing Act and covers property, or combinations of property, consisting of five or more living units;

**(9)** under subsection (a), of--

**(A)** an audit by a governmental unit to determine tax liability;

**(B)** the issuance to the debtor by a governmental unit of a notice of tax deficiency;

**(C)** a demand for tax returns; or

**(D)** the making of an assessment for any tax and issuance of a notice and demand for payment of such an assessment (but any tax lien that would otherwise attach to property of the estate by reason of such an assessment shall not take effect unless such tax is a debt of the debtor that will not be discharged in the case and such property or its proceeds are transferred out of the estate to, or otherwise revested in, the debtor).

**(10)** under subsection (a) of this section, of any act by a lessor to the debtor under a lease of nonresidential real property that has terminated by the expiration of the stated term of the lease before the commencement of or during a case under this title to obtain possession of such property;

**(11)** under subsection (a) of this section, of the presentment of a negotiable instrument and the giving of notice of and protesting dishonor of such an instrument;

**(12)** under subsection (a) of this section, after the date which is 90 days after the filing of such petition, of the commencement or continuation, and conclusion to the entry of final judgment, of an action which involves a debtor subject to reorganization pursuant to chapter 11 of this title and which was brought by the Secretary of Transportation under section 31325 of title 46 (including distribution of any proceeds of sale) to foreclose a preferred ship or fleet mortgage, or a security interest in or relating to a vessel or vessel under construction, held by the Secretary of Transportation under chapter 537 of title 46 or section 109(h) of title 49, or under applicable State law;

**(13)** under subsection (a) of this section, after the date which is 90 days after the filing of such petition, of the commencement or continuation, and conclusion to the entry of final judgment, of an action which involves a debtor subject to reorganization pursuant to chapter 11 of this title and which was brought by the Secretary of Commerce under section 31325 of title 46 (including distribution of any proceeds of sale) to foreclose a preferred ship or fleet mortgage in a vessel or a mortgage, deed of trust, or other security interest in a fishing facility held by the Secretary of Commerce under chapter 537 of title 46;

**(14)** under subsection (a) of this section, of any action by an accrediting agency regarding the accreditation status of the debtor as an educational institution;

**(15)** under subsection (a) of this section, of any action by a State licensing body regarding the licensure of the debtor as an educational institution;

**(16)** under subsection (a) of this section, of any action by a guaranty agency, as defined in section 435(j) of the Higher Education Act of 1965 or the Secretary of Education regarding the eligibility of the debtor to participate in programs authorized under such Act;

**(17)** under subsection (a) of this section, of the exercise by a swap participant or financial participant of any contractual right (as defined in section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement, or of any contractual right (as defined in section 560) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements;

**(18)** under subsection (a) of the creation or perfection of a statutory lien for an ad valorem property tax, or a special tax or special assessment on real property whether or not ad valorem, imposed by a governmental unit, if such tax or assessment comes due after the date of the filing of the petition;

**(19)** under subsection (a), of withholding of income from a debtor's wages and collection of amounts withheld, under the debtor's agreement authorizing that withholding and collection for the benefit of a pension, profit-sharing, stock bonus, or other plan established under section 401, 403, 408, 408A, 414, 457, or 501(c) of the Internal Revenue Code of 1986, that is sponsored by the employer of the debtor, or an affiliate, successor, or predecessor of such employer--

**(A)** to the extent that the amounts withheld and collected are used solely for payments relating to a loan from a plan under section 408(b)(1) of the Employee Retirement Income Security Act of 1974 or is subject to section 72(p) of the Internal Revenue Code of 1986; or

**(B)** a loan from a thrift savings plan permitted under subchapter III of chapter 84 of title 5, that satisfies the requirements of section 8433(g) of such title;

but nothing in this paragraph may be construed to provide that any loan made under a governmental plan under section 414(d), or a contract or account under section 403(b), of the Internal Revenue Code of 1986 constitutes a claim or a debt under this title;

**(20)** under subsection (a), of any act to enforce any lien against or security interest in real property following entry of the order under subsection (d)(4) as to such real property in any prior case under this title, for a period of 2 years after the date of the entry of such an order, except that the debtor, in a subsequent case under this title, may move for relief from such order based upon changed circumstances or for other good cause shown, after notice and a hearing;

**(21)** under subsection (a), of any act to enforce any lien against or security interest in real property--

**(A)** if the debtor is ineligible under section 109(g) to be a debtor in a case under this title; or

**(B)** if the case under this title was filed in violation of a bankruptcy court order in a prior case under this title prohibiting the debtor from being a debtor in another case under this title;

**(22)** subject to subsection (l), under subsection (a)(3), of the continuation of any eviction, unlawful detainer action, or similar proceeding by a lessor against a debtor involving residential property in which the debtor resides as a tenant under a lease or rental agreement and with respect to which the lessor has obtained before the date of the filing of the bankruptcy petition, a judgment for possession of such property against the debtor;

**(23)** subject to subsection (m), under subsection (a)(3), of an eviction action that seeks possession of the residential property in which the debtor resides as a tenant under a lease or rental agreement based on endangerment of such property or the illegal use of controlled substances on such property, but only if the lessor files with the court, and serves upon the debtor, a certification under penalty of perjury that such an eviction action has been filed, or that

the debtor, during the 30-day period preceding the date of the filing of the certification, has endangered property or illegally used or allowed to be used a controlled substance on the property;

**(24)** under subsection (a), of any transfer that is not avoidable under section 544 and that is not avoidable under section 549;

**(25)** under subsection (a), of--

**(A)** the commencement or continuation of an investigation or action by a securities self regulatory organization to enforce such organization's regulatory power;

**(B)** the enforcement of an order or decision, other than for monetary sanctions, obtained in an action by such securities self regulatory organization to enforce such organization's regulatory power; or

**(C)** any act taken by such securities self regulatory organization to delist, delete, or refuse to permit quotation of any stock that does not meet applicable regulatory requirements;

**(26)** under subsection (a), of the setoff under applicable nonbankruptcy law of an income tax refund, by a governmental unit, with respect to a taxable period that ended before the date of the order for relief against an income tax liability for a taxable period that also ended before the date of the order for relief, except that in any case in which the setoff of an income tax refund is not permitted under applicable nonbankruptcy law because of a pending action to determine the amount or legality of a tax liability, the governmental unit may hold the refund pending the resolution of the action, unless the court, on the motion of the trustee and after notice and a hearing, grants the taxing authority adequate protection (within the meaning of section 361) for the secured claim of such authority in the setoff under section 506(a);

**(27)** under subsection (a) of this section, of the exercise by a master netting agreement participant of any contractual right (as defined in section 555, 556, 559, or 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any master netting agreement, or of any contractual right (as defined in section 555, 556, 559, or 560) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such master netting agreements to the extent that such participant is eligible to exercise such rights under paragraph (6), (7), or (17) for each individual contract covered by the master netting agreement in issue; and

**(28)** under subsection (a), of the exclusion by the Secretary of Health and Human Services of the debtor from participation in the medicare program or any other Federal health care program (as defined in section 1128B(f) of the Social Security Act pursuant to title XI or XVIII of such Act).

The provisions of paragraphs (12) and (13) of this subsection shall apply with respect to any such petition filed on or before December 31, 1989.

**(c)** Except as provided in subsections (d), (e), (f), and (h) of this section--

(1) the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate;

(2) the stay of any other act under subsection (a) of this section continues until the earliest of--

(A) the time the case is closed;

(B) the time the case is dismissed; or

(C) if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied;

(3) if a single or joint case is filed by or against a debtor who is an individual in a case under chapter 7, 11, or 13, and if a single or joint case of the debtor was pending within the preceding 1-year period but was dismissed, other than a case refiled under a chapter other than chapter 7 after dismissal under section 707(b)--

(A) the stay under subsection (a) with respect to any action taken with respect to a debt or property securing such debt or with respect to any lease shall terminate with respect to the debtor on the 30th day after the filing of the later case;

(B) on the motion of a party in interest for continuation of the automatic stay and upon notice and a hearing, the court may extend the stay in particular cases as to any or all creditors (subject to such conditions or limitations as the court may then impose) after notice and a hearing completed before the expiration of the 30-day period only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed; and

(C) for purposes of subparagraph (B), a case is presumptively filed not in good faith (but such presumption may be rebutted by clear and convincing evidence to the contrary)--

(i) as to all creditors, if--

(I) more than 1 previous case under any of chapters 7, 11, and 13 in which the individual was a debtor was pending within the preceding 1-year period;

(II) a previous case under any of chapters 7, 11, and 13 in which the individual was a debtor was dismissed within such 1-year period, after the debtor failed to--

(aa) file or amend the petition or other documents as required by this title or the court without substantial excuse (but mere inadvertence or negligence shall not be a substantial excuse unless the dismissal was caused by the negligence of the debtor's attorney);

**(bb)** provide adequate protection as ordered by the court; or

**(cc)** perform the terms of a plan confirmed by the court; or

**(III)** there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the next most previous case under chapter 7, 11, or 13 or any other reason to conclude that the later case will be concluded--

**(aa)** if a case under chapter 7, with a discharge; or

**(bb)** if a case under chapter 11 or 13, with a confirmed plan that will be fully performed; and

**(ii)** as to any creditor that commenced an action under subsection (d) in a previous case in which the individual was a debtor if, as of the date of dismissal of such case, that action was still pending or had been resolved by terminating, conditioning, or limiting the stay as to actions of such creditor; and

**(4)(A)(i)** if a single or joint case is filed by or against a debtor who is an individual under this title, and if 2 or more single or joint cases of the debtor were pending within the previous year but were dismissed, other than a case refiled under a chapter other than chapter 7 after dismissal under section 707(b), the stay under subsection (a) shall not go into effect upon the filing of the later case; and

**(ii)** on request of a party in interest, the court shall promptly enter an order confirming that no stay is in effect;

**(B)** if, within 30 days after the filing of the later case, a party in interest requests the court may order the stay to take effect in the case as to any or all creditors (subject to such conditions or limitations as the court may impose), after notice and a hearing, only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed;

**(C)** a stay imposed under subparagraph (B) shall be effective on the date of the entry of the order allowing the stay to go into effect; and

**(D)** for purposes of subparagraph (B), a case is presumptively filed not in good faith (but such presumption may be rebutted by clear and convincing evidence to the contrary)--

**(i)** as to all creditors if--

**(I)** 2 or more previous cases under this title in which the individual was a debtor were pending within the 1-year period;

**(II)** a previous case under this title in which the individual was a debtor was dismissed within the time period stated in this paragraph after the debtor failed to file or amend the petition or other documents as required by this title or the court without substantial excuse (but mere inadvertence or negligence shall not be substantial excuse unless the dismissal was caused by the negligence of the debtor's attorney), failed to provide adequate protection as ordered by the court, or failed to perform the terms of a plan confirmed by the court; or

**(III)** there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the next most previous case under this title, or any other reason to conclude that the later case will not be concluded, if a case under chapter 7, with a discharge, and if a case under chapter 11 or 13, with a confirmed plan that will be fully performed; or

**(ii)** as to any creditor that commenced an action under subsection (d) in a previous case in which the individual was a debtor if, as of the date of dismissal of such case, such action was still pending or had been resolved by terminating, conditioning, or limiting the stay as to such action of such creditor.

**(d)** On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--

**(1)** for cause, including the lack of adequate protection of an interest in property of such party in interest;

**(2)** with respect to a stay of an act against property under subsection (a) of this section, if--

**(A)** the debtor does not have an equity in such property; and

**(B)** such property is not necessary to an effective reorganization;

**(3)** with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later--

**(A)** the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

**(B)** the debtor has commenced monthly payments that--

**(i)** may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

**(ii)** are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate; or

**(4)** with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved either--

**(A)** transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or

**(B)** multiple bankruptcy filings affecting such real property.

If recorded in compliance with applicable State laws governing notices of interests or liens in real property, an order entered under paragraph (4) shall be binding in any other case under this title purporting to affect such real property filed not later than 2 years after the date of the entry of such order by the court, except that a debtor in a subsequent case under this title may move for relief from such order based upon changed circumstances or for good cause shown, after notice and a hearing. Any Federal, State, or local governmental unit that accepts notices of interests or liens in real property shall accept any certified copy of an order described in this subsection for indexing and recording.

**(e)(1)** Thirty days after a request under subsection (d) of this section for relief from the stay of any act against property of the estate under subsection (a) of this section, such stay is terminated with respect to the party in interest making such request, unless the court, after notice and a hearing, orders such stay continued in effect pending the conclusion of, or as a result of, a final hearing and determination under subsection (d) of this section. A hearing under this subsection may be a preliminary hearing, or may be consolidated with the final hearing under subsection (d) of this section. The court shall order such stay continued in effect pending the conclusion of the final hearing under subsection (d) of this section if there is a reasonable likelihood that the party opposing relief from such stay will prevail at the conclusion of such final hearing. If the hearing under this subsection is a preliminary hearing, then such final hearing shall be concluded not later than thirty days after the conclusion of such preliminary hearing, unless the 30-day period is extended with the consent of the parties in interest or for a specific time which the court finds is required by compelling circumstances.

**(2)** Notwithstanding paragraph (1), in a case under chapter 7, 11, or 13 in which the debtor is an individual, the stay under subsection (a) shall terminate on the date that is 60 days after a request is made by a party in interest under subsection (d), unless--

**(A)** a final decision is rendered by the court during the 60-day period beginning on the date of the request; or

**(B)** such 60-day period is extended--

**(i)** by agreement of all parties in interest; or

**(ii)** by the court for such specific period of time as the court finds is required for good cause, as described in findings made by the court.

**(f)** Upon request of a party in interest, the court, with or without a hearing, shall grant such relief from the stay provided under subsection (a) of this section as is necessary to prevent irreparable damage to the interest of an entity in property, if such interest will suffer such damage before there is an opportunity for notice and a hearing under subsection (d) or (e) of this section.

**(g)** In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section--

  **(1)** the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

  **(2)** the party opposing such relief has the burden of proof on all other issues.

**(h)(1)** In a case in which the debtor is an individual, the stay provided by subsection (a) is terminated with respect to personal property of the estate or of the debtor securing in whole or in part a claim, or subject to an unexpired lease, and such personal property shall no longer be property of the estate if the debtor fails within the applicable time set by section 521(a)(2)--

  **(A)** to file timely any statement of intention required under section 521(a)(2) with respect to such personal property or to indicate in such statement that the debtor will either surrender such personal property or retain it and, if retaining such personal property, either redeem such personal property pursuant to section 722, enter into an agreement of the kind specified in section 524(c) applicable to the debt secured by such personal property, or assume such unexpired lease pursuant to section 365(p) if the trustee does not do so, as applicable; and

  **(B)** to take timely the action specified in such statement, as it may be amended before expiration of the period for taking action, unless such statement specifies the debtor's intention to reaffirm such debt on the original contract terms and the creditor refuses to agree to the reaffirmation on such terms.

**(2)** Paragraph (1) does not apply if the court determines, on the motion of the trustee filed before the expiration of the applicable time set by section 521(a)(2), after notice and a hearing, that such personal property is of consequential value or benefit to the estate, and orders appropriate adequate protection of the creditor's interest, and orders the debtor to deliver any collateral in the debtor's possession to the trustee. If the court does not so determine, the stay provided by subsection (a) shall terminate upon the conclusion of the hearing on the motion.

**(i)** If a case commenced under chapter 7, 11, or 13 is dismissed due to the creation of a debt repayment plan, for purposes of subsection (c)(3), any subsequent case commenced by the debtor under any such chapter shall not be presumed to be filed not in good faith.

**(j)** On request of a party in interest, the court shall issue an order under subsection (c) confirming that the automatic stay has been terminated.

**(k)(1)** Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

**(2)** If such violation is based on an action taken by an entity in the good faith belief that subsection (h) applies to the debtor, the recovery under paragraph (1) of this subsection against such entity shall be limited to actual damages.

**(l)(1)** Except as otherwise provided in this subsection, subsection (b) (22) shall apply on the date that is 30 days after the date on which the bankruptcy petition is filed, if the debtor files with the petition and serves upon the lessor a certification under penalty of perjury that--

**(A)** under nonbankruptcy law applicable in the jurisdiction, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after that judgment for possession was entered; and

**(B)** the debtor (or an adult dependent of the debtor) has deposited with the clerk of the court, any rent that would become due during the 30-day period after the filing of the bankruptcy petition.

**(2)** If, within the 30-day period after the filing of the bankruptcy petition, the debtor (or an adult dependent of the debtor) complies with paragraph (1) and files with the court and serves upon the lessor a further certification under penalty of perjury that the debtor (or an adult dependent of the debtor) has cured, under nonbankruptcy law applicable in the jurisdiction, the entire monetary default that gave rise to the judgment under which possession is sought by the lessor, subsection (b)(22) shall not apply, unless ordered to apply by the court under paragraph (3).

**(3)(A)** If the lessor files an objection to any certification filed by the debtor under paragraph (1) or (2), and serves such objection upon the debtor, the court shall hold a hearing within 10 days after the filing and service of such objection to determine if the certification filed by the debtor under paragraph (1) or (2) is true.

**(B)** If the court upholds the objection of the lessor filed under subparagraph (A)--

**(i)** subsection (b)(22) shall apply immediately and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; and

**(ii)** the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the court's order upholding the lessor's objection.

**(4)** If a debtor, in accordance with paragraph (5), indicates on the petition that there was a judgment for possession of the residential rental property in which the debtor resides and does not file a certification under paragraph (1) or (2)--

**(A)** subsection (b)(22) shall apply immediately upon failure to file such certification, and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; and

**(B)** the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the docket indicating the absence of a filed certification and the applicability of the exception to the stay under subsection (b)(22).

**(5)(A)** Where a judgment for possession of residential property in which the debtor resides as a tenant under a lease or rental agreement has been obtained by the lessor, the debtor shall so indicate on the bankruptcy petition and shall provide the name and address of the lessor that obtained that pre-petition judgment on the petition and on any certification filed under this subsection.

**(B)** The form of certification filed with the petition, as specified in this subsection, shall provide for the debtor to certify, and the debtor shall certify--

**(i)** whether a judgment for possession of residential rental housing in which the debtor resides has been obtained against the debtor before the date of the filing of the petition; and

**(ii)** whether the debtor is claiming under paragraph (1) that under nonbankruptcy law applicable in the jurisdiction, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after that judgment of possession was entered, and has made the appropriate deposit with the court.

**(C)** The standard forms (electronic and otherwise) used in a bankruptcy proceeding shall be amended to reflect the requirements of this subsection.

**(D)** The clerk of the court shall arrange for the prompt transmittal of the rent deposited in accordance with paragraph (1)(B) to the lessor.

**(m)(1)** Except as otherwise provided in this subsection, subsection (b) (23) shall apply on the date that is 15 days after the date on which the lessor files and serves a certification described in subsection (b)(23).

**(2)(A)** If the debtor files with the court an objection to the truth or legal sufficiency of the certification described in subsection (b)(23) and serves such objection upon the lessor, subsection (b)(23) shall not apply, unless ordered to apply by the court under this subsection.

**(B)** If the debtor files and serves the objection under subparagraph (A), the court shall hold a hearing within 10 days after the filing and service of such objection to determine if the situation giving rise to the lessor's certification under paragraph (1) existed or has been remedied.

**(C)** If the debtor can demonstrate to the satisfaction of the court that the situation giving rise to the lessor's certification under paragraph (1) did not exist or has been remedied, the stay provided under subsection (a)(3) shall remain in effect until the termination of the stay under this section.

**(D)** If the debtor cannot demonstrate to the satisfaction of the court that the situation giving rise to the lessor's certification under paragraph (1) did not exist or has been remedied--

**(i)** relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to proceed with the eviction; and

**(ii)** the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the court's order upholding the lessor's certification.

**(3)** If the debtor fails to file, within 15 days, an objection under paragraph (2)(A)--

**(A)** subsection (b)(23) shall apply immediately upon such failure and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; and

**(B)** the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the docket indicating such failure.

**(n)(1)** Except as provided in paragraph (2), subsection (a) does not apply in a case in which the debtor--

**(A)** is a debtor in a small business case pending at the time the petition is filed;

**(B)** was a debtor in a small business case that was dismissed for any reason by an order that became final in the 2-year period ending on the date of the order for relief entered with respect to the petition;

**(C)** was a debtor in a small business case in which a plan was confirmed in the 2-year period ending on the date of the order for relief entered with respect to the petition; or

**(D)** is an entity that has acquired substantially all of the assets or business of a small business debtor described in subparagraph (A), (B), or (C), unless such entity establishes by a preponderance of the evidence that such entity acquired substantially all of the assets or business of such small business debtor in good faith and not for the purpose of evading this paragraph.

**(2)** Paragraph (1) does not apply--

**(A)** to an involuntary case involving no collusion by the debtor with creditors; or

**(B)** to the filing of a petition if--

**(i)** the debtor proves by a preponderance of the evidence that the filing of the petition resulted from circumstances beyond the control of the debtor not foreseeable at the time the case then pending was filed; and

**(ii)** it is more likely than not that the court will confirm a feasible plan, but not a liquidating plan, within a reasonable period of time.

**(o)** The exercise of rights not subject to the stay arising under subsection (a) pursuant to paragraph (6), (7), (17), or (27) of subsection (b) shall not be stayed by any order of a court or administrative agency in any proceeding under this title.

**CREDIT(S)**

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2570; Pub.L. 97-222, § 3, July 27, 1982, 96 Stat. 235; Pub.L. 98-353, Title III, §§ 304, 363(b), 392, 441, July 10, 1984, 98 Stat. 352, 363, 365, 371; Pub.L. 99-509, Title V, § 5001(a), Oct. 21, 1986, 100 Stat. 1911; Pub.L. 99-554, Title II, §§ 257(j), 283(d), Oct. 27, 1986, 100 Stat. 3115, 3116; Pub.L. 101-311, Title I, § 102, Title II, § 202, June 25, 1990, 104 Stat. 267, 269; Pub.L. 101-508, Title III, § 3007(a)(1), Nov. 5, 1990, 104 Stat. 1388-28; Pub.L. 103-394, Title I, §§ 101, 116, Title II, §§ 204(a), 218(b), Title III, § 304(b), Title IV, § 401, Title V, § 501(b)(2), (d) (7), Oct. 22, 1994, 108 Stat. 4107, 4119, 4122, 4128, 4132, 4141, 4142, 4144; Pub.L. 105-277, Div. I, Title VI, § 603, Oct. 21, 1998, 112 Stat. 2681-886; Pub.L. 109-8, Title I, § 106(f), Title II, §§ 214, 224(b), Title III, §§ 302, 303, 305(1), 311, 320, Title IV, §§ 401(b), 441, 444, Title VII, §§ 709, 718, Title IX, § 907(d), (o)(1), (2), Title XI, § 1106, Title XII, § 1225, Apr. 20, 2005, 119 Stat. 41, 54, 64, 75, 77, 79, 84, 94, 104, 114, 117, 127, 131, 176, 181, 182, 192, 199; Pub.L. 109-304, § 17(b)(1), Oct. 6, 2006, 120 Stat. 1706; Pub.L. 109-390, § 5(a)(2), Dec. 12, 2006, 120 Stat. 2696; Pub.L. 111-327, § 2(a) (12), Dec. 22, 2010, 124 Stat. 3558.)

Notes of Decisions (5945)

11 U.S.C.A. § 362, 11 USCA § 362
Current through P.L. 114-219.

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit I



**BBWG**

# Belkin Burden Wenig & Goldman, LLP

A T T O R N E Y S   A T   L A W

270 Madison Avenue
New York, NY 10016
Tel 212. 867. 4466
Fax 212. 297. 1859

495 Post Road East
Westport, CT 06880
Tel 203. 227. 1534
Fax 203. 227. 6044

www.bbwg.com

Jeffrey L. Goldman
*Partner*
212. 867. 4466 Ext 312
jgoldman@bbwg.com

August 16, 2016

**BY HAND**

John Z. Wang, Esq.
Court Attorney to Hon. Anthony Cannataro
Supervising Judge, Civil Court
111 Centre Street, Room 838
New York, New York 10013

> Re: PPF Off Two Park Avenue Owner LLC
> v. Artisanal Fromagerie & Bistro LLC
> Index No. L&T 50707/2016

Dear Mr. Wang:

I am writing in response to Petitioner's counsel's letter dated August 16, 2016. If Petitioner wants relief from the stay, the appropriate remedy is a motion before the Bankruptcy Court, not a letter writing campaign to the Civil Court.

Petitioner has its remedy before Bankruptcy Court and asking this Court by letter, without a motion, to determine bankruptcy issues is improper. A copy of this letter is being sent to bankruptcy counsel for Respondent.

Respectfully submitted,

Jeffrey L. Goldman

Jeffrey L. Goldman

cc:   **BY HAND**
Robinson Brog Leinwand Greene
Genovese & Gluck, P.C.
Attn. A. Mitchell Greene, Esq.
875 Third Avenue, 9th Floor
New York, New York 10022

Gregg L. Weiner, Esq.
Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Attorneys for Petitioner

JGOLDMAN/11860.0001/1922065

# **Exhibit J**


ROPES & GRAY LLP
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704
WWW.ROPESGRAY.COM

Gregg L. Weiner
T +1 212 596 9396
F +1 646 728 2759
gregg.weiner@ropesgray.com

August 17, 2016

**BY HAND**

John Wang, Esq.
Law Clerk for The Honorable Anthony Cannataro
Civil Court of the City of New York,
County of New York: Non-Housing Part 52
111 Centre Street
New York, NY 10013-4390

Re:    PPF OFF Two Park Avenue Owner, LLC v. Artisanal Fromagerie & Bistro, LLC, L&T
       Index No: 50707/2016

Dear Mr. Wang:

I write in response to Respondent's letter of August 16, 2016.

Contrary to Mr. Goldman's claim, there is nothing "improper" in advising this Court that there is no
automatic stay barring issuance of the warrant of eviction pursuant to the express terms of the
Bankruptcy Code. Indeed,

> *[i]t is "not necessary for a landlord to move in the Bankruptcy*
> *Court to vacate the automatic stay when the Debtor has*
> *possession under a lease that has been terminated by the*
> *expiration of the stated term"*[;]. . . [rather,] a landlord may do
> "whatever is necessary and appropriate under state law to obtain
> possession of the formerly leased property."

*Fitz & Pal, Inc. v. Int'l Pipe Fabrication, L.L.C.*, 188 Misc. 2d 687, 691 (Dist. Ct. Nassau Cty.
2001) (emphasis added) (quoting *In re Neville*, 118 B.R. 14, 18 (Bankr. E.D.N.Y. 1990)) (holding
that, under Section 362(b)(10), automatic stay resulting from commercial tenant's chapter 11 filing
did not apply to summary holdover proceeding where lease had expired by its terms and landlord
was entitled to judgment of possession and warrant of eviction. *See also* N.Y. Prac., Landlord and
Tenant Practice in New York § 20:294 (2015) ("There is no stay against landlord's obtaining
possession of the premises once a commercial lease expires, whether such expiration occurs before
or after commencement of the bankruptcy proceedings. This protection ensures that a tenant's

John Wang, Esq.                          - 2 -                          August 17, 2016

bankruptcy will not be used to extend a commercial lease's term . . . ."). Thus, Petitioner is entitled to proceed immediately to obtain the warrant of eviction that the Court held in its August 10, 2016 decision "shall issue forthwith." Decision & Order, dated Aug. 10, 2016 at 8.

Petitioner reiterates its request for an immediate conference to address any remaining dispute regarding Respondent's erroneous claim as to the applicability of the stay.

Respectfully submitted,

*[signature]*

Gregg L. Weiner

cc:      Jeffrey L. Goldman